# EXHIBIT A

John D. Dillow, Bar No. 50403
JDillow@perkinscoie.com
Julie L. Hussey, Bar No. 237711
JHussey@perkinscoie.com
Julian Feldbein-Vinderman, Bar No. 307838
JFeldbeinVinderman@perkinscoie.com
PERKINS COIE LLP
11452 El Camino Real, Suite 300
San Diego, CA 92130-2594
Telephone: 858.720.5700
Facsimile: 858.720.5799

Attorneys for Defendant and Third-Party
Plaintiff The Boeing Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE BOEING COMPANY, a Delaware Corporation,<br><br>           Third-Party Plaintiff,<br><br>   v.<br><br>GSSL, INC. d/b/a NEAR SPACE CORPORATION, an Oregon corporation,<br><br>           Third-Party Defendant.<br>_____<br>TIMOTHY LACHENMEIER, an individual; and KRISTEN LACHENMEIER, an individual<br><br>           Plaintiffs,<br><br>   v.<br><br>THE BOEING COMPANY, a Delaware Corporation, BOEING DEFENSE, SPACE & SECURITY, and DOES 1-10,<br><br>           Defendants. | Case No. 8:20-cv-02206-JVS (JDEx)<br><br>**THE BOEING COMPANY'S THIRD-PARTY COMPLAINT FOR TOTAL EQUITABLE INDEMNITY, COMPARATIVE INDEMNITY, EQUITABLE APPORTIONMENT OF FAULT, AND CONTRACTUAL INDEMNITY**<br><br>Judge: Hon. James V. Selna |

Third-Party Plaintiff The Boeing Company ("Boeing") brings this Third-Party Complaint against Third-Party Defendant GSSL, Inc. d/b/a Near Space Corporation ("NSC"), and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy is between a third-party plaintiff and a third-party defendant which are residents of different states, and the amount in controversy exceeds $75,000, exclusive of interests and costs. Alternatively, this Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) and (b), because the claim alleged herein is so related to the claim in the underlying action, over which this Court has original jurisdiction, that it forms part of the same case or controversy under Article III of the United States Constitution, and because the claim alleged herein is asserted by a party other than plaintiffs. This is also a proper action, under 28 U.S.C. § 2201, for the issuance of a declaratory judgment as prayed for herein by Boeing.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2), because it is located in a judicial district where a substantial part of the events or omissions giving rise to the claim occurred. In addition, venue is proper in this Court pursuant to federal case law regarding impleader under Federal Rule of Civil Procedure 14(a), because the underlying action was brought in this Court.

## PARTIES

3. Boeing is now, and at all times mentioned in this Third-Party Complaint was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Illinois.

4. GSSL, Inc. d/b/a Near Space Corporation is now, and at all times mentioned in this Third-Party Complaint was, a corporation organized and existing under the laws of the State of Oregon, with its principal place of business in Oregon.

**GENERAL ALLEGATIONS**

5.     Boeing has been named as a defendant in the civil action captioned *Lachenmeier v. The Boeing Company et al.*, Case No. 8:20-cv-02206-JVS (JDEx), which was filed on November 12, 2020, in the U.S. District Court for the Central District of California (the "Underlying Action").

6.     Plaintiffs in the Underlying Action are Timothy and Kristin Lachenmeier, who at all times relevant to this Third-Party Complaint were executive officers of NSC. Plaintiffs allege that Boeing is liable for personal injuries that Mr. Lachenmeier allegedly sustained on March 27, 2017 (the "Accident") while conducting aviation operations, namely a Parachute System Qualification Test balloon drop ("PSQT"), at Spaceport America near Truth or Consequences, New Mexico.

7.     At the time of the Accident, Mr. Lachenmeier was the President and Chief Technical Officer of NSC as well as the Launch Director for the PSQT during which the Accident occurred.  As part of his supervisory role, Mr. Lachenmeier was closely involved in the design and execution of the PSQT, including determining the positioning of and selection of any ladders used therein.

8.     Plaintiffs in the Underlying Action allege that at the time of the Accident, Kristin Lachenmeier was the Chief Financial Officer of NSC.

9.     Without admitting any of the allegations made in the Underlying Action, Boeing refers to, and hereby incorporates by reference, the complaint filed in that matter.  A true and correct copy of the complaint in the Underlying Action is attached hereto as **Exhibit A** (the "Underlying Complaint"). The Underlying Complaint is incorporated by reference for the sole purpose of setting forth its allegations.

10.     Following the Accident, a joint root cause analysis conducted by Boeing and NSC determined that a NSC hardware failure caused an ungrounded spark to prematurely activate a pyrotechnic cutter that severed one of the restraints

-3-

that had been securing the BP-4 and caused the ladder that Mr. Lachenmeier had been standing on to be knocked backwards. The resulting motion forced Mr. Lachenmeier to fall off the ladder and he sustained a fracture to his right leg in the ensuing fall. Despite receiving medical treatment for his injuries, Mr. Lachenmeier ultimately required a below-the-knee-amputation of his right leg. The precipitating cause of the incident was the mechanical failure of a NSC aircraft product that resulted in bodily injury to Mr. Lachenmeier. NSC is legally responsible to Boeing for losses arising from NSC's aircraft product.

11.    At the time of the Accident, NSC's personnel, including Timothy Lachenmeier, had entered upon and were performing work at Spaceport America that was under Boeing's control for purposes of completing the PSQT which was conducted pursuant to a GP2 (Fixed Price Services Contract – Commercial) (the "GP2 Services Agreement") between NSC and Boeing. NSC entered into the GP2 Services Agreement with Boeing in California.   A true and correct copy of the GP2 Services Agreement is attached hereto as **Exhibit B**.

12.    Section 40 of the GP2 Services Agreement provides, in relevant part:

40.    **INDEMNIFICATION, INSURANCE AND PROTECTION OF PROPERTY**.  The following provisions shall only apply if and to the extent Seller's personnel enter or perform work at premises owned or controlled by Buyer or Buyer's customer:

a.    <u>Indemnification</u>.  Seller shall defend, indemnify and hold harmless The Boeing Company, its subsidiaries, and their directors, officers, employees and agents from and against all actions, causes of action, liabilities, claims, suits, judgments, liens, awards and damages of any kind and nature whatsoever for property damage, personal injury or death (including without limitation injury to or death of employees of Seller or any subcontractor thereof) and expenses, costs of litigation and counsel fees related thereto or incident to establishing the right to

-4-

indemnification, arising out of or in any way related to this Contract, the performance thereof by Seller or any subcontractor thereof or other third parties within the control or acting at the direction of Seller, or any of their respective employees (collectively for the purposes of this paragraph, the "Seller Parties"), including, without limitation, the provision of goods, services, personnel, facilities, equipment, support, supervision or review. The foregoing indemnity shall apply only to the extent of the negligence or willful misconduct of the Seller Parties that occurs while on premises owned or controlled by Buyer. In no event shall Seller's obligations hereunder be limited to the extent of any insurance available to or provided by Seller or any subcontractor thereof. Seller expressly waives any immunity under industrial insurance, whether arising out of statute or other source, to the extent of the indemnity set forth in this paragraph.

b. <u>Commercial General Liability</u>. Seller shall carry and maintain, and ensure that all subcontractors thereof carry and maintain, throughout the period when work is performed and until final acceptance by Buyer, Commercial General Liability insurance with available limits of not less than $2,000,000 per occurrence for bodily injury and property damage combined. Such insurance shall contain coverage for all premises and operations, broad form property damage, contractual liability (including, without limitation, that specifically assumed under paragraph a herein) and goods and completed-operations insurance with limits of not less than $1,000,000 per occurrence for a minimum of twenty-four (24) months after final acceptance of the work by Buyer. Such insurance shall not be maintained on a per-project basis unless the respective Seller or subcontractor thereof does not have blanket coverage.

13.     Boeing delegated any duty it may have had to address known safety hazards related to the PSQT launch to NSC which had a duty to ensure the safety of its own executive officers through the implementation of reasonable safety precautions.  NSC and Timothy Lachennmeier each breached that duty, and the Accident occurred due to NSC's and Timothy Lachennmeier's concurrent negligent and tortious conduct, which was the proximate cause of the injuries and damages alleged in the Underlying Action.  Under the GP2 Services Agreement, NSC is required to indemnify Boeing for NSC's and/or Timothy Lachenmeier's negligence.

14.     NSC's negligence also resulted in various breaches of the GP2 Services Agreement, which NSC is required to indemnify. These breaches include, but are not limited to: (1) NSC's failure to establish and maintain an acceptable quality control system and allow Boeing to adequately review NSC's procedures, practices, processes and related documents to determine such acceptability (Section 13); (2) NSC's failure to notify Boeing in writing "when discrepancies in [NSC's] process, including any violation of or deviation from NSC's approved inspection/quality control system, or goods/materials are discovered or suspected which may affect the Services delivered or to be delivered under this [GP2 Services Agreement]" (Section 14); (3) failure to perform the services in a manner that was warranted to be "free from defects in workmanship and conform to the requirements of [the GP2 Services Agreement]" (Section 17); and (4) NSC's failure to ensure that it and any subcontractor, use suitable precautions to prevent damage to Boeing's property, and promptly and equitably reimburse Boeing for such damage or repair that is caused by NSC's or its subcontractor's negligence (Section 40(g)).  Even in the absence of the GP2 Services Agreement, NSC would be legally liable to Boeing for such actions.

15.     On December 14, 2020, Boeing tendered its defense and indemnity related to the Underlying Action to NSC (the "Indemnification Letter").  On December 28, 2020, NSC denied Boeing's tender in its entirety.

/ / /

16.     Boeing is informed and believes and thereon alleges that at all times relevant herein, NSC was protected by insurance that covered losses or damages arising from (or caused by) a products/completed operations hazard or other bodily injury-related losses involving an NSC officer for which NSC has assumed the tort liability of Boeing and/or would be liable to Boeing for even in the absence of the GP2 Services Agreement.

17.     Boeing herein denies that any of its own acts or omissions, or those of its agents, employees, or representatives, caused or contributed to the injuries and damages the plaintiffs in the Underlying Action allegedly sustained.

18.     Boeing has not been negligent and is not responsible in any manner whatsoever for the Accident discussed herein, or for the injuries and damages alleged in the Underlying Action.

## FIRST CLAIM FOR RELIEF

### (Total Equitable Indemnity Against Near Space Corporation)

19.     Boeing incorporates by reference paragraphs l through 18 as if fully set forth herein.

20.     If Boeing is held liable and responsible to the plaintiffs in the Underlying Action for any damages alleged in the Underlying Complaint, any such liability would be due to the tortious conduct of NSC and Timothy Lachenmeier, for which NSC is liable. NSC should therefore completely indemnify Boeing.

21.     Boeing is entitled, at a minimum, to an adjudication of its share of legal responsibility, if any, for the damages alleged in the Underlying Complaint, as well as each defendant's respective share. On the basis of such adjudication, Boeing is entitled to be indemnified, at a minimum, on the basis of comparative/partial indemnity principles applied by, between, and among Boeing, NSC, and Timothy Lachenmeier.

/ / /

/ / /

-7-

## SECOND CLAIM FOR RELIEF

### (Comparative Indemnity Against Near Space Corporation)

22.    Boeing incorporates by reference paragraphs l through 21 as if fully set forth herein.

23.    If it is determined that Boeing is liable to the plaintiffs in the Underlying Action for the losses, damages, or injuries alleged in the Underlying Complaint, Boeing is entitled to indemnification from NSC for that portion of the judgment in the Underlying Action attributable to the percentage of the comparative fault assessed or assessable against NSC and/or Timothy Lachenmeier.

## THIRD CLAIM FOR RELIEF

### (Equitable Apportionment of Fault Against Near Space Corporation)

24.    Boeing incorporates by reference paragraphs l through 23 as if fully set forth herein.

25.    By reason of the foregoing, Boeing is entitled, at a minimum, to a declaration of this Court with respect to the relative proportion of negligence, fault, and/or other liability of NSC and Timothy Lachenmeier which proximately caused and/or contributed to any loss, damage, or injury alleged in the Underlying Action.

## FOURTH CLAIM FOR RELIEF

### (Contractual Indemnity Against Near Space Corporation)

26.    Boeing incorporates by reference paragraphs l through 25 as if fully set forth herein.

27.    Boeing contends that it was in no way legally responsible for the losses, damages, or injuries alleged in the Underlying Complaint. NSC is obligated, under the terms of the GP2 Services Agreement, to indemnify and defend Boeing for the attorneys' fees and expenses incurred in defending this action and for any damages for which Boeing is found liable.

28.    NSC's refusal to accept Boeing's tender and defend and indemnify Boeing related to the plaintiffs' claims in the Underlying Action is a breach of a

-8-

material term of the GP2 Services Agreement which has damaged, and continues to damage, Boeing in an amount to be determined at trial.

29.     As a result of NSC's continuing breach of the GP2 Services Agreement, Boeing has suffered and will continue to suffer irreparable harm, for which it has no adequate remedy at law, thus entitling it to injunctive relief.

**WHEREFORE,** Boeing requests the following:

1.     An adjudication that any responsibility and/or liability determined to exist for the damages alleged in the Underlying Complaint is the result of the primary and/or active negligence and/or otherwise tortious misconduct of NSC, and only the secondary and/or passive negligence and/or derivative negligence of Boeing;

2.     An adjudication that NSC is obligated to defend Boeing against the claims brought by the plaintiffs in the Underlying Action, to reimburse Boeing for the necessary and reasonable attorneys' fees, expenses, and court costs it incurs in defending against the claims brought by the plaintiffs in the Underlying Action, and to indemnify Boeing for all sums that it may be compelled to pay the plaintiffs in the Underlying Action as a result of damages, judgments, settlement and/or other recovery;

3.     That in the event judgment is rendered in favor of the plaintiffs in the Underlying Action and against Boeing, on a finding that Boeing was negligent and/or otherwise responsible, the Court adjudge and decree that the negligent and/or other wrongful conduct of Boeing and NSC, or any of them, shall be apportioned, that the Court make the resulting judgment against the parties according to the apportioned negligence and/or other tortious misconduct, and that Boeing be awarded partial and comparative indemnification against NSC;

4.     A judgment against NSC, adjudicating that NSC is obligated to defend and indemnify Boeing and to pay the costs of suit herein and in the Underlying Action, including attorneys' fees;

-9-

5.     An award to Boeing for its costs of suit and its attorneys' fees and expenses; and

6.     An award to Boeing for any other and further relief that the Court may deem just and proper.

DATED:  February 26, 2021                **PERKINS COIE LLP**

By: _/s/ Julie L. Hussey_
     John D. Dillow, Bar No. 50403
     JDillow@perkinscoie.com
     Julie L. Hussey, Bar No. 237711
     JHussey@perkinscoie.com
     Julian Feldbein-Vinderman, Bar No. 307838
     JFeldbeinVinderman@perkinscoie.com

Attorneys for Defendants The Boeing Company
and Boeing, Defense, Space & Security

# EXHIBIT A

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| TIMOTHY LACHENMEIER, an individual, and KRISTEN LACHENMEIER, an individual,<br><br>_Plaintiff(s)_<br><br>v.<br><br>THE BOEING COMPANY, a Delaware Corporation, BOEING DEFENSE, SPACE & SECURITY, and DOES 1-10,<br><br>_Defendant(s)_ | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No. **2:20-cv-10363-SVW-JPR**

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_ THE BOEING COMPANY, a Delaware Corporation
BOEING DEFENSE, SPACE & SECURITY
c/o CSC - LAWYERS INCORPORATING SERVICE
2730 Gateway Oaks Drive
Sacramento, CA 95833

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: SEAN A. ANDRADE / HENRY H. GONZALEZ / ARTURO PADILLA
ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Telephone: (213) 986-3950
Facsimile: (213) 995-9696

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date: __11/16/2020__

_Signature of Clerk or Deputy Clerk_



**ANDRADE GONZALEZ LLP**
SEAN A. ANDRADE [SBN 223591]
sandrade@andradefirm.com
HENRY H. GONZALEZ [SBN 208419]
hgonzalez@andradefirm.com
ARTURO PADILLA [SBN 188902]
apadilla@andradefirm.com
634 South Spring Street, Top Floor
Los Angeles, California 90014
Telephone: (213) 986-3950
Facsimile: (213) 995-9696

Attorneys for Plaintiffs
TIMOTHY LACHENMEIER and KRISTEN LACHENMEIER

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY LACHENMEIER, an individual, and KRISTEN LACHENMEIER, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>THE BOEING COMPANY, a Delaware Corporation, BOEING DEFENSE, SPACE & SECURITY, and DOES 1-10,<br><br>Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>1. NEGLIGENCE<br><br>2. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br><br>3. LOSS OF CONSORTIUM<br><br>DEMAND FOR JURY TRIAL |

COMPLAINT AND DEMAND FOR JURY TRIAL

59

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950 Fax: (213) 985-9686

1  **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2      Plaintiffs TIMOTHY LACHENMEIER (hereinafter, "TIM" or "TIM

3  LACHENMEIER") and KRISTEN LACHENMEIER (hereinafter "KRISTEN" or

4  "KRISTEN LACHENMEIER") (collectively, the "LACHENMEIERS" or

5  "Plaintiffs"), by and through their attorneys, for causes of action against Defendants

6  THE BOEING COMPANY ("BOEING"), BOEING DEFENSE, SPACE &

7  SECURITY ("BDSS") and DOES 1-10 (collectively "Defendants"), hereby

8  complain and allege as follows:

9  <div align="center">**NATURE OF THE ACTION**</div>

10      1.    On March 27, 2017, TIM LACHENMEIER and Near Space

11  Corporation ("NSC"), a company that TIM founded, were working with BOEING

12  to conduct a high-altitude balloon drop for BOEING to test the parachute recovery

13  system on its new Starliner space capsule that would transport a crew to and from

14  the International Space Station.  Both Boeing and SpaceX have won prized

15  commercial contracts with NASA to carry personnel and research to the

16  International Space Station.  The March 27 test was one of a series of tests to

17  simulate space reentry by carrying BOEING's capsule to 40,000 feet with a helium

18  balloon and releasing it to test its parachutes as part of the recovery system under

19  the actual conditions it would encounter.

20      2.    For the March 27 test, BOEING and BDSS negligently failed to

21  implement proper safety measures, including, but not limited to, (a) failing to have

22  in place a capsule tie down system to prevent an inadvertent release of the capsule

23  prior to the time of launch which would expose anyone working near the vehicle to

24  substantial and potentially fatal harm, (b) providing to TIM and NSC an inadequate,

25  unsafe, and defective ladder that they knew could cause catastrophic injury,

26  including death or permanent total disability, if something went wrong while

27

28

<div align="center">1</div>

1   someone was using it to access the capsule, and (c) failing to provide an adequate

2   grounding system which could have prevented the freak ESD event.

3      3.    BOEING and BDSS knew or should have known that a capsule tie

4   down system would be required to prevent an inadvertent release of the capsule prior

5   to the time of launch which would expose anyone working near the vehicle to

6   substantial and potentially fatal harm. In addition, at least two years before the

7   March 27 test, BOEING and BDSS had banned the use of the type of ladder they

8   provided to TIM and NSC—which was very similar to the common ladders found

9   at a neighborhood hardware stores. BOEING's own Ladder Standard and Fall

10   Protection Guidelines from 2015 mandated using specially designed step platforms

11   with guardrails to safely access its capsules during launch preparations. The ladders

12   also violate the American National Standards Institute's Safety Code. In addition,

13   Boeing failed to provide an adequate grounding system which could have prevented

14   the freak ESD event.

15      4.    BOEING's and BDSS's negligence in providing a suitable capsule

16   restraint system along with their decision to ignore their own ladder safety standards

17   would cause TIM to suffer a catastrophic injury. At approximately 7:00 a.m. on

18   March 27, 2017, TIM was leaning over the top of the BP-4 test capsule, standing on

19   the access ladder that BOEING and BDSS had provided to make the final electronics

20   connections for the launch, when a freak accident occurred: as TIM plugged in the

21   capsule release cable, an electrostatic discharge caused one of the pyro activated

22   cutters to misfire, severing the primary restraint lines holding the balloon to the

23   ground. This static discharge sent the capsule hurling upwards instantly and the force

24   pushed the ladder TIM was standing on backwards and away from the capsule. With

25   no other choice, TIM tried to jump away to safety, but there was nowhere to go. His

26   right foot landed hard on the lowboy trailer on which the capsule was mounted, also

27   provided by Boeing, shattering his ankle, before being hit by the ladder and tumbling

28

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-9850  Fax: (213) 985-9686

2

61

1    backwards head over heels the rest of the way to the ground. TIM fell approximately

2    20 feet, knocking off his hard hat when hit by the ladder, and ultimately landing hard

3    on his neck, back, and hips.

4         5.    TIM would go on to suffer substantial physical and financial damages,

5    needlessly endure extreme pain and suffering from his resulting catastrophic injuries

6    and multiple surgeries, and, along with KRISTEN, enduring extreme emotional

7    distress from TIM being forced into a below-the-knee amputation of his right leg

8    that left him permanently disfigured or risk death. Defendants' reckless conduct left

9    the LACHENMEIERS with permanent physical and emotional scars and the

10    LACHENMEIERS therefore seek monetary and punitive damages for their

11    emotional distress and loss of consortium.

12         **JURISDICTION AND VENUE**

13         6.    Jurisdiction over this action is conferred on this Court pursuant to 28

14    U.S.C. § 1332. The parties are residents of different states and the amount in

15    controversy exceeds $75,000.00.

16         7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because the

17    acts, events, or omissions giving rise to Plaintiff's claims occurred in whole, or in

18    part, in the Central District of California.

19         **THE PARTIES**

20         8.    During relevant times, Plaintiffs TIM LACHENMEIER and KRISTEN

21    LACHENMEIER were husband and wife and residents of the state of Oregon.

22         9.    At all times mentioned herein, Plaintiff TIM LACHENMEIER was the

23    President of NSC, and was acting as the Launch Director of NSC.

24         10.    At all times mentioned herein, Plaintiff KRISTEN LACHENMEIER

25    was the Chief Financial Officer of NSC.

26

27

28

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950 Fax: (213) 985-9696

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950  Fax: (213) 985-8986

1        11.    Defendant BOEING is a corporation duly organized and existing under
2   the laws of the State of Delaware, with its headquarters and principal place of
3   business in Chicago, Illinois.

4        12.    Defendant BDSS is a business entity of unknown form, with its
5   headquarters in Arlington, Virginia.

6        13.    Plaintiffs are unaware of the true names and capacities, whether
7   individual, partnership, corporate, associate, or otherwise, of those Defendants sued
8   herein as DOES 1 through 10 (the "DOE Defendants") and, therefore, sues these
9   Defendants by fictitious names. The DOE Defendants include employees,
10  representatives, affiliates, and agents of the Defendants, and each of them, and at all
11  times herein relevant were acting within the scope and course of their employment
12  or agency with Defendants, and each of them and the acts and omissions of the DOE
13  Defendants were the proximate cause of the injuries and losses suffered by Plaintiffs.
14  Plaintiffs will amend this Complaint to allege the true names and capacities of the
15  DOE Defendants when ascertained.

16       14.    On or about March 22, 2019, Defendants entered into an agreement
17  with Plaintiffs, tolling the applicable Statute of Limitations until July 29, 2019 (the
18  "Tolling Agreement"). A true and correct copy of the March 22, 2019 Tolling
19  Agreement is attached hereto and incorporated herein by reference as Exhibit "A."

20       15.    The Tolling Agreement has been extended by written agreement of the
21  parties six separate times. The operative Sixth Amendment to the Tolling
22  Agreement, extending the tolling period to November 13, 2020, was executed by the
23  Defendants and Plaintiffs on July 2, 2020. A true and correct copy of the July 2,
24  2020, Sixth Amendment to the Tolling Agreement is attached hereto and
25  incorporated herein by reference as Exhibit "B."

26  / / /
27  / / /
28

4

16. Defendants' conduct, as alleged herein, was undertaken by its officers, directors, project engineers, and managing agents, who were responsible for corporate policies, underwriting, claims supervision and operational decisions, on behalf of the corporate Defendants. The corporate Defendants had advance knowledge of the actions and conduct of other employees, whose actions and conduct were ratified, authorized, and approved by the corporate Defendants.

17. The LACHENMEIERS are informed and believe, and based thereon allege that, at all times material hereto, each Defendant sued herein was the agent, servant, employer, employee, joint venturer, contractor, partner, owner, subsidiary, division, alias, and/or alter ego of each of the remaining Defendants and was, at all times, acting within the purpose and scope of such agency, employment, contract, ownership, subsidiary, alias, and/or alter ego and with the authority, consent, approval, control, influence, and ratification of each of the remaining Defendants sued herein.

## GENERAL ALLEGATIONS

18. In or around April 6, 2015, Defendants BOEING and BDSS' Commercial Crew Transportation System unit ("CCTS") in Huntington Beach, County of Orange, California, issued a purchase contract for services to NSC (the "Purchase Contract"). Under the Purchase Contract, NSC was to provide Parachute Development and Qualification Test Services as well as to conduct the Parachute Drop Test. NSC's invoices were to be submitted to Defendants' CCTS unit in Huntington Beach, California. The Purchase Contract was executed on April 8, 2015.

19. In the early morning of March 27, 2017, NSC conducted a Parachute System Qualification Balloon Test ("PSQT") at Spaceport America, New Mexico, pursuant to the Purchase Contract with Defendants. During the PSQT, Plaintiff TIM LACHENMEIER served as the Launch Director on behalf of NSC, and participated

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3850  Fax: (213) 995-9686

5

1   during several stages of the PSQT as required by the Purchase Contract. This

2   included making final connections prior to the PSQT launch, with, among other

3   lacking safety measures from Defendants, an inadequate grounding system, lack of

4   a capsule tie down system, and requiring Plaintiff TIM LACHENMEIER to lean

5   over the top of the BOEING BP-4 drop test vehicle (the "BP-4"), while standing on

6   an unsafe and/or defective access ladder supplied by Defendants (the "Ladder").

7      20.   At all relevant times Defendants had a duty under the Purchase Contract

8   to provide and maintain the work area and equipment in a safe condition and free of

9   defects, for NSC's use during the PSQT. In fact, Defendants' Purchase Contract

10   provided that material substitutions made by NSC, would be unauthorized and

11   prohibited, and Defendants maintained control.

12      21.   Pursuant to the Purchase Contract, Defendants provided the capsule,

13   the lowboy trailer on which the capsule was mounted, and the ladders required to

14   access the capsule from the ground. Boeing was also responsible for the all of the

15   ground support equipment for moving and securing the capsule prior to launch, but

16   failed to provide a sufficient capsule tie-down and grounding system. In addition,

17   the Defendants' ladders were inadequate, unsafe, and *knowingly* defective. At least

18   two years before the March 27 test, BOEING and BDSS had banned the use of the

19   type of ladder they provided to TIM and NSC because they knew it could cause

20   catastrophic injury, including death or permanent total disability, if something went

21   wrong while someone was using it to access the capsule.

22      22.   Further Defendants knew, or should have known, that implementing

23   other measures, including providing an adequate grounding system, a capsule tie

24   down system, and constraining the BP-4 capsule during pre-launch test activities,

25   would have prevented the accident.

26   ///

27   ///

28

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950  Fax: (213) 995-9696

6

23. BOEING and BDSS did not disclose to NSC, TIM, or KRISTEN that (i) they had banned the use of the type of ladder they provided to TIM and NSC, (ii) that BOEING's own Ladder Standard and Fall Protection Guidelines from 2015 mandated using specially designed step platforms with guardrails to safely access its capsules during launch preparations, or (iii) that the ladders they provided to TIM and NSC also violated the American National Standards Institute's Safety Code.

24. Plaintiffs are informed and believe, and on that basis allege, that at all relevant times Defendants negligently failed to comply with standards and guidelines for providing a safe working environment, tie-down system, grounding system, fall restraint, fall protection, and safe ladders which were intended to protect employees and contracted workers at test sites and other work areas against foreseeable harm including foreseeable injuries caused by the use of unsecured ladders which are prone to tipping over.

25. Plaintiffs are informed and believe, and on that basis allege, that while TIM LACHENMEIER was on the ladder making final connections, an electrostatic discharge caused one of the pyro activated cutters to misfire, severing the primary restraint lines holding the balloon to the ground. This static discharge sent the capsule hurling upwards instantly and the force pushed the ladder TIM was standing on backwards and away from the capsule. As a result of the rapid and forceful motion, the ladder pushed away from the BP-4, forcing TIM LACHENMEIER to jump off the ladder but with nowhere to go, his right foot landed hard on the low-boy trailer shattering his ankle, before being hit by the ladder and tumbling backwards head over heels the rest of the way to the ground. TIM fell a total of approximately 20 feet, knocking off his hard hat when hit by the ladder, and ultimately landing hard on his neck, back, and hips.

26. TIM LACHENMEIER's injuries as a result of Defendants' failure to implement proper safety measures, including failing to provide a capsule tie-down

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950  Fax: (213) 985-9896

7

66

system, an adequate grounding system, and his resulting fall from Defendants' ladder were so catastrophic that among other things, he suffered a severe comminuted closed tibia and fibula pilon fracture with multiple bone fragments. Unfortunately, despite numerous excruciating surgical and other medical procedures on his right leg, TIM LACHENMEIER ultimately needed and underwent a below-the-knee amputation of his right leg on July 3, 2017.

27. During TIM LACHENMEIER's numerous and painful medical procedures, his wife KRISTEN LACHENMEIER was by his side, caring for TIM's severe wounds, and watching her husband suffer relentless and on-going excruciating pain.

28. Plaintiffs' lives have been forever altered as a result of Defendants' negligence. TIM LACHENMEIER is no longer able to perform or fulfill his normal work activities and responsibilities. Moreover, TIM LACHENMEIER will require extensive and costly medical care for the remainder of his life as a result of Defendants' negligence and their reckless disregard for his health and safety, and that of other employees and contractors.

29. Defendants' conduct has further caused TIM LACHENMEIER to suffer loss of companionship with his wife, KRISTEN LACHENMEIER, including but not limited to companionship, comfort, care, assistance, society, and moral support.

30. At all relevant times, KRISTEN was present during TIM's medical treatment, surgeries, doctors' consultations, and when TIM was forced into a below-the-knee amputation of his right leg, or risk death, and cared for TIM's severe wounds, all of which caused her to suffer significant emotional distress, pain and suffering, which is continuous and ongoing. Defendants' negligence caused KRISTEN LACHENMEIER to suffer loss of companionship with her husband,

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950 Fax: (213) 995-9696

1  which is significant and ongoing, and includes, but is not limited to companionship,

2  comfort, care, assistance, society, and moral support.

### FIRST CAUSE OF ACTION
#### Negligence
#### (Tim Lachenmeier Against All Defendants)

5  31.  Plaintiffs reallege and incorporate each of the preceding and subsequent

6  paragraphs as though fully set forth herein.

7  32.  Defendants owed TIM LACHENMEIER a duty to act reasonably and

8  use due care when he was providing testing and other services within the scope of

9  the NSC's Purchase Contract with Defendants.

10  33.  Defendants breached their duty to TIM LACHENMEIER by, among

11  other things, failing to provide TIM with a safe working environment including a

12  capsule tie-down system, proper grounding system, and a ladder which was free of

13  defects, failed to abide by Defendants' ladder standards, failed to meet fall protection

14  guidelines, and/or failing to implement other safety measures, including a ladder tie

15  down system and constraining the BP-4 capsule during pre-launch test activities,

16  which resulted in TIM LACHENMEIER suffering catastrophic injuries.

17  34.  Defendants' negligent disregard for their own safety standards and

18  rules were the actual and proximate cause of TIM LACHENMEIER's fall and

19  catastrophic injuries. Defendants' conduct caused TIM LACHENMEIER to suffer

20  substantial damages and needlessly endure extreme pain and suffering, which is on-

21  going, from his resulting catastrophic injuries which necessitated the below-the-knee

22  amputation of his right leg and left him permanently disfigured, and requiring

23  continuing surgeries, leaving the LACHENMEIERS with permanent physical and

24  emotional scars.

25  / / /

26  / / /

27  / / /

28

ANDRADE GONZALEZ LLP
834 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3850  Fax: (213) 985-9898

9

68

## SECOND CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (All Plaintiffs Against All Defendants)

35. Plaintiffs reallege and incorporate each of the preceding and subsequent paragraphs as though fully set forth herein.

36. Defendants engaged in extreme and outrageous conduct, as alleged herein, by:

(a) unreasonably, recklessly, and in bad faith failing to provide TIM LACHENMEIER and NSC with adequate and non-defective equipment to perform his duties under the Purchase Contract with NSC;

(b) unreasonably, recklessly, and in bad faith failing to disclose to NSC, TIM, or KRISTEN that (i) they neglected to provide a capsule tie down and grounding system and that they had banned the use of the type of ladder they provided to TIM and NSC, (ii) that BOEING's own Ladder Standard and Fall Protection Guidelines from 2015 mandated using specially designed step platforms with guardrails to safely access its capsules during launch preparations, or (iii) that the ladders they provided to TIM and NSC also violated the American National Standards Institute's Safety Code; and

(c) after the accident, pressuring TIM and KRISTEN to resume parachute recovery system testing, stating that TIM and KRISTEN were holding up their test, while TIM and KRISTEN were overwhelmed by the stress and worry caused by TIM's rapidly deteriorating condition, causing them to suffer extreme physical and emotional pain.

37. Defendants intended to cause TIM emotional distress or acted with reckless disregard of the probability that TIM would suffer emotional distress, knowing that TIM was present when the conduct occurred.

/ / /

/ / /

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950  Fax: (213) 995-9896

10

38. Defendants conduct, as alleged herein, caused Plaintiff TIM LACHENMEIER to suffer severe emotional distress, including but not limited to suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

39. Defendants' conduct, as alleged herein, was a substantial factor in causing Plaintiff TIM LACHENMEIER's severe emotional distress, which would not have occurred but for Defendants' conduct.

40. Defendants intended to cause KRISTEN emotional distress or acted with reckless disregard of the probability that KRISTEN would suffer emotional distress, knowing that KRISTEN was present when the conduct occurred.

41. At all relevant times, KRISTEN was aware of and present during Plaintiff TIM LACHENMEIER's medical conditions and treatment. Plaintiff KRISTEN LACHENMEIER witnessed Plaintiff TIM LACHENMEIER's injuries, pain, and suffering caused by Defendants. Plaintiff KRISTEN LACHENMEIER assisted and was present with Plaintiff TIM LACHENMEIER during his numerous surgeries and treatment for his injuries. Furthermore, Plaintiffs were forced to completely alter their way of living and conducting everyday activities because of Plaintiff TIM LACHENMEIER's catastrophic injury which has permanently disfigured him.

42. Defendants' conduct, as alleged herein, caused Plaintiff KRISTEN LACHENMEIER to suffer emotional distress, including but not limited to suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, and humiliation.

43. Defendants' conduct, as alleged herein, was a substantial factor in causing Plaintiff KRISTEN LACHENMEIER's severe emotional distress, which would not have occurred but for Defendants' conduct.

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3850 Fax: (213) 985-9696

11

70

44. Plaintiffs TIM LACHENMEIER and KRISTEN LACHENMEIER are entitled to recover damages for their emotional distress, in the amount to be proven at trial.

45. Defendants' conduct, as alleged herein, was committed maliciously and oppressively with the wrongful intention of injuring Plaintiffs and with a willful and conscious disregard of Plaintiffs' health. Defendants knowingly and intentionally caused Plaintiffs to needlessly endure horrific physical injuries, extreme emotional distress, pain and suffering, loss of consortium, lost wages, and loss of earnings. Accordingly, Plaintiffs are entitled to recover punitive damages in an amount according to proof, in order to punish and to make an example of Defendants and to deter such conduct in the future.

## THIRD CAUSE OF ACTION
### Loss of Consortium
### (All Plaintiffs Against All Defendants)

46. Plaintiffs reallege and incorporate each of the preceding and subsequent paragraphs as though fully set forth herein.

47. During relevant times alleged herein, Plaintiffs were a married couple, living together in the State of Oregon.

48. Defendants' conduct, as alleged herein, caused TIM LACHENMEIER a loss of companionship with his wife, KRISTEN LACHENMEIER, including but not limited to the loss of companionship, comfort, care, assistance, society, and moral support.

49. Defendants' conduct, as alleged herein, caused KRISTEN LACHENMEIER a loss of companionship with her husband, TIM LACHENMEIER, including but not limited to companionship, comfort, care, assistance, society, and moral support.

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3550 Fax: (213) 995-9896

12

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3850   Fax: (213) 985-9896

50.     Plaintiffs TIM LACHENMEIER and KRISTEN LACHENMEIER are entitled to recover damages for their loss of consortium, in the amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.      On the First Cause of Action for Negligence, that the Court enter judgment against Defendants for general, special, and compensatory damages, in an amount to be determined at trial.

2.      On the Second Cause of Action for Intentional Infliction of Emotional Distress, that the Court enter judgment against the Defendants for general, special, and compensatory damages, in an amount to be determined at trial.

3.      On the Third Cause of Action for Loss of Consortium, that the Court enter judgment against the Defendants for general, special, and compensatory damages, in an amount to be determined at trial.

4.      On all Causes of Action:

a.      For general and compensatory damages, in an amount to be determined at trial;

b.      For special and economic damages, in an amount to be determined at trial;

c.      For reasonable attorneys' fees incurred herein and as permitted by law;

d.      For pre-judgment and post-judgment interest;

e.      For payment of the costs of this suit;

/ / /
/ / /
/ / /

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3950  Fax: (213) 995-9896

1    f.  For punitive and exemplary relief; and

2    g.  For such other and further relief as this Court may deem proper

3 and just.

4

5 DATED: November 12, 2020   **ANDRADE GONZALEZ LLP**

6

7             */s/ Sean A. Andrade*

8             SEAN A. ANDRADE
              HENRY H. GONZALEZ

9             ARTURO PADILLA
              Attorneys for Plaintiffs TIMOTHY

10            LACHENMEIER and KRISTEN
              LACHENMEIER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">14

COMPLAINT AND DEMAND FOR JURY TRIAL</div>

## JURY DEMAND

Plaintiffs respectfully request a jury on all issues triable by jury in the above entitled action.

DATED: November 12, 2020     **ANDRADE GONZALEZ LLP**

*/s/ Sean A. Andrade*

SEAN A. ANDRADE
HENRY H. GONZALEZ
ARTURO PADILLA
Attorneys for Plaintiffs
TIMOTHY LACHENMEIER and
KRISTEN LACHENMEIER

ANDRADE GONZALEZ LLP
634 South Spring Street, Top Floor
Los Angeles, California 90014
Tel: (213) 986-3850  Fax: (213) 985-9866

15

**TOLLING AGREEMENT REGARDING CLAIMS ARISING FROM
INJURIES TIM LACHENMEIER SUSTAINED ON MARCH 27, 2017**

This tolling agreement ("Tolling Agreement") is made on March $22$, 2019, between Tim Lachenmeier and Kris Lachenmeier ("Claimants"), by and through their attorneys, and The Boeing Company, including the Boeing business unit named Boeing Defense, Space & Security, (collectively, "Boeing"), by and through its respective attorneys.

On March 27, 2017, Claimant Tim Lachenmeier who worked for Near Space Corporation alleges he sustained serious injuries to his right leg while conducting a parachute balloon test, which eventually required below-the-knee amputation (hereinafter the "Incident"). On March 1, 2019, Mr. Lachenmeier provided Boeing with a claim summary and settlement demand. Boeing is in the process of investigating the merits of Mr. Lachenmeier's claims arising out of the Incident. Boeing has also learned that Kris Lachenmeier intends to pursue a derivative claim for loss of consortium arising from her husband's alleged injuries. Boeing and Claimants wish to allow time for investigation and resolution discussions prior to the filing of a lawsuit.

In exchange for the mutual covenants and undertakings set forth in this Tolling Agreement, which constitute good and valuable consideration and the receipt and sufficiency of which are hereby acknowledged, the parties to this Tolling Agreement agree to the following:

1. Boeing expressly waives the right to plead or otherwise assert as a defense any statute of limitation existing under the laws of the State of California or the laws of any other jurisdiction in the United States under which the right to commence litigation arising out of the Incident expires by the passage of time ("Limitation Period") from March 27, 2019 until July 29, 2019 ("Tolling Period"). Boeing does not waive any other defense, including, but not limited to, any defense based on any statute of limitation existing under the laws of California or the laws of any other jurisdiction which already has expired or will expire before March 27, 2019. The execution of this Tolling Agreement shall not revive any claim that has expired by reason of a Limitation Period prior to March 27, 2019. Additionally, to the extent other limitations periods may exist that have not yet expired, this Tolling Agreement is not intended to shorten or reduce any such limitation periods. Within the constraints above, the statute(s) of limitation is tolled until July 29, 2019 for claims arising from the Incident. By executing this Tolling Agreement, Boeing does not consent to jurisdiction, personal or otherwise, in any state with respect to Claimants' claims arising out of or related to the Incident, including but not limited to, the State of California.

2. Nothing in this Tolling Agreement shall be construed as an admission or denial by any of the parties to this Tolling Agreement as to the merits of any claim or defense in any litigation arising from the Incident. Nothing in this Tolling Agreement may be used as evidence against any of the parties to this Tolling Agreement in any litigation arising from the Incident, except for the sole purpose of enforcing the terms of this Tolling Agreement.

1

3.    The individual signatories to this Tolling Agreement represent that they have been duly authorized to execute this Tolling Agreement on behalf of the parties they purport to represent.

4.    The parties to this Tolling Agreement agree to keep the existence and terms of this Tolling Agreement confidential and agree not to disclose the details of this Tolling Agreement to any person, whether directly or indirectly, unless required to do so by law, order of a court or to enforce the terms of this Tolling Agreement. To the extent that any party discloses the existence of or information relating to this Tolling Agreement to their agent, attorney or insurer, that party shall instruct the person or persons to whom the information is disclosed that the information must be kept confidential.

5.    This Tolling Agreement shall bind and be effective as to the parties and their respective successors, assigns, receivers and trustees, if any.

6.    This Tolling Agreement sets forth all terms, conditions and understandings with respect to the subject matter of this Tolling Agreement, and supersedes any and all oral agreements and understandings, upon which the parties have placed no reliance. This Tolling Agreement may not be amended except by means of a writing signed by all parties.

7.    This Tolling Agreement may be executed in any number of counterparts and a photocopy, facsimile, or emailed PDF copy of a signature to this Tolling Agreement shall be deemed to be as good as an original signature.

To signify their acceptance of the foregoing terms, each of the parties has signed below as of the date first specified above.

Dated: March 22, 2019

By: _____
    Julie L. Hussey
    Perkins Coie, LLP

    Counsel for The Boeing Company and
    Boeing Defense, Space & Security, a business unit.

By: _____
    Arturo Padilla
    Andrade Gonzalez LLP

    Counsel for Claimants Tim Lachenmeier
    and Kris Lachenmeier

2

76

## SIXTH AMENDMENT TO TOLLING AGREEMENT

This agreement is made as of June ____, 2020, between Tim and Kris Lachenmeier ("Claimants"), by and through their attorneys, and The Boeing Company, including the Boeing business unit named Boeing Defense, Space & Security, (collectively, "Boeing"), by and through its respective attorneys, and amends the March 22, 2019 Tolling Agreement (the "Tolling Agreement"), as amended by the First, Second, Third, Fourth and Fifth Amendments, entered into by the same parties.

WHEREAS, Claimants and Boeing entered into a Tolling Agreement dated March 22, 2019,

WHEREAS, the Tolling Period in the Tolling Agreement was set to expire on July 29, 2019,

WHEREAS, Claimants and Boeing entered into a First Amendment to the Tolling Agreement on July 22, 2019 which extended the tolling period until October 29, 2019,

WHEREAS, Claimants and Boeing entered into a Second Amendment to the Tolling Agreement on October 25, 2019 which extended the tolling period until November 12, 2019,

WHEREAS, Claimants and Boeing entered into a Third Amendment to the Tolling Agreement on November 8, 2019 which extended the tolling period until November 22, 2019,

WHEREAS, Claimants and Boeing entered into a Fourth Amendment to the Tolling Agreement on November 20, 2019 which extended the tolling period until February 20, 2020,

WHEREAS, Claimants and Boeing entered into a Fifth Amendment to the Tolling Agreement on February 19, 2020 which extended the tolling period until July 14, 2020,

WHEREAS, Claimants and Boeing wish to extend the Tolling Period for an additional one hundred and twenty-two (122) days until November 13, 2020 to give the parties an opportunity to mediate Claimants' claims against Boeing, and

WHEREAS, Claimants and Boeing intend for the Agreement to otherwise remain unchanged and in full force and effect in all other respects.

NOW, THEREFORE, in consideration of the foregoing:

The Tolling Agreement shall be amended by deleting the first paragraph in its entirety and replacing it with the following provision:

1.      Boeing expressly waives the right to plead or otherwise assert as a defense any statute of limitation existing under the laws of the State of California or the laws of any other jurisdiction in the United States under which the right to commence litigation arising out of the Incident expires by the passage of time ("Limitation Period") from March 27, 2019 until November 13, 2020 ("Tolling Period"). Boeing does not waive any other defense, including, but not limited to, any defense based on any statute of limitation existing under the laws of

-1-

California or the laws of any other jurisdiction which already has expired or will expire before March 27, 2019. Additionally, to the extent other limitations periods may exist that have not yet expired, this Tolling Agreement is not intended to shorten or reduce any such limitation periods. Within the constraints above, the statute(s) of limitation is tolled until November 13, 2020 for claims arising from the Incident. By executing this Tolling Agreement, Boeing does not consent to jurisdiction, personal or otherwise, in any state with respect to Claimants' claims arising out of or related to the Incident, including but not limited to, the State of California.

IN WITNESS WHEREOF, the Parties have each subscribed to this Agreement as of the day and year set forth below.

For Claimants Tim and Kris Lachenmeier    For The Boeing Company

Dated: _____July 2_____, 2020.    Dated: _____July 2_____, 2020.

By: _____    By: _____
    Arturo Padilla               Julie L. Hussey
    Andrade Gonzalez LLP       Perkins Coie LLP

-2-

78

EXHIBIT B

## SIXTH AMENDMENT TO TOLLING AGREEMENT

This agreement is made as of June ____, 2020, between Tim and Kris Lachenmeier ("Claimants"), by and through their attorneys, and The Boeing Company, including the Boeing business unit named Boeing Defense, Space & Security, (collectively, "Boeing"), by and through its respective attorneys, and amends the March 22, 2019 Tolling Agreement (the "Tolling Agreement"), as amended by the First, Second, Third, Fourth and Fifth Amendments, entered into by the same parties.

WHEREAS, Claimants and Boeing entered into a Tolling Agreement dated March 22, 2019,

WHEREAS, the Tolling Period in the Tolling Agreement was set to expire on July 29, 2019,

WHEREAS, Claimants and Boeing entered into a First Amendment to the Tolling Agreement on July 22, 2019 which extended the tolling period until October 29, 2019,

WHEREAS, Claimants and Boeing entered into a Second Amendment to the Tolling Agreement on October 25, 2019 which extended the tolling period until November 12, 2019,

WHEREAS, Claimants and Boeing entered into a Third Amendment to the Tolling Agreement on November 8, 2019 which extended the tolling period until November 22, 2019,

WHEREAS, Claimants and Boeing entered into a Fourth Amendment to the Tolling Agreement on November 20, 2019 which extended the tolling period until February 20, 2020,

WHEREAS, Claimants and Boeing entered into a Fifth Amendment to the Tolling Agreement on February 19, 2020 which extended the tolling period until July 14, 2020,

WHEREAS, Claimants and Boeing wish to extend the Tolling Period for an additional one hundred and twenty-two (122) days until November 13, 2020 to give the parties an opportunity to mediate Claimants' claims against Boeing, and

WHEREAS, Claimants and Boeing intend for the Agreement to otherwise remain unchanged and in full force and effect in all other respects.

NOW, THEREFORE, in consideration of the foregoing:

The Tolling Agreement shall be amended by deleting the first paragraph in its entirety and replacing it with the following provision:

1.     Boeing expressly waives the right to plead or otherwise assert as a defense any statute of limitation existing under the laws of the State of California or the laws of any other jurisdiction in the United States under which the right to commence litigation arising out of the Incident expires by the passage of time ("Limitation Period") from March 27, 2019 until November 13, 2020 ("Tolling Period"). Boeing does not waive any other defense, including, but not limited to, any defense based on any statute of limitation existing under the laws of

-1-

California or the laws of any other jurisdiction which already has expired or will expire before March 27, 2019. Additionally, to the extent other limitations periods may exist that have not yet expired, this Tolling Agreement is not intended to shorten or reduce any such limitation periods. Within the constraints above, the statute(s) of limitation is tolled until November 13, 2020 for claims arising from the Incident. By executing this Tolling Agreement, Boeing does not consent to jurisdiction, personal or otherwise, in any state with respect to Claimants' claims arising out of or related to the Incident, including but not limited to, the State of California.

IN WITNESS WHEREOF, the Parties have each subscribed to this Agreement as of the day and year set forth below.

For Claimants Tim and Kris Lachenmeier    For The Boeing Company

Dated: ___July 2_____, 2020.    Dated: ___July 2_____, 2020.

By: _____    By: _____
    Arturo Padilla        Julie L. Hussey
    Andrade Gonzalez LLP    Perkins Coie LLP

-2-

80

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TIMOTHY LACHENMEIER, et al.<br><br>Plaintiff(s)<br><br>v.<br><br>THE BOEING COMPANY, et al.<br><br>Defendant(s). | CASE NUMBER:<br><br>2:20–cv–10363–SVW–JPR<br><br><br><br>**NOTICE TO PARTIES OF<br>COURT–DIRECTED ADR PROGRAM** |

## NOTICE TO PARTIES:

It is the policy of this Court to encourage settlement of civil litigation when such is in the best interest of the parties. The Court favors any reasonable means, including alternative dispute resolution (ADR), to accomplish this goal. *See* L.R. 16-15. Unless exempted by the trial judge, parties in all civil cases must participate in an ADR process before trial. *See* L.R. 16-15.1.

The district judge to whom the above-referenced case has been assigned is participating in an ADR Program that presumptively directs this case to either the Court Mediation Panel or to private mediation. *See* General Order No. 11-10, §5. For more information about the Mediation Panel, visit the Court website, www.cacd.uscourts.gov, under "ADR."

Pursuant to L.R. 26-1(c), counsel are directed to furnish and discuss with their clients the attached ADR Notice To Parties *before* the conference of the parties mandated by Fed.R.Civ.P. 26(f). Based upon the consultation with their clients and discussion with opposing counsel, counsel must indicate the following in their Joint 26(f) Report: 1) whether the case is best suited for mediation with a neutral from the Court Mediation Panel or private mediation; and 2) when the mediation should occur. *See* L.R. 26-1(c).

At the initial scheduling conference, counsel should be fully prepared to discuss their preference for referral to the Court Mediation Panel or to private mediation and when the mediation should occur. The Court will enter an Order/Referral to ADR at or around the time of the scheduling conference.

Clerk, U.S. District Court

__November 16, 2020__
Date

By _/s/ Geneva Hunt_
Deputy Clerk

---

ADR–08 (04/18)          NOTICE TO PARTIES OF COURT–DIRECTED ADR PROGRAM

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**NOTICE TO PARTIES: COURT POLICY ON SETTLEMENT
AND USE OF ALTERNATIVE DISPUTE RESOLUTION (ADR)
Counsel are required to furnish and discuss this Notice with their clients.**

Despite the efforts of the courts to achieve a fair, timely and just outcome in all cases, litigation has become an often lengthy and expensive process. For this reason, it is this Court's policy to encourage parties to attempt to settle their disputes, whenever possible, through alternative dispute resolution (ADR).

ADR can reduce both the time it takes to resolve a case and the costs of litigation, which can be substantial. ADR options include mediation, arbitration (binding or non-binding), neutral evaluation (NE), conciliation, mini-trial and fact-finding. ADR can be either Court-directed or privately conducted.

The Court's ADR Program offers mediation through a panel of qualified and impartial attorneys who will encourage the fair, speedy and economic resolution of civil actions. Panel Mediators each have at least ten years of legal experience and are appointed by the Court. They volunteer their preparation time and the first three hours of a mediation session. This is a cost-effective way for parties to explore potential avenues of resolution.

This Court requires that counsel discuss with their clients the ADR options available and instructs them to come to the initial scheduling conference prepared to discuss the parties' choice of ADR option. The ADR options available are: a settlement conference before the magistrate judge assigned to the case or the magistrate judge in Santa Barbara, the Court Mediation Panel, and private mediation. Counsel are also required to indicate the client's choice of ADR option in advance of the initial scheduling conference. *See* L.R. 26-1(c) and Fed.R.Civ.P. 26(f).

Clients and their counsel should carefully consider the anticipated expense of litigation, the uncertainties as to outcome, the time it will take to get to trial, the time an appeal will take if a decision is appealed, the burdens on a client's time, and the costs and expenses of litigation in relation to the amounts or stakes involved.

Each year thousands of civil cases are filed in this district, yet typically no more than one percent go to trial. Most cases are settled between the parties, voluntarily dismissed, resolved through Court-directed or other forms of ADR, or dismissed by the Court as lacking in merit or for other reasons provided by law.

For more information about the Court's ADR Program, the Mediation Panel, and the profiles of mediators, visit the Court website, www.cacd.uscourts.gov, under "ADR."

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
(AMENDED/CORRECTED) CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| TIMOTHY LACHENMEIER, an individual, and KRISTEN LACHENMEIER, an individual | THE BOEING COMPANY, a Delaware Corporation, BOEING DEFENSE, SPACE & SECURITY, and DOES 1-10 |

| (b) County of Residence of First Listed Plaintiff    Tillamook | County of Residence of First Listed Defendant    New Castle |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |

| (c) Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. | Attorneys (Firm Name, Address and Telephone Number) If you are representing yourself, provide the same information. |
|---|---|
| ANDRADE GONZALEZ LLP, 634 S. Spring St., Top Floor, Los Angeles, CA 90014 | |

## II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multidistrict Litigation - Transfer
☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No    (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT:** $ Excess of $75,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S. Code § 1332

## VII. NATURE OF SUIT (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 835 Patent - Abbreviated New Drug Application |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | **SOCIAL SECURITY** |
| ☐ 470 Racketeer influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 861 HIA (1395ff) |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 862 Black Lung (923) |
| ☐ 485 Telephone Consumer Protection Act | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 490 Cable/Sat TV | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 864 SSID Title XVI |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 865 RSI (405 (g)) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 891 Agricultural Acts | | ☒ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | | |
|---|---|---|---|
| CV-71 (10/20) | (AMENDED/CORRECTED) CIVIL COVER SHEET | | Page 1 of 3 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**(AMENDED/CORRECTED) CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No<br><br>If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | | |
|---|---|---|
| ☐ Yes ☒ No<br><br>If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | | |
|---|---|---|
| ☐ Yes ☒ No<br><br>If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.?<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.)<br><br>*check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A.<br>Orange County | B.<br>Riverside or San Bernardino County | C.<br>Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☒ | ☐ | ☐ |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| ☒ Yes ☐ No | ☐ Yes ☐ No |
| If "yes," your case will initially be assigned to the<br>**SOUTHERN DIVISION.** | If "yes," your case will initially be assigned to the<br>**EASTERN DIVISION.** |
| Enter "Southern" in response to Question E, below, and continue from there.<br><br>If "no," go to question D2 to the right. ➡ | Enter "Eastern" in response to Question E, below.<br><br>If "no," your case will be assigned to the WESTERN DIVISION.<br><br>Enter "Western" in response to Question E, below. ↓ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | SOUTHERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

| CV-71 (10/20) | (AMENDED/CORRECTED) CIVIL COVER SHEET | Page 2 of 3 |
|---|---|---|

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
(AMENDED/CORRECTED) CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court?　　　　　☒ NO　　　☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed in this court?

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　☒ NO　　　☐ YES

If yes, list case number(s):

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** /s/ Sean A. Andrade　　　　　　　　　DATE: 11/17/2020

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

Case 8:20-cv-02206-JVS-JDE   Document 22   Filed 04/26/21   Page 40 of 134   Page ID #:361

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY LACHENMEIER, et al. | CASE NO:<br>8:20−cv−02206−JVS−JDE |
| Plaintiff(s), | |
| v. | INITIAL ORDER FOLLOWING<br>FILING OF COMPLAINT<br>ASSIGNED TO JUDGE SELNA |
| THE BOEING COMPANY, et al. | |
| Defendant(s). | |

**Important Notice:** The Court posts tentative law and motions rulings to the internet. Please see Section P, below

COUNSEL FOR PLAINTIFF SHALL SERVE THIS ORDER ON ALL DEFENDANTS AND/OR THEIR COUNSEL ALONG WITH THE SUMMONS AND COMPLAINT, OR IF THAT IS NOT PRACTICABLE AS SOON AS POSSIBLE THEREAFTER. IF THIS CASE WAS ASSIGNED TO THIS COURT AFTER BEING REMOVED FROM STATE COURT, THE DEFENDANT WHO REMOVED THE CASE SHALL SERVE THIS ORDER ON ALL OTHER PARTIES.

///

This case has been assigned to the calendar of Judge James V. Selna. The intent of this Order is to ensure that this case will proceed so as "to secure [a] just, speedy and inexpensive determination." (Fed.R.Civ. P., Rule 1.)

## A.   THE COURT'S ORDERS

Copies of Judge Selna's orders that may have specific application to this case are available on the Central District of California website. See ¶ N. Those orders include the following:

    (1)   Order Setting Rule 26(f) Scheduling Conference

    (2)   Order re Civil Jury Trials

    (3)   Order re Civil Court Trials

    (3)   Order re RICO Case Statement

## B.   SERVICE OF PLEADINGS

Although Fed.R.Civ.P., Rule 4(m) does not require the summons and complaint to be served for as much as 120 days, the Court expects that the initial pleadings will be served much sooner than that, and will require plaintiff to show cause before then if it appears that there is undue delay.

## C.   ASSIGNMENT TO A MAGISTRATE JUDGE

Under 28 U.S.C. § 636, the parties may consent to have a Magistrate Judge preside over all proceedings, including trial. The Magistrate Judges who accept those designations are identified on the Central District's website, which also contains the consent form. See ¶ N.

-2-

**D.**   **EX PARTE PRACTICE**

*Ex parte* applications are solely for extraordinary relief and should be used with discretion. See Mission Power Engineering Company v. Continental Casualty Co., 883 F. Supp. 488 (C. D. Cal. 1995). The Court will generally decide *ex parte* matters on the papers. Opposition to an *ex parte* application, if any, should be submitted within 24 hours.

**E.**   **APPLICATIONS AND STIPULATIONS FOR EXTENSIONS OF TIME**

No stipulations extending scheduling requirements or modifying applicable rules are effective until and unless the Court approves them. Both applications and stipulations must set forth:

1.   The existing due date or hearing date;

2.   Specific, concrete reasons supporting good cause for granting the extension. In this regard, a statement that an extension "will promote settlement" is insufficient. The requesting party or parties must indicate the status of ongoing negotiations: Have written proposals been exchanged? Is counsel in the process of reviewing a draft settlement agreement? Has a mediator been selected?

3.   Whether there have been prior requests for extensions, and whether these were granted or denied by the Court.

///

///

## F.  TROs AND INJUNCTIONS

Parties seeking emergency or provisional relief shall comply with F.R.Civ.P., Rule 65 and Local Rule 65. The Court will not rule on any application for such relief for at least 24 hours after the party subject to the requested order has been served; such party may file opposing or responding papers in the interim.

## G.  CASES REMOVED FROM STATE COURT

All documents filed in state court, including documents appended to the complaint, answers and motions, must be refiled in this Court as a supplement to the Notice of Renewal, if not already included. See 28 U.S.C. § 1447(a),(b). If the defendant has not yet answered or moved, the answer or responsive pleading filed in this Court must comply with the Federal Rules of Civil Procedure and the Local Rules of the Central District. If before the case was removed a motion was pending in state court, it must be re–noticed in accordance with Local Rule 7.

## H.  STATUS OF FICTITIOUSLY NAMED DEFENDANTS

This Court intends to adhere to the following procedures where a matter is removed to this Court on diversity grounds with fictitiously named defendants. (See 28 U.S.C. §§ 1441(a) and 1447.)

1.  Plaintiff is normally expected to ascertain the identity of and serve any fictitiously named defendants within 120 days of the removal of the action to this Court.

///

2.   If plaintiff believes (by reason of the necessity for discovery or otherwise) that fictitiously named defendants cannot be fully identified within the 120–day period, an *ex parte* application requesting permission to extend that period to effectuate service may be filed with this Court. Such application shall state the reasons therefor, and may be granted upon a showing of good cause. The *ex parte* application shall be served upon all appearing parties, and shall state that appearing parties may comment within seven (7) days of the filing of the *ex parte* application.

3.   If plaintiff desires to substitute a named defendant for one of the fictitiously named parties, plaintiff first shall seek to obtain consent from counsel for the previously–identified defendants (and counsel for the fictitiously named party, if that party has separate counsel). If consent is withheld or denied, plaintiff may apply *ex parte* requesting such amendment, with notice to all appearing parties. Each party shall have seven calendar days to respond. The *ex parte* application and any response should comment not only on the substitution of the named party for a fictitiously named defendant, but on the question of whether the matter should thereafter be remanded to the Superior Court if diversity of citizenship is destroyed by the addition of the new substituted party. *See* U.S.C. § 1447(c), (d).

## I.   BANKRUPTCY APPEALS

Counsel shall comply with the ORDER RE PROCEDURE TO BE FOLLOWED IN APPEAL FROM BANKRUPTCY COURT issued at the time the appeal is filed in the District Court.

///

///

///

## J. **MOTIONS UNDER FED.R.CIV.P. RULE 12**

Many motions to dismiss or to strike could be avoided if the parties confer in good faith (as they are required to do under L.R. 7–3), especially for perceived defects in a complaint, answer or counterclaim which could be corrected by amendment. See Chang v. Chen, 80 F.3d 1293, 1296 (9th Cir. 1996) (where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment). Moreover, a party has the right to amend his complaint "once as a matter of course at any time before a responsive pleading is served." Fed.R.Civ.P., Rule 15(a). A 12(b)(6) motion is not a responsive pleading and therefore plaintiff might have a right to amend. See Nolen v. Fitzharris, 450 F.2d 958, 958–59 (9th Cir. 1971); St. Michael's Convalescent Hospital v. California, 643 F.2d 1369, 1374 (9th Cir. 1981). And even where a party has amended his Complaint once or a responsive pleading has been served, the Federal Rules provide that leave to amend should be "freely given when justice so requires." F.R.Civ.P., Rule 15(a). The Ninth Circuit requires that this policy favoring amendment be applied with "extreme liberality." Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990).

These principles require that counsel for the plaintiff should carefully evaluate the defendant's contentions as to the deficiencies in the complaint, and that in many instances the moving party should agree to any amendment that would cure a curable defect.

The moving party shall attach a copy of the challenged pleading to the Memorandum of Points and Authorities in support of the motion.

///

///

The foregoing provisions apply as well to motions to dismiss a counterclaim, answer or affirmative defense, which a plaintiff might contemplate bringing.

## K. **REQUIREMENTS FOR BRIEFS**

In addition to the requirements in Local Rule 11, the Court requires the following for all briefs:

1. No footnote shall exceed 5 lines. The Court strongly discourages the use of extensive footnotes as a subterfuge to avoid page limitations in the Local Rules.

2. All footnotes shall be in the same type size as text. See Local Rule 11–3.1.1.

3. Each case cited shall include a jump cite to the page or pages where the relevant authority appears (e.g., United States v. Doe, 500 U. S. 1, 14, 17 (1997)).

Failure to follow these requirements may result in rejection of a brief for correction.

## L. **LEAD COUNSEL**

Lead counsel shall appear on all dispositive motions, scheduling conferences, and settlement conferences. **The Court does not entertain special appearances; only counsel of record may appear.**

## M. **COURTESY COPIES**

A courtesy copy of all electronically filed pleadings shall be delivered to Judge Selna's courtesy copy drop on the tenth floor at the rear of the elevator lobby by noon the day following filing. **Failure to make timely delivery of the courtesy copies may result in a delay in hearing a motion or ordering the matter off calendar.**

## N. **ELECTRONIC COPIES**

When the Court requires an electronic copy of a document (*e.g.*, with proposed jury instructions), a copy shall be submitted at time of filing in one of the following manners: providing a copy on a disk, CD, or thumb drive in a labeled envelope and lodged with the clerk; or by e-mailing a copy to the Courtroom Deputy (JVS_Chambers@cacd.uscourts.gov). Regardless of media, the document should be formatted in WordPerfect9 or higher.

## O. **WEBSITE**

Copies of this Order and other orders of this Court are available on the Central District of California's website, at "www.cacd.uscourts.gov" at Judge Selna's home page located under "Judge's Procedures and Schedules."

## P. **TENTATIVES–DAY OF HEARING AND WEB POSTING**

The Court attempts to issue tentative rulings on each motion. Tentatives will be posted on the Court's website: www.cacd.uscourts.gov/. From the home page, click on "Judges' Procedures and Schedules" in the left column. From the

list click on "Hon. James V. Selna," which will take you to Judge Selna's page.

Click on the red notice in the upper left: "Click here to view Tentative Rulings."

Then click on the desired ruling which comes up in a .pdf file which can be read

with an Adobe Acrobat reader. Judge Selna attempts to post tentatives by late

Friday afternoon preceding the hearing date. Hard copies of tentatives will also

be available from the clerk approximately 15 minutes before the hearing.


     The Court thanks counsel and the parties for their anticipated

cooperation.


**IT IS SO ORDERED.**

DATED: November 19, 2020

_James V Selna_

_____

James V. Selna
United States District Judge

NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY(S)
OR OF PARTY APPEARING IN PRO PER

SEAN A. ANDRADE/HENRY H. GONZALEZ
ANDRADE GONZALEZ LLP
634 S. SPRING ST., TOP FLOOR
LOS ANGELES, CA 90014
TELEPHONE: (213) 986-3950

ATTORNEY(S) FOR: PLAINTIFFS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| TIMOTHY LACHENMEIER, an individual, and KRISTEN LACHENMEIER, an individual, | CASE NUMBER: |
|---|---|
| Plaintiff(s), | |
| v. | |
| THE BOEING COMPANY, a Delaware Corporation, BOEING DEFENSE, SPACE & SECURITY, and DOES 1-10, | **CERTIFICATION AND NOTICE OF INTERESTED PARTIES** (Local Rule 7.1-1) |
| Defendant(s) | |

TO:     THE COURT AND ALL PARTIES OF RECORD:

The undersigned, counsel of record for      TIMOTHY LACHENMEIER and KRISTEN LACHENMEIER
or party appearing in pro per, certifies that the following listed party (or parties) may have a pecuniary interest in the outcome of this case. These representations are made to enable the Court to evaluate possible disqualification or recusal.

(List the names of all such parties and identify their connection and interest. Use additional sheet if necessary.)

| PARTY | CONNECTION / INTEREST |
|---|---|
| TIMOTHY LACHENMEIER | PLAINTIFF |
| KRISTEN LACHENMEIER | PLAINTIFF |
| THE BOEING COMPANY | DEFENDANT |
| BOEING DEFENSE, SPACE & SECURITY | DEFENDANT |

November 12, 2020
Date

/s/ Sean A. Andrade
Signature

Attorney of record for (or name of party appearing in pro per):

TIMOTHY LACHENMEIER and KRISTEN LACHENMEIER

CV-30 (05/13)                    NOTICE OF INTERESTED PARTIES

95

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

TIMOTHY LACHENMEIER, et al.

PLAINTIFF(S),

v.

THE BOEING COMPANY, et al.

DEFENDANT(S).

CASE NUMBER:

2:20–cv–10363–SVW (JPRx)

## NOTICE OF INTRA-DISTRICT
## TRANSFER BY CLERK OF COURT

To:  All Counsel Appearing of Record

Due to clerical error, this case was improperly assigned to the __ Division of this District. Pursuant to General Order 19-03 this case is hereby transferred to the __ Division for all further proceedings.

X      Case was opened in the CM/ECF System by counsel, and provisionally assigned to a division of this Court. After review of the pleadings, pursuant to the General Orders of the Court, this case is hereby transferred to the _Southern_ Division.

This case has been reassigned to case number _8:20–cv–02206–JVS (JDEx)_ and has been reassigned to _Judge James V. Selna_ for all further proceedings.

Any matters that are or may be referred to a Magistrate Judge are hereby reassigned to _Magistrate Judge John D. Early_ for:

X any discovery and/or post-judgment matters that may be referred.

for all proceedings in accordance with General Order 05-07.

All subsequent documents filed must reflect the new case number and newly assigned District Judge's/Magistrate Judge's initials as follows: _8:20–cv–02206–JVS (JDEx)_. Unless documents are exempted from electronic filing, they must be filed electronically on the docket under the new case number.

**Please be advised that no further filings may be made under case number _2:20–cv–10363–SVW (JPRx)_. Any such filings made after the date of entry of this Notice may not be reviewed or considered by the Court.**

Clerk, U.S. District Court

By: _/s/ Estrella Tamayo_
_Estrella_Liberato@cacd.uscourts.gov_
Deputy Clerk

*cc: Previously assigned Judge/Magistrate Judge; Deputy-In-Charge;
Statistics Clerk*

G-73 (03/19)       NOTICE OF INTRA–DISTRICT TRANSFER BY CLERK OF COURT

| Attorney or Party without Attorney:<br>Magdalena D. Kozinska, Esq., SBN: 258403<br>WRIGHT FINLAY & ZAK LLP / OC<br>4665 MacArthur Court 280<br>Newport Beach, CA 92660<br>TELEPHONE No.: (949) 477-5050 | E-MAIL ADDRESS (Optional): mkozinska@wrightlegal.net<br>FAX No. (Optional): | FOR COURT USE ONLY |
|---|---|---|

Attorney for: Plaintiff Piedmont Capital Management, LLC

Ref No. or File No.: 201-2020880

Insert name of Court, and Judicial District and Branch Court:
Superior Court Of California, County of Sacramento - Gordon D. Schaber County Courthouse

Petitioner: Piedmont Capital Management, LLC

Respondent: Bounthavy M. Rasaphangthong, et al.

| **DECLARATION<br>OF DUE DILIGENCE** | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER:<br>34-2020-00284914 |
|---|---|---|---|---|

After due search, careful inquiry and diligent attempts at the following address(es), I have not been able to effect service of said process on: **Linda Rasaphangthong**

Documents: **Summons; Complaint; Alternative Dispute (ADR) package; Civil Case Cover Sheet; Order RE: Delay in Scheduling Initial Case Management Conference;**

| Date | Time | | Results |
|---|---|---|---|
| 10/24/2020 | 1:52 PM | Home | 3611 Ivy St, Sacramento, CA 95838-3820<br>Per the subject's husband, Linda was at work and he would have her call me. |
| 10/26/2020 | 5:59 PM | Home | 3611 Ivy St, Sacramento, CA 95838-3820<br>No contact at the front door at night due to the gate being locked. I waited for about 10 minutes, honking my horn, before finally leaving. |
| 10/28/2020 | 11:47 AM | Home | 3611 Ivy St, Sacramento, CA 95838-3820<br>No answer at the front door. The interior lights were on. Unfortunately, no access from the private fence. |
| 10/29/2020 | 12:00 PM | Home | 3611 Ivy St, Sacramento, CA 95838-3820<br>No contact. I did get a call from someone who said they were taking it through their Lawyer while taking my report this morning. I gave my number to Linda's husband. |
| 12/1/2020 | 9:11 AM | Home | 3611 Ivy St, Sacramento, CA 95838-3820<br>I honked a few times in front of the property with locked gate. No response. |
| 12/2/2020 | 5:16 PM | Home | 3611 Ivy St, Sacramento, CA 95838-3820<br>No contact. The door knob of the gate was locked from the outside. I honked my horn several times. Lights were on from the outside looking in. |

Fee for Service: **$ 139.20**



County: **Sacramento**
Registration No.: **2017-12**
**Nationwide Legal, LLC**
**200 West Santa Ana Blvd., Suite 300**
**Santa Ana, CA 92701**
**(714) 558-2400**

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on December 7, 2020.

Signature: _____

**Winston Loteyro**

## DUE DILIGENCE REPORT

Order#: OC39825A

97

# EXHIBIT B

1. **FORMATION OF CONTRACT.** This proposed purchase contract, which incorporates by reference these General Provisions and all other terms and conditions set forth in this proposed purchase contract (collectively, the "Contract"), is Buyer's offer to purchase the services and any related goods, materials, and/or other deliverables (collectively, the "Services") described in this offer. Acceptance is strictly limited to the terms and conditions included in this offer. Unless specifically agreed to in writing by Buyer's Authorized Procurement Representative, Buyer objects to, and is not bound by, any term or condition that differs from or adds to this offer. Seller's commencement of performance or acceptance of this offer in any manner shall conclusively evidence acceptance of this offer as written. Seller's provision of the Services shall be governed solely by this Contract. Buyer and Seller are referred to herein as a "Party" or collectively as the "Parties."

Except as authorized herein, no amendment or modification of this Contract shall bind either Party unless it is in writing and is signed by the authorized representatives of the Parties.

2. **SCOPE OF SERVICES.** Seller shall furnish the Services set forth in the Contract during the term of this Contract.

3. **INDEPENDENT CONTRACTOR.** Seller is an independent contractor for all purposes. Seller shall have complete control over the performance of, and the details for accomplishing, the Services. In no event shall Seller or its agents, representatives or employees be deemed to be agents, representatives or employees of Buyer. Seller's employees shall be paid exclusively by Seller for all Services performed. Seller shall comply with all requirements and obligations relating to such employees under federal, state and local law (or foreign law, if applicable). Such compliance shall include, but not be limited to, laws regarding minimum wages, social security, unemployment insurance, federal and state income taxes and workers' compensation insurance.

4. **STANDARDS.** Seller shall assign personnel satisfactory to Buyer. Buyer may, for good cause shown in Buyer's sole determination, require Seller to withdraw the services of any person and require that Seller promptly provide replacements for such person satisfactory to Buyer. Seller shall indemnify and hold harmless Buyer from and against any liabilities, claims, charges or suits for alleged losses, costs, damages or expenses arising from Buyer's exercise of its rights hereunder.

5. **SCHEDULE**
   a. Time is and shall remain of the essence in the performance of this Contract and Seller shall strictly adhere to the schedules specified in this Contract. Failure to deliver in accordance with the Contract schedule, if unexcused, shall constitute a material breach of this Contract. In the event of any anticipated or actual delay, including but not limited to delays attributed to labor disputes, Seller shall: (i) promptly notify Buyer in writing of the reasons for the delay and the actions being taken to overcome or minimize the delay; (ii) provide Buyer with a written recovery schedule; and (iii) if requested by Buyer, ship via air or expedited routing, at no additional cost to Buyer, to avoid or minimize delay to the maximum extent possible.
   b. Seller shall not deliver Services prior to the scheduled delivery dates unless authorized in writing by Buyer's Authorized Procurement Representative.

6. **NOTICE TO BUYER OF LABOR DISPUTES.** Whenever Seller has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this Contract, Seller shall immediately give notice thereof, including all relevant information, to Buyer.

7. **PACKING AND SHIPPING**
   a. Seller shall pack the goods and materials to prevent damage and deterioration. Unless otherwise set forth in this Contract, Seller shall package the goods in accordance with the requirements of Boeing Document D37522-6 "Supplier Packaging". Buyer may charge Seller for damage to or deterioration of any goods resulting from improper packing or packaging.
   a. If the Contract specifies FOB destination (place of delivery), then in addition to any other shipping instructions, Seller shall forward goods freight prepaid. Seller shall make the transportation arrangements, pay the shipping costs, and remain responsible for the goods and materials until the goods and materials are delivered and the Buyer takes possession at the destination.
   c. If the Contract specifies FOB origin (place of shipment), then in addition to any other shipping instructions, Seller shall forward goods collect. For goods shipped within the United States, Seller shall make no declaration concerning the value of the goods shipped except on goods where the tariff rating is dependent upon released or declared value. In such event, Seller shall release or declare such value at the maximum value within the lowest rating. Seller will ship the goods in accordance with the provisions set forth in the Boeing Domestic Shipment Routing Guide to be accessed through Buyer's supplier portal at https://portal.exostar.com/. Sellers need a One

Time Password (OTP) token to log into the Boeing Supplier Portal. Upon Buyer's request, Seller will identify packaging charges showing material and labor costs for container fabrication.

d. Seller shall provide with each container shipped under this Contract an Advanced Shipping Notice ("ASN"). For each container shipped, Seller shall provide two (2) readable copies of the ASN barcode as follows: one (1) copy is to be securely affixed to the outside of each container and one (1) copy is to be loose inside each container. Non-conforming shipments are subject to rejection and repackaging at Seller's expense. Instructions and guidelines related to the ASN process can be found on the Boeing Supplier Portal. Seller shall access by selecting the "Enterprise ASN Instructions" hyper-link under the header "Exostar Resources." A copy of these instructions can also be found at www.exostar.com.

## 8. CHANGES

a. Buyer's Authorized Procurement Representative may, without notice to sureties and in writing, direct changes within the general scope of this Contract in any of the following: (i) technical requirements and descriptions, specifications, statement of work, drawings or designs; (ii) shipment or packing methods; (iii) place of delivery, inspection or acceptance; (iv) reasonable adjustments in quantities or delivery schedules or both; (v) amount of Buyer-furnished property; (vi) terms and conditions of this Contract required to meet Buyer's obligations under customer prime contracts or subcontracts; (vii) description of services to be performed; (viii) the time of performance (e.g., hours of the day, days of the week, etc.); and (ix) place of performance. Seller shall comply promptly with such direction. Except for the rights granted to Buyer under this Article, a change pursuant to this Article shall not give rise to nor authorize any other modification of or amendment to the terms and conditions of this Contract.

b. If such change increases or decreases the cost or time required to perform this Contract, Buyer and Seller shall negotiate an equitable adjustment in the price or schedule, or both, to reflect the increase or decrease. Buyer shall modify this Contract in writing accordingly. Unless otherwise agreed in writing, Seller must assert any claim for adjustment to Buyer's Authorized Procurement Representative in writing within twenty-five (25) days, and deliver a fully supported proposal to Buyer's Authorized Procurement Representative within sixty (60) days, after Seller's receipt of such direction. Buyer may, at its sole discretion, consider any claim regardless of when asserted. If Seller's proposal includes the cost of property made obsolete or excess by the change, Buyer may direct the disposition of the property. Buyer may examine Seller's pertinent books and records to verify the amount of Seller's claim. Failure of the Parties to agree upon any adjustment shall not excuse Seller from performing in accordance with Buyer's direction.

c. If Seller considers that Buyer's conduct constitutes a change, Seller shall notify Buyer's Authorized Procurement Representative promptly in writing as to the nature of such conduct and its effect upon Seller's performance. Pending direction from Buyer's Authorized Procurement Representative, Seller shall take no action to implement any such change.

## 9. SUSPENSION OF WORK

a. Buyer's Authorized Procurement Representative may, by written order, suspend all or part of the work to be performed under this Contract for a period not to exceed one hundred (100) days. Within such period of any suspension of work, Buyer shall: (i) cancel the suspension of work order; (ii) terminate this Contract in accordance with the "Termination for Convenience" Article of this Contract; (iii) cancel this Contract in accordance with the "Cancellation for Default" Article of this Contract if grounds for default exist; or (iv) extend the stop work period.

b. Seller shall resume work whenever a suspension is canceled. Buyer and Seller shall negotiate an equitable adjustment in the price or schedule or both if: (i) this Contract is not canceled or terminated; (ii) the suspension results in a change in Seller's cost of performance or ability to meet the Contract delivery schedule; and (iii) Seller submits a claim for adjustment within twenty (20) days after the suspension is canceled.

## 10. TERMINATION FOR CONVENIENCE.
Buyer may terminate all or part of this Contract for its sole convenience. In the event of such termination, Seller shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to stop work. Subject to the terms of this Contract, within ninety (90) days after the effective date of termination, Seller may submit to Buyer a claim reflecting the percentage of the work performed prior to the effective date of termination, plus reasonable charges that Seller can demonstrate to the satisfaction of Buyer using its standard record keeping system have resulted from the termination. Seller shall not be paid for any work performed or costs incurred which reasonably could have been avoided. Further, Seller shall not be paid, and in no event shall Buyer be obligated to pay, lost or anticipated profits or unabsorbed indirect costs or overhead. In no event shall Buyer be obligated to pay Seller any amount in excess of the Contract price. The provisions of this Article shall not limit or affect the right of Buyer to cancel this Contract for default. Seller shall continue all work not terminated.

## 11. CANCELLATION FOR DEFAULT

a. Buyer may, by written notice to Seller, cancel all or part of this Contract: (i) if Seller fails to deliver the Services

within the time specified by this Contract or any written extension; (ii) if Seller fails to perform any other provision of this Contract or fails to make progress, so as to endanger performance of this Contract, and, in either of these two circumstances, within ten (10) days after receipt of notice from Buyer specifying the failure, does not cure the failure or provide Buyer with a written detailed plan adequate to cure the failure if such failure reasonably cannot be cured within such ten (10) days and such plan is acceptable to Buyer's Authorized Procurement Representative; or (iii) in the event of Seller's bankruptcy, suspension of business, insolvency, appointment of a receiver for Seller's property or business, or any assignment, reorganization or arrangement by Seller for the benefit of its creditors.

b.  Seller shall continue all Services not canceled.  If Buyer cancels all or part of this Contract, Seller shall be liable for Buyer's excess re-procurement costs.

c.  Buyer may require Seller to transfer title and deliver to Buyer, as directed by Buyer, any (i) completed goods, and (ii) any partially completed goods and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information and contract rights (collectively, "Manufacturing Materials") that Seller has specifically produced or acquired for the canceled portion of this Contract.  Upon direction from Buyer, Seller shall also protect and preserve property in its possession in which Buyer or its customer has an interest.

d.  Buyer shall pay the Contract price for completed goods accepted.  In addition, any payment for Manufacturing Materials accepted by Buyer and for the protection and preservation of property shall be at a price determined in accordance with the "Termination for Convenience" Article of this Contract, except that Seller shall not be entitled to profit.  Buyer may withhold from any amount due under this Contract any sum Buyer determines to be necessary to protect Buyer or Buyer's customer against loss because of outstanding liens or claims of former lien holders.

e.  If, after cancellation, it is determined that Seller was not in default, the rights and remedies of the Parties shall be as if the Contract had been terminated according to the "Termination for Convenience" Article of this Contract.

**12.  FORCE MAJEURE.**  Seller shall not be liable for the excess re-procurement costs pursuant to the "Cancellation for Default" Article of this Contract incurred by Buyer because of any failure to perform this Contract under its terms if the failure arises from causes beyond the control and without the fault or negligence of Seller.  Examples of these causes are: (a) acts of God or of the public enemy; (b) acts of the Government in either its sovereign or contractual capacity; (c) fires; (d) floods; (e) epidemics; (f) quarantine restrictions; (g) strikes; (h) freight embargoes; and (i) unusually severe weather.  In each instance, the failure to perform must be beyond the control and without the fault or negligence of Seller.  If Seller's failure is caused by the failure of a subcontractor of Seller and if such failure arises out of causes beyond the reasonable control of both, and if such failure is without the fault or negligence of either, Seller shall not be liable for excess re-procurement costs unless the goods or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit Seller to meet the required delivery schedules.  Seller shall notify Buyer in writing within ten (10) days after the beginning of any such cause(s).  In all cases, Seller shall use reasonable efforts to avoid or minimize all such failures, including exercising work-around plans or obtaining the Services from other sources.

**13.  QUALITY CONTROL.**  Seller shall establish and maintain a quality control system acceptable to Buyer for the Services purchased under this Contract.  Seller shall permit Buyer to review procedures, practices, processes and related documents to determine such acceptability.

**14.  SELLER NOTICE OF DISCREPANCIES.**  Seller shall promptly notify Buyer in writing when discrepancies in Seller's process, including any violation of or deviation from Seller's approved inspection/quality control system, or goods/materials are discovered or suspected which may affect the Services delivered or to be delivered under this Contract.

**15.  INSPECTION**

a.  At no additional cost to Buyer, Services shall be subject to inspection, surveillance and test at reasonable times and places, including Seller's subcontractors' locations.  Buyer shall perform inspections, surveillance and tests so as not to unduly delay the work.

b.  Seller shall maintain an inspection system acceptable to Buyer for the Services purchased under this Contract.

c.  If Buyer performs an inspection or test on the premises of Seller or its subcontractors, Seller shall furnish, and require its subcontractors to furnish, without additional charge, reasonable facilities and assistance for the safe and convenient performance of these duties.

**16.  ACCEPTANCE AND REJECTION**

a.  Buyer shall accept the Services or give Seller notice of rejection within a reasonable time after the date of delivery.  No payment, prior test, inspection, passage of title, any failure or delay in performing any of the foregoing, or failure to discover any defect or other nonconformance shall relieve Seller of any obligations under this Contract or impair any rights or remedies of Buyer.

b. If Seller delivers defective or non-conforming Services, Buyer may at its option and at Seller's expense: (i) require Seller to promptly reperform, correct or replace the Services; (ii) correct the Services; or (iii) obtain replacement Services from another source. Return to Seller of defective or non-conforming Services and redelivery to Buyer of corrected or replaced Services shall be at Seller's expense.

c. Seller shall not redeliver corrected or rejected Services without disclosing the former rejection or requirement for correction. Seller shall disclose any corrective action taken. All repair, replacement and other correction and redelivery shall be completed as Buyer may reasonably direct.

## 17. WARRANTY

a. Seller warrants that:
   i. The Services shall be performed by employees or agents of Seller who are experienced and skilled in their profession and in accordance with industry standards;
   ii. The Services shall be free from defects in workmanship and conform to the requirements of this Contract; and
   iii. The Services shall not infringe any patent, copyright, trademark, or other proprietary right of any third party or misappropriate any trade secret of any third party.

b. To the extent Seller's delivery of Services includes materials or goods, Seller further warrants that:
   i. The materials or goods shall conform to all specifications and requirements under this Contract and shall be free from defects in materials;
   ii. To the extent the materials or goods are not manufactured pursuant to detailed designs and specifications furnished by Buyer, such materials or goods shall be free from design and specification defects;
   iii. The materials or goods shall be free from liens or encumbrances;
   iv. The materials or goods shall not contain any viruses, malicious code, trojan horse, worm, time bomb, self-help code, back door, or other software code or routine designed to: (a) damage, destroy or alter any software or hardware; (b) reveal, damage, destroy, or alter any data; (c) disable any computer program automatically; or (d) permit unauthorized access to any software or hardware; and
   v. The materials or goods shall not contain any third-party software (including software that may be considered free software or open source software) that: (a) may require any software to be published, accessed or otherwise made available without the consent of Buyer; (b) may require distribution, copying or modification of any software free of charge; (c) may require disclosure, license or redistribution of source code; (d) may require the grant of rights in excess of those granted by Boeing in its standard end user license agreements; (e) may require that others have the right to modify the code; or, (f) may impose additional requirements on redistribution such as inclusion of additional license agreements for specific code modules.

c. This warranty shall begin upon Buyer's final acceptance of the Services and shall survive inspection, test and payment for, the Services. This warranty shall extend for a period of one (1) year or such period as set forth elsewhere in this Contract, and Buyer shall give Seller notice after discovery of any defect or nonconformance in the Services. This warranty shall run to Buyer and its successors, assigns and customers. In the event of any defect or non-conforming Services, Buyer may, at its option and at Seller's expense, either (i) require correction, replacement or reperformance of any defective or nonconforming Services, or (ii) make an equitable adjustment in the price of this Contract. Any Services corrected, replaced or reperformed shall be subject to the requirements of this Contract to the same extent as Services initially performed.

## 18. COUNTERFEIT GOODS

a. Seller shall not furnish Counterfeit Goods to Buyer, defined as goods or separately-identifiable items or components of goods that: (i) are an unauthorized copy or substitute of an Original Equipment Manufacturer or Original Component Manufacturer (collectively, "OEM") item; (ii) are not traceable to an OEM sufficient to ensure authenticity in OEM design and manufacture; (iii) do not contain proper external or internal materials or components required by the OEM or are not constructed in accordance with OEM design; (iv) have been re-worked, re-marked, re-labeled, repaired, refurbished, or otherwise modified from OEM design but not disclosed as such or are represented as OEM authentic or new; or (v) have not passed successfully all OEM required testing, verification, screening, and quality control processes. Notwithstanding the foregoing, Services or items that contain modifications, repairs, re-work, or re-marking as a result of Seller's or its subcontractor's design authority, material review procedures, quality control processes or parts management plans, and that have not been misrepresented or mismarked, shall not be deemed Counterfeit Goods. Counterfeit Goods shall be deemed nonconforming to this Contract.

b. Seller shall implement an appropriate strategy to ensure that goods furnished to Buyer under this Contract are not Counterfeit Goods. Seller's strategy shall include, but is not limited to, the direct procurement of items from OEMs or authorized suppliers, conducting approved testing or inspection to ensure the authenticity of items, and, when items are to be procured from non-authorized suppliers, obtaining from such non-authorized suppliers appropriate certificates of conformance that provide one or more of the following: (i) the OEM's original certificate of conformance for the item; (ii) sufficient records providing unbroken supply chain traceability to the OEM; or (iii) test

and inspection records demonstrating the item's authenticity.

c.  If Seller becomes aware or suspects that it has furnished Counterfeit Goods to Buyer under this Contract, Seller promptly, but in no case later than thirty (30) days from discovery, shall notify Buyer and replace, at Seller's expense, such Counterfeit Goods with OEM or Buyer-approved goods that conform to the requirements of this Contract. Seller shall be liable for all costs related to the replacement of Counterfeit Goods and any testing or validation necessitated by the installation of authentic goods after Counterfeit Goods have been replaced.

d.  Seller bears responsibility for procuring authentic goods or items from its subcontractors and shall ensure that all such subcontractors comply with the requirements of this Article.

19.  **RIGHTS OF BUYER'S CUSTOMERS AND REGULATORS TO PERFORM INSPECTION, SURVEILLANCE, AND TESTING.**  Buyer's rights to perform inspections, surveillance and tests and to review procedures, practices, processes and related documents related to quality assurance, quality control, flight safety and configuration control shall extend to the customers of Buyer that are departments, agencies or instrumentalities of the United States Government, including the United States Government Federal Aviation Administration and any successor agency or instrumentality of the United States Government. Buyer may also, at Buyer's option, by prior written notice from Buyer's Authorized Procurement Representative, extend such rights to other customers of Buyer and to agencies or instrumentalities of foreign governments equivalent in purpose to the Federal Aviation Administration. Seller shall cooperate with any such United States Government-directed or Buyer-directed inspection, surveillance, test or review without additional charge to Buyer. Nothing in this Contract shall be interpreted to limit United States Government access to Seller's facilities pursuant to law or regulation.

20.  **INVOICE AND PAYMENT.**  As compensation for Services to be performed by Seller, Buyer shall pay Seller as set forth in this Contract. Buyer shall have no liability for any other expenses or costs incurred by Seller. Payment due date, including discount periods, shall be computed from the date of the later of the scheduled delivery date of Service, the actual delivery date of Service or the date of receipt of a correct invoice. Payment shall be processed on the next payment system run following the computed payment due date. Payment shall be deemed to have been made on the date the Buyer's check is mailed or payment is otherwise tendered. Seller shall promptly repay to Buyer any amounts paid in excess of amounts due Seller. Payment shall be subject to the standard payment process set forth elsewhere in the Contract or as set forth at: http://www.boeingsuppliers.com.

Except for amounts invoiced under articles Termination for Convenience or Cancellation for Default, Seller shall be deemed to have waived all charges and fees that are not invoiced within ninety (90) calendar days after the end of the calendar year in which the charges were incurred.

21.  **TAXES.**  Unless this Contract specifies otherwise, the price of this Contract includes, and Seller is liable for and shall pay, all taxes, impositions, charges and exactions imposed on or measured by this Contract except for applicable sales and use taxes that are separately stated on Seller's invoice. Prices shall not include any taxes, impositions, charges or exactions for which Buyer has furnished a valid exemption certificate or other evidence of exemption.

22.  **FINANCIAL RECORDS AND AUDIT.**  Seller shall retain all financial records and documents pertaining to the Services for a period of no less than three years after final payment. Such records and documents shall date back to the time this Contract was issued and shall include, without limitation, catalogs, price lists, invoices, underlying data and basis for cost estimates, and inventory records. Buyer shall have the right to examine, reproduce and audit all Seller records related to pricing, performance and proposed costs associated with any proposals (prior to or after contract award), invoices or claims.

23.  **SELLER FINANCIAL REVIEW**

a.  If the Contract, in the aggregate, exceeds $700,000 and extends for more than one year, or if requested, the Seller shall provide financial data as specified below, on a quarterly basis, or as requested, to Buyer's Corporate Credit Office for credit and financial condition reviews. If Seller itself is publicly traded (not a subsidiary of a publicly-traded company) and is required to file reports with the Securities and Exchange Commission ("SEC"), Buyer's Corporate Credit Office shall obtain Seller financial data from information made available to the general public via 10-K and 10-Q reporting requirements. In the event that Seller does not submit financial statements to the SEC or is no longer required to do so during the term of this Contract, Seller shall provide financial data on a quarterly basis to Buyer's Corporate Credit Office. Such financial data shall include, but is not limited to, balance sheets, schedule of accounts payable and receivable, major lines of credit, creditors, income statements (profit and loss), cash flow statements, firm backlog, and headcount. Copies of such data are to be made available within seventy-two (72) hours of any written request by Buyer's Corporate Credit Office. All such information shall be treated as confidential.

b.  This provision shall not apply if Seller is a nonprofit education or research institution associated with state or provincial universities, an agency of the United States government or of state governments, an entity that is at least fifty percent (50%) directly owned by Buyer, or an individual providing Services when the individual is the sole employee (inclusive of subcontractors) of the Seller.

## 24. CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION AND MATERIALS

a.  Buyer and Seller shall each keep confidential and protect from unauthorized use and disclosure all (i) confidential, proprietary and/or trade secret information of a Party or third party information authorized to be disclosed by a Party, including without limitation specifications and information pertaining to qualification, certification, manufacturing, and/or quality procedures; (ii) software containing, conveying or embodying such information; and (iii) tooling that is obtained, directly or indirectly, from the other in connection with this Contract or other agreement, including Buyer's contract with its customer, if any, (collectively referred to as "Proprietary Information and Materials").  Proprietary Information and Materials shall not include information that is, as evidenced by competent records provided by the receiving Party, lawfully in the public domain in the same form as disclosed herein, lawfully disclosed to or known by the receiving Party without restriction, generally known in the relevant trade or industry prior to disclosure hereunder, or developed by the receiving Party independently without use of or reference to the disclosing Party's Proprietary Information and Materials.

b.  Buyer and Seller shall each use Proprietary Information and Materials of the other only in the performance of and for the purpose of this Contract, other contracts between the Parties, and Buyer's contract(s) with its customer, if any.  However, despite any other obligations or restrictions imposed by this Article or any prior agreement, Buyer shall have the right to use, reformat and reproduce Seller's Proprietary Information and Materials internal to Buyer, regardless of when disclosed.  Buyer shall further have the right to, use, disclose, reproduce and make derivative works of Seller's Proprietary Information and Materials (i) to fulfill Buyer's obligations under, and (ii) for the purposes of testing, certification, use, sale or support of any Services delivered under, this Contract (or Buyer's products containing such Services), other contracts with Seller and Buyer's contract with its customer, if any.  Any such use, disclosure, reproduction or derivative work by Buyer shall, whenever appropriate, include a restrictive legend suitable for the particular circumstances.  In addition to disclosures permitted hereunder, a receiving Party may disclose received Proprietary Information and Materials in response to a subpoena or court order duly issued in a judicial or legislative process, provided that the receiving Party has used reasonable efforts to give the disclosing Party advance written notice of any such disclosure requirement in order to enable the disclosing Party (i) to seek an appropriate protective order or other remedy; (ii) to consult with the receiving Party with respect to the disclosing Party's taking steps to resist or narrow the scope of such request or legal process; or (iii) to modify or waive compliance, in whole or in part, with the terms of this section.  In the event that such protective order or other remedy is not obtained in a timely manner, or the disclosing Party modifies or waives compliance, the receiving Party shall use commercially reasonable efforts to disclose only that portion of the Proprietary Information and Materials which is legally required to be disclosed and to require that all Proprietary Information and Materials that is so disclosed will be accorded confidential treatment.

c.  Upon Buyer's request at any time, and in any event upon the completion, termination or cancellation of this Contract, Seller shall return to Buyer all of Buyer's Proprietary Information and Materials and all materials derived therefrom, unless specifically directed otherwise in writing by Buyer.  Seller shall not at any time (i) dispose of (as scrap or otherwise) any goods, parts or other materials containing, conveying, embodying or made in accordance with or by reference to any Proprietary Information and Materials of Buyer without the prior written authorization of Buyer or (ii) make, use, or sell any goods, parts or other materials containing, conveying, embodying or made in accordance with or by reference to any Proprietary Information and Materials of Buyer, except to the extent required to perform this Contract without Buyer's written approval, which may take the form of a license agreement between the Parties requiring payment by Seller of a reasonable license fee to Buyer as consideration for each use of such Proprietary Information and Materials of Buyer.  Prior to disposing of such goods, parts or other materials as scrap, Seller shall render them unusable.  Buyer shall have the right to audit Seller's compliance with this Article.

d.  Seller may disclose Proprietary Information and Materials of Buyer to its subcontractors as required for the performance of this Contract, provided that each such subcontractor first agrees in writing to obligations no less restrictive than those imposed upon Seller under this Article.  Seller shall be liable to Buyer for any breach of such obligation by such subcontractor.

e.  The provisions of this Article are effective notwithstanding the application of any restrictive legends or notices to Proprietary Information and Materials.  The provisions of this Article shall survive the performance, completion, termination or cancellation of this Contract.

## 25. PATENT, TRADEMARK AND COPYRIGHT INDEMNITY.
Seller will indemnify, defend and hold harmless Buyer and its customer from all claims, suits, actions, awards (including, but not limited to, awards based on intentional infringement of patents known at the time of such infringement, exceeding actual damages and/or including attorneys'

fees and/or costs), liabilities, damages, costs and attorneys' fees related to the actual or alleged infringement of any United States or foreign intellectual property right (including, but not limited to, any right in a patent, copyright, industrial design or semiconductor mask work, or based on misappropriation or wrongful use of information or documents) and arising out of the Seller's provision of the Services and/or sale or use of the Services by either Buyer or its customer. Buyer and/or its customer will duly notify Seller of any such claim, suit or action. Seller will, at its own expense, fully defend such claim, suit or action on behalf of the indemnitees. Seller will have no obligation under this Article with regard to any infringement arising from (a) the compliance of Seller's new product design with formal specifications issued by Buyer where infringement could not be avoided in complying with such specifications or (b) use or sale of Services for other than their intended application in combination with other items when such infringement would not have occurred from the use or sale of those Services solely for the purpose for which they were designed or sold by Seller. The exception in (a) above shall not apply if the infringement arises out of adherence to one or more industry standards or regulatory requirements. For purposes of this Article only, the term Buyer will include The Boeing Company and all Boeing subsidiaries and all officers, agents and employees of Boeing or any Boeing subsidiary.

**26. INTELLECTUAL PROPERTY**

a. Definitions:

Intellectual Property ("IP"). IP means inventions, discoveries and improvements, know-how, works of authorship, technical data, drawings, specifications, process information, reports and documented information; and computer software. IP includes all worldwide common law and statutory rights to the foregoing, including but not limited to, patents, industrial designs, trade secrets, copyrights, mask work registrations, and the like.

Background IP. Background IP means all IP owned or developed by Seller prior to the effective date of or outside the scope of this Contract.

Foreground IP. Foreground IP means IP conceived, developed or first reduced to practice by, for or with Seller either alone or with others in the performance of this Contract.

b. Seller-Owned IP. Seller shall retain ownership of all its Background IP and of any Foreground IP not assigned to Buyer pursuant to paragraph e. below (collectively, the "Seller-Owned IP"). With regard to Seller-Owned IP that is other than Proprietary Information and materials, Seller grants to Buyer an irrevocable, nonexclusive, sublicensable, perpetual, paid-up, royalty-free, worldwide license (i) to use, reproduce, distribute, modify, and prepare derivative works of such Seller-Owned IP and (ii) to use, make, have made, offer for sale, sell, distribute and import products and services that incorporate or embody such Seller-Owned IP, in each case solely as necessary for the purpose of exploiting Buyer's rights in the Services and/ or the Foreground IP assigned to Buyer hereunder or as otherwise permitted under this Contract. Seller grants to Buyer such license rights for any purpose in the event Buyer cancels all or part of this Contract for Seller default in accordance with the "Cancellation for Default" Article of this Contract or in the event Buyer, in its own judgment, must provide Seller with design, manufacturing, or on-site support substantially in excess of what is required of Buyer under this Contract in order for Seller to comply with this Contract.

c. Agreements. Seller shall obtain agreements with its employees and independent contractors to enable the grant of rights to which Buyer is entitled under this Article.

d. Third Party IP. To the extent Seller incorporates third-party IP into any contract deliverable, Seller shall obtain for Buyer at least the license rights granted in paragraph b of this Article in such third-party IP, at no additional cost to Buyer and hereby grants such rights to Buyer.

e. Foreground IP. The following subparagraphs of this paragraph e shall not apply to any Services to the extent their development was funded by the U.S. Government.

  i. All Foreground IP shall be the exclusive property of Buyer. To the extent Foreground IP consists of works of authorship that qualify as a "work for hire" as defined under U.S. copyright law, such works shall be deemed to be "works made for hire" with the copyrights automatically vesting in Buyer. For all other Foreground IP, Seller hereby irrevocably transfers, conveys, and assigns all right, title and interest in such Foreground IP free of charge to Buyer. Seller shall protect Foreground IP that is Proprietary Information and Materials as required by this Contract and shall mark documents or portions of documents containing Foreground IP as "Boeing Proprietary" information or as otherwise directed by Buyer in writing.

  ii. Seller will, within two (2) months after conception or first actual reduction to practice of any invention and prior to Contract completion, disclose in writing to Buyer all inventions, whether or not patentable, in sufficient technical detail to clearly convey the invention to one skilled in the art to which the invention pertains. Seller shall promptly execute all written instruments, and assist as Buyer reasonably directs in order to file, acquire, prosecute, maintain, enforce and assign Buyer's Foreground IP rights. Seller hereby irrevocably appoints Buyer and any of Buyer's officers and agents as Seller's attorney in fact to act on Seller's behalf and instead of Seller, with the same legal force and effect as if executed by Seller, with respect to executing any such written instruments.

  iii. Buyer-Owned IP. Buyer shall retain ownership of all Buyer IP provided hereunder and of any Foreground

IP assigned to Buyer pursuant to paragraph e. above (collectively, the "Buyer-Owned IP"). Buyer grants to Seller a non-exclusive, royalty-free right during the term of this Contract to use, reproduce, modify, practice and prepare derivative works of any Buyer-Owned IP solely as necessary for Seller to perform its obligations under this Contract or otherwise permitted under this Contract. Seller shall not, without Buyer's prior written consent, use Buyer-Owned IP or any derivative works of any of the Buyer-Owned IP in any manner not authorized under this Contract, including, but not limited to, developing, manufacturing, obtaining a certification to manufacture, offering for sale or selling any product, equipment, or service which utilizes or is enabled by Buyer-Owned IP.

## 27. ASSIGNMENT AND CHANGE OF CONTROL

a.  Seller shall not and shall cause its affiliates not to, directly, indirectly, voluntarily or involuntarily, in each case, whether by transfer, operation of law, Change of Control (as defined in subparagraph b below) or otherwise assign this Contract, assign any of its rights or interest in this Contract, delegate any of its obligations under this Contract, or subcontract for all or substantially all of its performance of this Contract (each, an "Assignment"), without Buyer's prior written consent after advance written notice by Seller. No purported Assignment, with or without Buyer's consent, shall relieve Seller of any of its obligations under this Contract or prejudice any rights or claims that Buyer may have against Seller, whether such obligations, rights or claims, as the case may be, arise before or after the date of any purported Assignment; provided however, that Seller may assign its right to monies due or to become due under this Contract, and this Article does not limit Seller's ability to purchase standard commercial supplies or raw material in connection with its performance of this Contract.

b.  For purposes of this Contract, the term "Change in Control" shall mean any of the following, whether in a single transaction or a series of related transactions and whether or not Seller is a party thereto:

   i.   a sale, conveyance, transfer, distribution, lease, assignment, license or other disposition of all or substantially all of the assets of Seller;

   ii.  any consolidation or merger of Seller or its controlling affiliates, any dissolution of Seller or its controlling affiliates, or any reorganization of one or more of Seller or its controlling affiliates; or

   iii. any sale, transfer, issuance, or disposition of any equity securities or securities or instruments convertible or exchangeable for equity securities (collectively, "securities") of Seller or its controlling affiliates in which the holders of all of the securities that may be entitled to vote for the election of any member of a board of directors or similar governing body of Seller or such controlling affiliate immediately prior to such transaction(s) hold less than fifty percent (50%) of the securities that may be entitled to vote for the election of any such member in such entity immediately following such transaction(s).

## 28. PUBLICITY.

Without Buyer's prior written approval, Seller shall not, and shall require that its subcontractors at any tier shall not, release any publicity, advertisement, news release or denial or confirmation of same regarding this Contract or the Services or program to which it pertains. Seller shall be responsible to Buyer for any breach of this obligation by any subcontractor.

## 29. BUYER'S PROPERTY.

Seller shall clearly mark, maintain an inventory of and keep segregated or identifiable all of Buyer's property and all property to which Buyer acquires an interest by virtue of this Contract. Seller assumes all risk of loss, destruction or damage of such property while in Seller's possession, custody or control, including transfer to Seller's subcontractors. Upon request, Seller shall provide Buyer with adequate proof of insurance against such risk of loss. Seller shall not use such property other than in performance of this Contract without Buyer's prior written consent. Seller shall notify Buyer's Authorized Procurement Representative if Buyer's property is lost, damaged or destroyed. As directed by Buyer, upon completion, termination or cancellation of this Contract, Seller shall deliver such property, to the extent not incorporated in delivered materials, to Buyer in good condition subject to ordinary wear and tear and normal manufacturing losses. Nothing in this Article limits Seller's use, in its direct contracts with the Government, of property in which the Government has an interest.

## 30. OFFSET CREDITS/INDUSTRIAL PARTICIPATION

a.  To the exclusion of all others, Buyer or its assignees shall be entitled to all industrial benefits or offset credits that might result from this Contract. Seller shall provide all information and assistance to Buyer that Buyer may reasonably request in support of Buyer's efforts to secure offset credits related to the goods to be provided under this Contract.

b.  Before entering into a subcontract for any non-U.S. products or services in excess of $100,000 in support of this Contract, Seller shall complete and submit to Buyer Form X33647, entitled, "Advance Content Notification/Supplier Foreign Content Report" as set forth in the Supplier Data Requirements List (SDRL) applicable to this Contract. If there is no SDRL applicable to this Contract, Seller shall submit the form to Buyer's Authorized Procurement Representative and e-mail a copy to: foreigncontent@boeing.com.

c. In addition, Seller shall support Buyer in the fulfillment of offset, industrial participation, co-production or similar obligations that Boeing may have accepted as a requirement for the sale of end products to non-U.S. customers related to the goods to be provided under this Contract.

**31. UTILIZATION OF SMALL BUSINESS CONCERNS.** Seller agrees to actively seek out and provide the maximum practicable opportunities for small businesses, small disadvantaged businesses, women-owned small businesses, minority business enterprises, historically black colleges and universities and minority institutions, Historically Underutilized Business Zone small business concerns and US Veteran and Service-Disabled Veteran Owned small business concerns to participate in the subcontracts Seller awards to the fullest extent consistent with the efficient performance of this Contract.

**32. BUSINESS CONDUCT**
a. <u>Compliance with Laws</u>. Seller and the Services shall comply with all applicable statutes and government rules, regulations and orders including without limitation, (i) all applicable country laws relating to anti-corruption or anti-bribery, including, but not limited to, legislation implementing the Organization for Economic Co-operation and Development "Convention on Combating Bribery of Foreign Public Officials in International Business Transactions" or other anti-corruption/anti-bribery convention; and (ii) the requirements of the Foreign Corrupt Practices Act, as amended, ("FCPA") (15 U.S.C. §§78dd-1, *et. seq.*), regardless of whether Seller is within the jurisdiction of the United States, and Seller shall, neither directly nor indirectly, pay, offer, give, or promise to pay or give, any portion of monies or anything of value received from Buyer to a non-U.S. public official or any person in violation of the FCPA and/or in violation of any applicable country laws relating to anti-corruption or anti-bribery.
b. <u>Gratuities</u>. Seller warrants that neither it nor any of its employees, agents, or representatives have offered or given, or will offer or give, any gratuities to Buyer's employees, agents or representatives for the purpose of securing this Contract or securing favorable treatment under this Contract.
c. <u>Code of Basic Working Conditions and Human Rights</u>. Buyer is committed to providing a safe and secure working environment and the protection and advancement of basic human rights in its worldwide operations. In furtherance of this commitment, Buyer has adopted a Code of Basic Working Conditions and Human Rights setting out in detail the measures it takes to ensure this commitment is fulfilled. This code may be downloaded at http://www.boeing.com/aboutus/culture/code.html. Buyer strongly encourages Seller to adopt and enforce concepts similar to those embodied in the Boeing Code, including conducting Seller's operations in a manner that is fully compliant with all applicable laws and regulations pertaining to fair wages and treatment, freedom of association, personal privacy, collective bargaining, workplace safety and environmental protection. Seller shall include the substance of this clause, including this flowdown requirement, in all subcontracts awarded by Seller for work under this Contract.
d. <u>Environmental Health and Safety Performance</u>. Seller acknowledges and accepts full and sole responsibility to maintain an environment, health and safety management system ("EMS") appropriate for its business throughout the performance of this Contract. Buyer expects that Seller's EMS will promote health and safety, environmental stewardship, and pollution prevention by appropriate source reduction strategies. Seller shall convey the requirement of this clause to its suppliers. Seller shall not deliver goods that contain any asbestos mineral fibers.
e. <u>Seller Facility</u>. Seller shall provide Buyer written notice of any proposed plans for moving Seller's manufacturing location for the goods or moving tooling or other equipment utilized in the manufacture of the goods to another facility. In no event shall Seller proceed with implementing such plans prior to obtaining Buyer's prior written approval.
f. <u>Buyer Policies</u>. Seller agrees that Buyer's internal policies, procedures and codes are intended to guide the internal management of the Buyer and are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by the Seller against the Buyer.
g. <u>Conflict Minerals</u>. Seller shall, no later than thirty (30) days following each calendar year in which Seller has delivered any goods to Buyer, under this Contract or otherwise, complete and provide to Buyer a single and comprehensive Conflict Minerals Reporting Template, using the form found at <u>http://www.boeingsuppliers.com</u>. Seller shall perform appropriate due diligence on its supply chain in order to fulfill the reporting obligations of this Article.
h. <u>Ethics and Compliance Program</u>. Seller acknowledges and accepts full and sole responsibility to maintain an ethics and compliance program appropriate for its business throughout the performance of this Contract. Buyer strongly encourages Seller to model its program in accordance with the Federal Sentencing Guidelines, applicable guidance from enforcement authorities, and industry best practices. Seller shall publicize to its employees who are engaged in the performance of work under the Contract that they may report any concerns of misconduct by Buyer or any of its employees or agents by going to <u>Ethics@Boeing</u>. Seller shall convey the substance of this clause to its suppliers.

33. **ACCESS TO PLANTS AND PROPERTIES.** Where Seller is either entering or performing work at premises owned or controlled by Buyer or Buyer's customer or obtaining access electronically to Buyer systems or information, Seller shall comply with: (i) all the rules and regulations established by Buyer or Buyer's customer for access to and activities in and around premises controlled by Buyer or Buyer's customer; and (ii) Buyer requests for information and documentation to validate citizenship or immigration status of Seller's personnel or subcontractor personnel. In addition, Seller acknowledges that Buyer may perform routine background checks on Seller personnel. Seller shall include the substance of this clause, including this flowdown requirement, in all subcontracts awarded by Seller for work under this Contract.

34. **ACCESS TO BUYER INFORMATION AND ELECTRONIC SYSTEMS**
   a. Seller and its personnel shall comply with the Terms of Use of Boeing Information and Electronic Systems located at http://www.boeingsuppliers.com/terms.html which is incorporated herein by reference, with the revision date applicable to this Agreement being the revision in effect as of the date of Seller's acceptance of this Contract.

   b. In addition to any other rights and obligations set forth in any relevant Agreement, Seller acknowledges that any information accessed through the electronic information systems operated by or on behalf of Buyer, whether or not marked as "proprietary" or equivalent, shall be considered as proprietary to Buyer and shall be protected in accordance with the "Proprietary Information and Materials" Section of the Contract.

35. **TRADE CONTROL COMPLIANCE**
   a. The Parties shall comply with all export and import laws, regulations, decrees, orders, and policies of the United States Government and the Government of any country in which the Parties conduct business pursuant to this Contract, including but not limited to the Export Administration Regulations ("EAR") of the U.S. Department of Commerce, the International Traffic in Arms Regulations ("ITAR") of the U.S. Department of State, the U.S. Customs & Border Protection Regulations, the Harmonized Tariff Schedule, and the antiboycott and embargo regulations and guidelines as set forth in the EAR and in the U.S. Department of the Treasury, Office of Foreign Assets Control (collectively, "Trade Control Laws").
   b. Seller shall control the disclosure of, and access to, controlled items or technical data provided by Buyer related to performance of this Contract in compliance with all applicable Trade Control Laws. Seller shall not transfer (to include transfer to foreign persons employed by or associated with, or under contract to Seller, or Seller's sub-tier suppliers or Seller's non-U.S. subsidiaries) any export controlled item, data or services, without providing advance notice to Buyer and obtaining the requisite export and/or import authority.
   c. Subject to applicable Trade Control Laws, Seller shall provide Buyer with the export control classification of any commodity or technology including software.
   d. Seller represents that it maintains an effective export/import control compliance program in accordance with all applicable Trade Control Laws. A copy of process control documents and other documents reasonably requested by Buyer related to Seller's compliance with applicable Trade Control Laws shall be made available to Buyer upon request.
   e. Seller shall promptly notify Buyer if Seller is, or becomes, listed in any Denied Parties List or if Seller's export privileges are otherwise denied, suspended or revoked in whole or in part by any Governmental entity.
   f. Seller shall timely inform Buyer of any actual or alleged violations of any applicable Trade Control Laws, including any suits, actions, proceedings, notices, citations, inquiries, or other communications from any government agency concerning any actual or alleged violations, in Seller's performance under this Contract and shall comply with all reasonable requests from Buyer for information regarding any such violations.
   g. Seller shall incorporate into any contracts with its sub-tier suppliers obligations no less restrictive than those set forth in this Article requiring compliance with all applicable Trade Control Laws.

36. **CUSTOMER CLAUSES.** Clauses applicable to this Contract from Buyer's contract with its customers, if any, are incorporated elsewhere in this Contract either by attachment or by some other means of reference.

37. **GOVERNING LAW.** This Contract and any disputes arising out of, or relating to, this Contract shall be governed by the laws of the State of Delaware without regard to the conflict of law rules thereof. This Contract excludes the application of the 1980 United Nations Convention on Contracts for the International Sale of Goods.

   38. **DISPUTES.** Any dispute that arises under or is related to this Contract that cannot be settled by mutual agreement of the Parties may be decided by a court of competent jurisdiction. Pending final resolution of any dispute, Seller shall proceed with performance of this Contract according to Buyer's instructions so long as Buyer continues to pay amounts not in dispute.

## 39. NO WAIVER, RIGHTS AND REMEDIES

a. Any failures, delays or forbearances of either Party in insisting upon or enforcing any provisions of this Contract, or in exercising any rights or remedies under this Contract, shall not be construed as a waiver or relinquishment of any such provisions, rights or remedies; rather, the same shall remain in full force and effect.

b. Except as expressly and affirmatively disclaimed in writing in this Contract, the rights and remedies set forth herein are cumulative and in addition to any other rights or remedies that the Parties may have at law or in equity. If any provision of this Contract is or becomes void or unenforceable by law, the remainder shall be valid and enforceable. Seller acknowledges and agrees that money damages would not be an adequate remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of the Services to Buyer.

c. Seller agrees that Buyer approvals of Seller's technical and quality specifications, drawings, plans, procedures, reports, and other submissions shall not relieve Seller from its obligations to perform all requirements of this Contract.

d. Buyer may at any time deduct or set-off Seller's claims for money due or to become due from Buyer against any claims that Buyer has or may have arising out of this Contract or other transactions between Buyer and Seller.

## 40. INDEMNIFICATION, INSURANCE AND PROTECTION OF PROPERTY.

The following provisions shall only apply if and to the extent Seller's personnel enter or perform work at premises owned or controlled by Buyer or Buyer's customer:

a. <u>Indemnification</u>. Seller shall defend, indemnify and hold harmless The Boeing Company, its subsidiaries, and their directors, officers, employees and agents from and against all actions, causes of action, liabilities, claims, suits, judgments, liens, awards and damages of any kind and nature whatsoever for property damage, personal injury or death (including without limitation injury to or death of employees of Seller or any subcontractor thereof) and expenses, costs of litigation and counsel fees related thereto or incident to establishing the right to indemnification, arising out of or in any way related to this Contract, the performance thereof by Seller or any subcontractor thereof or other third parties within the control or acting at the direction of Seller, or any of their respective employees (collectively for the purposes of this paragraph, the "Seller Parties"), including, without limitation, the provision of goods, services, personnel, facilities, equipment, support, supervision or review. The foregoing indemnity shall apply only to the extent of the negligence or willful misconduct of the Seller Parties that occurs while on premises owned or controlled by Buyer. In no event shall Seller's obligations hereunder be limited to the extent of any insurance available to or provided by Seller or any subcontractor thereof. Seller expressly waives any immunity under industrial insurance, whether arising out of statute or other source, to the extent of the indemnity set forth in this paragraph.

b. <u>Commercial General Liability</u>. Seller shall carry and maintain, and ensure that all subcontractors thereof carry and maintain, throughout the period when work is performed and until final acceptance by Buyer, Commercial General Liability insurance with available limits of not less than $2,000,000 per occurrence for bodily injury and property damage combined. Such insurance shall contain coverage for all premises and operations, broad form property damage, contractual liability (including, without limitation, that specifically assumed under paragraph a herein) and goods and completed-operations insurance with limits of not less than $1,000,000 per occurrence for a minimum of twenty-four (24) months after final acceptance of the work by Buyer. Such insurance shall not be maintained on a per-project basis unless the respective Seller or subcontractor thereof does not have blanket coverage.

c. <u>Automobile Liability</u>. If licensed vehicles will be used in connection with the performance of the work, Seller shall carry and maintain, and ensure that any subcontractor thereof who uses a licensed vehicle in connection with the performance of the work carries and maintains, throughout the period when work is performed and until final acceptance by Buyer, Business Automobile Liability insurance covering all vehicles, whether owned, hired, rented, borrowed or otherwise, with available limits of not less than $1,000,000 per occurrence combined single limit for bodily injury and property damage.

d. <u>Workers' Compensation and Employers' Liability</u>. Throughout the period when work is performed and until final acceptance by Buyer, Seller shall, and ensure that any subcontractor thereof shall, cover or maintain insurance in accordance with the applicable laws relating to Workers' Compensation (and Employers' Liability with limits not less than $1,000,000 per incident) with respect to all of their respective employees working on or about Buyer's premises. If Buyer is required by any applicable law to pay any Workers' Compensation premiums with respect to an employee of Seller or any subcontractor, Seller shall reimburse Buyer for such payment.

e. <u>Certificates of Insurance</u>. Prior to commencement of the work, Seller shall provide for Buyer's review and approval certificates of insurance reflecting full compliance with the requirements set forth in paragraphs b, c and d. Such certificates shall be kept current and in compliance throughout the period when work is being performed and until final acceptance by Buyer, and shall provide for thirty (30) days advance written notice to Buyer in the event of cancellation. Failure of Seller or any subcontractor thereof to furnish certificates of insurance, or to procure and maintain the insurance required herein or failure of Buyer to request such certificates, endorsements or other proof of coverage shall not constitute a waiver of Seller's or subcontractor's obligations hereunder.

f. <u>Self-Assumption</u>. Any self-insured retention, deductibles and exclusions in coverage in the policies required under this Article shall be assumed by, for the account of and at the sole risk of Seller or the subcontractor which provides the insurance and to the extent applicable shall be paid by such Seller or subcontractor. In no event shall the liability of Seller or any subcontractor thereof be limited to the extent of any of the minimum limits of insurance required herein.

g. <u>Protection of Property</u>. Seller assumes, and shall ensure that all subcontractors thereof and their respective employees assume, the risk of loss or destruction of or damage to any property of such parties whether owned, hired, rented, borrowed or otherwise, brought to a facility owned or controlled by Buyer or Buyer's customer. Seller waives, and shall ensure that any subcontractor thereof and their respective employees waive, all rights of recovery against Buyer, its subsidiaries and their respective directors, officers, employees and agents for any such loss, destruction or damage. At all times Seller shall, and ensure that any subcontractor thereof shall, use suitable precautions to prevent damage to Buyer's property. If any such property is damaged by the fault or negligence of Seller or any subcontractor thereof, Seller shall, at no cost to Buyer, promptly and equitably reimburse Buyer for such damage or repair or otherwise make good such property to Buyer's satisfaction. If Seller fails to do so, Buyer may do so and recover from Seller the cost thereof.

41. **ORDER OF PRECEDENCE.** All documents and provisions in this Contract shall be read so as to be consistent to the fullest extent possible. In the event of a conflict or inconsistency between the documents or provisions as incorporated into or attached to the Contract, the documents or provisions shall prevail in the order listed below, with the first document or provision listed having the highest precedence:

Document Title/Description:
   a. Customer Contract Requirements (CCR), if set forth in this Contract
   b. The system generated purchase contract document
   c. Common terms and conditions (CXXX, DXXX, EXXX, FXXX, GXXX, HXXX, IXXX, JXXX, MXXX, QXXX)
   d. Buyer site-specific terms and conditions
   e. General Provisions (GP1, GP2, GP3, GP4, GP6, GP7, GP8, GP9) and Special Provisions (SP1, SP2, SP3, SP4)
   f. Specifications (the most recently agreed to and issued version of specifications shall control and Buyer's specifications will prevail over any subsidiary documents referenced therein)
   g. Statements of work (the most recently agreed to and issued version of a statement of work shall control)
   h. All other attachments, exhibits, appendices, documents or terms incorporated by reference in or attached to this Contract

42. **ENTIRE AGREEMENT.** This Contract, together with all purchase orders, change orders, attachments, exhibits, supplements, specifications, and other terms referenced in this Contract, contains the entire agreement of the Parties and supersedes any and all prior agreements, understandings and communications between Buyer and Seller related to the subject matter of this Contract.

# **EXHIBIT** B

Allianz Global Corporate & Specialty®

# Aviation Commercial General Liability Insurance Policy

## Prepared for:

GSSL, Inc. dba Near Space Corporation (NSC), et al
c/o Kris Lachenmeier
PO Box 909
Tillamook, OR 97141

## Arranged by:

Halton Hall & Associates, Inc.
PO Box 6275
Fort Worth, TX 76115





# Allianz Global Corporate & Specialty

The following are your options for reporting a claim to Allianz Global Corporate & Specialty.

We also recommend that you contact your agent or broker.

- Email: NewLoss@agcs.allianz.com

- Call:   1-800-558-1606
  (outside of the U.S., +1-314-513-1353)

- Fax:   1-888-323-6450
  (outside of the U.S., +1-314-513-1345)

- Mailing Address:

  Allianz Global Corporate & Specialty
  Attn: FNOL Claims Unit
  One Progress Point Parkway
  O'Fallon, MO 63368

**AGCS-FNOL (07-15)**

**113**



Policy Number A2GA000581517AM                    Previous Policy Number  A2GA000581516AM

# AVIATION COMMERCIAL GENERAL LIABILITY COVERAGE DECLARATIONS

| Issuing Company: | PRODUCER NAME: |
|---|---|
| Allianz Global Risks US Insurance Company<br>225 W. Washington Street, Suite 1800<br>Chicago, IL  60606-3484<br>(hereinafter known as the Company) | Halton Hall & Associates, Inc.<br>PO Box 6275<br>Fort Worth, TX 76115 |

**ITEM 1**.   NAMED INSURED:        GSSL, Inc. dba Near Space Corporation (NSC), et al

MAILING ADDRESS:   c/o Kris Lachenmeier
PO Box 909
Tillamook, OR 97141

**ITEM 2**.   POLICY PERIOD:        FROM  March 1, 2017          TO     March 1, 2018

BOTH AT 12:01 A.M. LOCAL STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| ITEM 3. LIMITS OF INSURANCE | | |
|---|---|---|
| GENERAL AGGREGATE | $ | 2,000,000 |
| EACH OCCURRENCE | $ | 2,000,000 |
| DAMAGE TO PREMISES RENTED TO YOU | $ | 250,000  each premises |
| PRODUCTS/COMPLETED OPERATIONS | $ | Not Covered  aggregate |
| PERSONAL & ADVERTISING INJURY | $ | 2,000,000  aggregate |
| MEDICAL EXPENSE | $ | 5,000  each person |
| HANGARKEEPER'S LIABILITY | | |
|     EACH **LOSS** | $ | 250,000 |
|     EACH **AIRCRAFT** | $ | 250,000 |
|     DEDUCTIBLES | $ | NIL  each turbine powered **aircraft** |
| | $ | NIL  each other **aircraft** |
| **PROPERTY DAMAGE** DEDUCTIBLE (excluding **Property Damage** included in the **products-completed operations hazard)** | $ | NIL  each turbine powered **aircraft** |
| | $ | NIL  each other **aircraft** |
| | $ | NIL  each non-**aircraft** claim |



| **FORM OF BUSINESS** | | | |
|---|---|---|---|
| ☐ INDIVIDUAL | ☐ PARTNERSHIP | ☐ JOINT VENTURE | ☐ TRUST |
| ☒ LIMITED LIABILITY COMPANY | ☒ ORGANIZATION, INCLUDING A CORPORATION (BUT NOT INCLUDING A PARTNERSHIP, JOINT VENTURE, TRUST, LIMITED LIABILITY COMPANY OR PUBLIC ENTITY) | | |
| ☐ A PUBLIC ENTITY | | | |

| **ALL PREMISES YOU OWN, RENT OR OCCUPY** | |
|---|---|
| LOCATION # | ADDRESS(ES) OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 1 | Any premises necessary or incidental to the aviation operations of the Named Insured |

| **PREMIUM PAYABLE** | | | |
|---|---|---|---|
| | PREMIUM | | $▮▮▮▮▮ |
| | STATE TAX OR OTHER (if applicable) | | |
| | TOTAL | | $▮▮▮▮▮ |
| PREMIUM SHOWN IS PAYABLE: | ☒ AT INCEPTION | ☐ SEMI-ANNUALLY | ☐ QUARTERLY ☐ MONTHLY |

| **FORMS AND ENDORSEMENTS ATTACHED TO THIS POLICY AS OF THE EFFECTIVE DATE** |
|---|
| Endorsements 1 - 11 |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

**In Witness Whereof**, we have caused this policy to be executed and attested.

Secretary                                                                                 President

**AGCS - CGL 1205 (09-09)**                                                                         **Page 2 of 2**



# TABLE OF CONTENTS

AVIATION COMMERCIAL GENERAL LIABILITY INSURANCE POLICY.............................................................2

*SECTION I – DEFINITIONS*...........................................................................................................................2

*SECTION II - COVERAGES*...........................................................................................................................6

    COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY..............................................6
        1.   Insuring Agreement...................................................................................................................6
        2.   Exclusions.................................................................................................................................6
    COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY ....................................................9
        1.   Insuring Agreement...................................................................................................................9
        2.   Exclusions.................................................................................................................................9
    COVERAGE C – MEDICAL PAYMENTS.................................................................................................10
        1.   Insuring Agreement.................................................................................................................10
        2.   Exclusions...............................................................................................................................10
    COVERAGE D – HANGARKEEPER'S LIABILITY ...................................................................................11
        1.   Insuring Agreement.................................................................................................................11
        2.   Exclusions...............................................................................................................................11
    SUPPLEMENTARY PAYMENTS – COVERAGE A, B AND D ..................................................................12

*SECTION III - LIMITS OF INSURANCE*.......................................................................................................12

*SECTION IV – COMMON POLICY EXCLUSIONS*........................................................................................13

*SECTION V – WHO IS AN INSURED*...........................................................................................................16

*SECTION VI – POLICY CONDITIONS*..........................................................................................................18

        1.   Bankruptcy..............................................................................................................................18
        2.   Cancellation............................................................................................................................18
        3.   Changes..................................................................................................................................18
        4.   Duties In The Event Of Occurrence, Loss, Claim Or Suit.......................................................18
        5.   Examination Of Your Books And Records...............................................................................18
        6.   Inspection And Surveys..........................................................................................................19
        7.   Legal Action............................................................................................................................19
        8.   Other Insurance......................................................................................................................19
        9.   Premiums................................................................................................................................20
       10.  Premium Audit........................................................................................................................20
       11.  Representations......................................................................................................................20
       12.  Separation Of Insureds...........................................................................................................20
       13.  State Statutes.........................................................................................................................20
       14.  Titles Of Paragraphs..............................................................................................................20
       15.  Transfer Of Rights Of Recovery Against Others To Us..........................................................20
       16.  Transfer Of Your Rights And Duties Under This Policy...........................................................20
       17.  Violation Of Statute.................................................................................................................21
       18.  When We Do Not Renew........................................................................................................21

**AGCS - CGL 1400 (07-06)**          Includes copyrighted material of Insurance          **Page 1 of 21**
Services Office, Inc. with its permission.

116

# AVIATION COMMERCIAL GENERAL LIABILITY INSURANCE POLICY

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the Company providing this insurance which is shown in the Declarations (and hereinafter referred to as the Company).

The word "Insured" means any person or organization qualifying as such under **SECTION – V - WHO IS AN INSURED**.

Other words and phrases that appear in **bold** type have special meaning. Refer to **SECTION I – DEFINITIONS**.

In consideration of the payment of the premium, in reliance upon the statements of the Declarations made a part hereof, subject to all of the terms of this policy including the applicable limits of liability, the Company agrees with the Named Insured with respect to the coverages indicated in the Declarations as follows:

## SECTION I – DEFINITIONS

1. **Advertisement** means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

   **a.** notices that are published include material placed on the Internet or on similar electronic means of communication.

   **b.** regarding web-sites, only that part of a web-site that is about your goods, products or services for the purpose of attracting customers or supporters is considered **advertisement**.

2. **Aircraft** means any **aircraft** including engines, propellers, operating and navigating instruments and radio equipment attached to or usually attached to or carried on the **aircraft**, including component parts detached and not replaced by other similar parts, and tools therein which are standard for the make and type of **aircraft**. The term **aircraft** excludes missiles, **spacecraft** and launch vehicles.

3. **Auto** means:

   **a.** a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment or

   **b.** any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, **auto** does not include **mobile equipment.**

4. **Aviation operations** means all operations arising from the ownership, maintenance or use of locations for aviation activities including that portion of roads or other accesses that adjoin these locations. **Aviation operations** include all operations necessary or incidental to aviation activities.

5. **Bodily Injury** means physical injury sustained by any person, caused by an **occurrence** during the policy period, including sickness, disease, mental anguish, and death at any time resulting therefrom. Mental anguish does not include **Personal Injury**.

6. **Coverage territory** means any of the following:

   **a.** the United States of America (including its territories and possessions), Puerto Rico and Canada;

   **b.** international waters or airspace, provided the occurrence takes place in the course of travel or transportation to or from any place included in **a.** above;

   **c.** all parts of the world if the injury or damage arises out of,

      (1) goods or products made or sold by you in the territory described in **a.** above, or

      (2) the activities of a person whose home is in the territory described in **a.** above, but who is away for a short time on your business, or

      (3) **Personal and Advertising Injury** offenses that take place through the Internet or similar electronic means of communication,

   provided that the Insured's responsibility to pay damages is determined in a **suit** on the merits, in the territory described in **a.** above or in a settlement we agree to.

7. **Employee** includes a **leased worker**. **Employee** does not include a temporary worker.

8. **Executive officer** means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

9. **Impaired property** means tangible property, other than **your product** or **your work,** that cannot be used or is less useful because:

   **a.** it incorporates **your product** or **your work** that is known or thought to be defective, deficient, inadequate or dangerous or

   **b.** you have failed to fulfill the terms of contract or agreement and

   if such property can be restored to use by:

**AGCS - CGL 1400 (07-06)**        Includes copyrighted material of Insurance Services Office, Inc. with its permission.        **Page 2 of 21**

**117**

**c.** the repair, replacement, adjustment or removal of **your product** or **your work** or

**d.** your fulfilling the terms of the contract or agreement.

**10. In flight** means the time commencing with the actual take-off run of the **aircraft** until it has completed its landing roll, or if the **aircraft** is a rotorcraft, from the time the rotors start to rotate under power until they cease to rotate.

**11. Insured contract** means any of the following:

**a.** a contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with the permission of the owner is not an **insured contract**;

**b.** a sidetrack agreement;

**c.** any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** an obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

**e.** an elevator maintenance agreement;

**f.** that part of any other contract or agreement pertaining to your **aviation operations** (including indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for **Bodily Injury** or **Property Damage** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **11.** does not include that part of any contract or agreement:

(1) that indemnifies a railroad for **Bodily Injury** or **Property Damage** arising out of construction or demolition operations within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing,

(2) that indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications or

(b) giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage, or

(3) under which the Insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the Insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities,

(4) that indemnifies any person or organization for **Bodily Injury** or **Property Damage** arising out of the manufacture of **aircraft** or **aircraft** parts by the indemnitee,

(5) that indemnifies any person or organization for **Bodily Injury** or **Property Damage** arising out of the major alteration or repair or **aircraft** parts by the indemnitee or

(6) which is agreed to orally by you and another party, unless the contract or agreement is required by a governmental body for you to use an airport.

**12. Launch Vehicle** means a **rocket** (including, but not limited to, the Space Transportation System (STS)) used to carry or launch a probe, **spacecraft product** or similar.

**13. Leased worker** means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. **Leased worker** does not include a temporary worker.

**14. Loading or unloading** means the handling of property:

**a.** after it is moved from the place where it is accepted for movement into or onto an **aircraft**, watercraft or **auto**,

**b.** while it is in or on an **aircraft**, watercraft or **auto** or

**c.** while it is being moved from an **aircraft**, watercraft or **auto** to the place where it is finally delivered.

**Loading or unloading** does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the **aircraft**, watercraft or **auto**.

**15. Loss** means an accident resulting in direct damage to tangible property. **Loss** includes any resulting loss of use.

**16. Military Aviation Products** means **your products** while owned by or used by or in the possession of the armed services of any government. An **aircraft** leased or chartered to the armed services of any government shall be deemed not to be a **military aviation product**.

**AGCS - CGL 1400 (07-06)**          Includes copyrighted material of Insurance          **Page 3 of 21**
                                        Services Office, Inc. with its permission.

118

**17. Missile** means a **rocket** (except **launch vehicles**):

   **a.** After arrival of a **missile** at a launching site, such **missile** shall be deemed not to be owned by, loaned to, in the possession or control of, on **in flight** by the Insured.

   **b.** When the Insured removes a **missile** from the launching site, or recovers a **missile** after completion of its flight for the purpose of returning it to the premises of the Insured other than a launching site, such **missile** shall be deemed to be in the possession or control of the Insured until such **missile** again arrives at a launching site or the Insured surrenders possession of such **missile** to a person or organization who is not an Insured under this policy.

**18. Mobile equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

   **a.** bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   **b.** vehicles maintained for use solely on or next to premises you own, lease, or rent including special use vehicles designed for operation on airports, however, this shall not include passenger cars, pickup trucks, ambulances, tow trucks, buses, snow plows (except while within the confines of the aircraft operations area);

   **c.** vehicles that travel on crawler treads;

   **d.** vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) power cranes, shovels, loaders, diggers or drills or

      (2) road construction or resurfacing equipment such as graders, scrapers or rollers.

   **e.** vehicles not described in **a.**, **b.**, **c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well service equipment or

      (2) cherry pickers and similar devices used to raise and lower workers.

   **f.** vehicles not described in **a.**, **b.**, **c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not **mobile equipment** but will be considered **autos**:

      (1) equipment designed primarily for:

         (a) road maintenance, (but not construction or resurfacing),

         (b) street cleaning or

         (c) snow removal.

      (2) cherry pickers and similar devices mounted on an automobile or truck chassis and used to raise or lower workers;

      (3) air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

   However, **mobile equipment** does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered **autos**.

**19. Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, during the policy period, that results in **Bodily Injury** or **Property Damage** during the policy period neither expected nor intended from the standpoint of the Insured. In the event of continuing or progressive **Bodily Injury** or **Property Damage** happening over an extended length of time, such **Bodily Injury** and **Property Damage** shall be deemed to be one **occurrence**, and shall be deemed to occur only when such **Bodily Injury** and **Property Damage** first commences.

**20. Personal and Advertising Injury** means injury, including consequential **Bodily Injury**, arising out of one or more of the following offenses:

   **a.** false arrest, detention or imprisonment;

   **b.** malicious prosecution;

   **c.** the wrongful eviction from, wrongful entry into or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies committed by or on behalf of its owner, landlord or lessor;

   **d.** oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   **e.** oral or written publication, in any manner, of material that violates a person's right of privacy;

   **f.** the use of another's advertising idea in your **advertisement**;

**AGCS - CGL 1400 (07-06)**    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    **Page 4 of 21**

**119**

**g.** infringing upon another's copyright, title or slogan in your **advertisement**;

**h.** misdirection of a person to an **aircraft** or other conveyance.

**21. Products-completed operations hazard:**

**a.** includes all **Bodily Injury** and **Property Damage** occurring away from the premises you own, lease, or rent and arising out of **your product** or **your work** except:

   (1) products that are still in your physical possession or

   (2) work that has not yet been completed or abandoned. However, **your work** will be deemed completed at the earliest of the following times:

      (a) when all of the work called for in your contract has been completed;

      (b) when all of the work to be done at the job site has been completed if your contract calls for work at more than one job site;

      (c) when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include **Bodily Injury** or **Property Damage** arising out of any of the following:

   (1) the transportation of property, unless the injury or damage arising out of a condition in or on a vehicle not owned or operated by you, and that the condition was created by the **loading or unloading** of that vehicle by any Insured;

   (2) the existence of tools, uninstalled equipment or abandoned or unused materials;

   (3) products or operations for which the classification, listed in the Declarations or in a policy schedule, states that **products-completed operations** are subject to the General Aggregate Limit.

**22. Property Damage** means:

**a.** physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it.

**b.** loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the **occurrence** that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems software, hard or floppy disks, DVD/CD-ROMS, flash memory, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**23. Rocket** means a projectile, pyrotechnic device or flying vehicle propelled by a reaction engine that contains within itself, or carries along with itself, the substances necessary for its operation or for the consumption or combustion of its fuel, and not normally requiring intake of any outside substance.

**24. Spacecraft** means a spacecraft, satellite, spaceship, space station (or **launch vehicle** for such spacecraft) designed to travel to, in, or from and operate primarily in space (including parts thereof detached **in flight**). The term spacecraft excludes **aircraft** and **missiles**.

**25. Suit** means a civil proceeding in which damage because of **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** to which this insurance applies are alleged. **Suit** includes:

**a.** an arbitration proceeding in which such damages are claimed and to which the Insured must submit or does submit with our consent, or

**b.** any other alternative dispute resolution proceeding in which such damages are claimed and to which the Insured submits with our consent.

**26. Volunteer worker** means a person who is not your **employee**, and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**27. Your product:**

**a.** means:

   (1) any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by

      (a) you,

      (b) others trading under your name or

      (c) a person or organization whose business or assets you have acquired.

**AGCS - CGL 1400 (07-06)**        Includes copyrighted material of Insurance        **Page 5 of 21**
Services Office, Inc. with its permission.

120

(2) containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** includes:

(1) warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **your product** and

(2) the providing of or failure to provide warnings or instructions.

**c.** does not include vending machines or other property rented to or located for the use of others but not sold.

**28. Your work:**

**a.** means:

(1) work or operations performed by you or on your behalf or

(2) materials, parts or equipment furnished in connection with such work or operation.

**b.** includes:

(1) warranties or representation made at any time with respect to the fitness, quality, durability, performance or use of **your work**;

(2) the providing of or failure to provide warnings or instructions.

# SECTION II - COVERAGES

## COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the Insured becomes legally obligated to pay as damages because of **Bodily Injury** or **Property Damage** to which this insurance applies resulting from your **aviation operations**. We will have the right and duty to defend the Insured against any **suit** seeking those damages. However, we will have no duty to defend the Insured against any **suit** seeking damages for **Bodily Injury** or **Property Damage** to which this insurance does not apply. We may at our discretion investigate any **occurrence** and settle any claim or **suit** that may result. However:

(1) the amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE,** and

(2) our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settle-

ments under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS – COVERAGE A, B AND D.**

**b.** This insurance applies to **Bodily Injury** and **Property Damage** only if:

(1) the **Bodily Injury** or **Property Damage** is caused by an **occurrence** that takes place in the **coverage territory**,

(2) the **Bodily Injury** or **Property Damage** occurs during the policy period and

(3) prior to the policy period, no Insured or any **employee** authorized to give or receive notice of an **occurrence** or claim, knew that the **Bodily Injury** or **Property Damage** had occurred, in whole or in part. If such listed Insured or authorized **employee** knew, prior to the policy period, that the **Bodily Injury** or **Property Damage** occurred, then any continuation, change or resumption of such **Bodily Injury** or **Property Damage** during or after the policy period will be deemed to have been known prior to the policy period.

**c. Bodily Injury** or **Property Damage** which occurs during the policy period and was not, prior to the policy period, known to have occurred by any Insured or any **employee** authorized by the Insured to give or receive notice of an **occurrence** or claim, includes any continuation, change or resumption of that **Bodily Injury** or **Property Damage** after the end of the policy period.

**d. Bodily Injury** or **Property Damage** will be deemed to have been known to have occurred at the earliest time when any Insured or any **employee** authorized to give or receive notice of an **occurrence** or claim:

(1) reports all or any part of the **Bodily Injury** or **Property Damage** to us or any other insurer, or

(2) receives written or verbal demand or claim for damages because of the **Bodily Injury** or **Property Damage,** or

(3) becomes aware by any other means that **Bodily Injury** or **Property Damage** has occurred or has begun to occur.

**e.** Damages because of **Bodily Injury** include damages claimed by any person or organization for care, loss of services or death resulting at any time from **Bodily Injury**.

**AGCS - CGL 1400 (07-06)**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     **Page 6 of 21**

**121**

**2. Exclusions**

The insurance provided by Coverage A does not apply to:

**a. Bodily Injury** or **Property Damage** expected or intended from the standpoint of the Insured.

This exclusion does not apply to **Bodily Injury** resulting from the use of reasonable force to protect persons or property.

**b. Bodily Injury** or **Property Damage** for which the Insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

This exclusion does not apply to liability for damages:

(1) that the Insured would have in the absence of the contract or agreement or

(2) assumed in a contract or agreement that is an **insured contract**, provided the **Bodily Injury** and **Property Damage** occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an **insured contract**, reasonable attorney fees and necessary litigation expenses incurred by or for a party other than the Insured are deemed to be damages because of **Bodily Injury** or **Property Damage**, provided that:

(a) liability to such party for, or for the cost of, that party's defense has also been assumed in the same **insured contract** and

(b) such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Bodily Injury** or **Property Damage** for which any Insured may be held liable by reason of any of the following:

(1) causing or contributing to the intoxication of any person;

(2) the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol;

(3) any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion **c.** applies only if you are in the business of manufacturing, distributing, selling, servicing or furnishing alcoholic beverages.

**d.** Any obligation of the Insured under a workers' compensation, disability benefits or unemployed compensation law or any similar law.

**e. Bodily Injury** to:

(1) an **employee** of the Insured arising out of and in the course of:

(a) employment by the Insured or

(b) performing duties related to the conduct of the Insured's business.

(2) the spouse, child, parent, brother or sister of the **employee** as a consequence of paragraph **e.**(1) above.

This exclusion applies:

(3) whether the Insured may be liable as an employer or in any other capacity and

(4) to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the Insured under an **insured contract**.

**f. Bodily Injury** and **Property Damage** arising out of air traffic control operations on the ground or in the air.

**g. Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use or entrustment to others of any **aircraft**, **auto** or watercraft owned by or operated by or leased, rented, or loaned to any Insured. Use includes operation and **loading or unloading** and with respect to **aircraft**, operated by also includes operation on behalf of any Insured.

This exclusion applies even if the claims against any Insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that Insured, if the **occurrence** which caused the **Bodily Injury** or **Property Damage** involved the ownership, maintenance, use or entrustment to others of any **aircraft**, **auto** or watercraft that is owned by or operated by or leased, rented or loaned to any Insured.

This exclusion **g.** does not apply to any of the following:

(1) a watercraft while ashore on premises you own, or rent;

(2) a watercraft you do not own that is:

(a) less than 26 feet long and

(b) not being used to carry persons or property for a charge.

**AGCS - CGL 1400 (07-06)**      Includes copyrighted material of Insurance Services Office, Inc. with its permission.      **Page 7 of 21**

**122**

(3) Parking an **auto** on or on the ways next to premises you own or rent, provided the **auto** is not owned by or leased, rented or loaned to you or any Insured;

(4) Liability assumed under any **insured contract** for the ownership, maintenance or use of watercraft;

(5) **Bodily Injury** or **Property Damage** arising out of:

   (a) the operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of **mobile equipment** if it were not subject to compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged or

   (b) the operation of any of the machinery or equipment listed in paragraph **f.** (2) or **f.** (3) of the definition of **mobile equipment.**

h. **Bodily Injury** or **Property Damage** arising out of:

(1) the transportation of **mobile equipment** by an **auto** owned or operated by or leased, rented or loaned to any Insured or

(2) the use of **mobile equipment** in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition contest or stunting activity.

i. **Property Damage** arising out of the appropriation of property or property rights by governmental power.

j. **Property Damage** to any of the following:

(1) property you own, lease, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) premises you sell, give away or abandon, if the **Property Damage** arises out of any part of those premises;

(3) property loaned to you;

(4) personal property in the care, custody or control of the Insured;

(5) that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the **Property Damage** arises out of those operations;

(6) that particular part of any property that must be restored, repaired or replaced because **your work** was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to **Property Damage** (other than damage by fire) to premises, including the contents of such premises rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in **SECTION III – LIMITS OF INSURANCE**.

Paragraph (2) of this exclusion does not apply if the premises are **your work** and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to **Property Damage** included in the **products-completed operations hazard.**

k. **Property Damage** to **your product** arising out of it or any part of it.

l. **Property Damage** to **your work** arising out of it or any part of it and included in the **products-completed operations hazard.**

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. **Property Damage** to **impaired property** or property that has not been physically injured, arising out of:

(1) a defect, deficiency, inadequacy or dangerous condition in **your product** or **your work**, or

(2) a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **your product** or **your work** after it has been put to its intended use.

n. **Property damage** to **launch vehicles** including any parts or any articles used in connection therewith; however, this exclusion shall not apply if such **property damage** is caused by an **aircraft** or **your product** forming a part of such **aircraft**.

o. **Property damage** to **spacecraft** including any parts or any articles used in connection therewith, after such **spacecraft** or parts or articles have been delivered to a launch site; however, this exclusion shall not apply to **property dam-**

**AGCS - CGL 1400 (07-06)**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     Page 8 of 21

123

**age** resulting from an **aircraft** including any parts or articles used in connection therewith.

**p.** **Property damage** to any **missile** or any **military aviation product** arising out of such **missile** or **military aviation product** including any parts thereof.

**q.** Damages claimed for any **loss**, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of any of the following:

(1) **Your product**,

(2) **Your work** or

(3) **Impaired property,**

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**r.** **Bodily Injury** arising out of **Personal and Advertising Injury**.

**s.** Damages arising out of the **loss** of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts, or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD/DVD-ROMS, flash memory, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**t.** **Bodily Injury** to any of the following:

(1) a person arising out of any:

(a) refusal to employ that person,

(b) termination of that person's employment or

(c) employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person.

(2) the spouse, child, parent, brother or sister of that person as a consequence of **Bodily Injury** to that person at whom any of the employment-related practices described in paragraphs (a), (b) or (c) above is directed.

This exclusion applies:

(1) whether the Insured may be liable as an employer or in any other capacity and

(2) to any obligation to share damages with or to repay someone else who must pay damages because of the injury.

Exclusions **c.** through **q.** do not apply to damage by fire to premises while rented or leased to you or temporarily occupied by you with the permission of the owner. A separate limit of insurance applies to this coverage as described in **SECTION III – LIMITS OF INSURANCE.**

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.** **Insuring Agreement**

**a.** We will pay those sums that the Insured becomes legally obligated to pay as damages because of **Personal and Advertising Injury** to which this insurance applies resulting from your **aviation operations**. We will have the right and duty to defend any **suit** seeking those damages. However, we will have no duty to defend the Insured against any **suit** seeking damages for **Personal and Advertising Injury** to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or **suit** that may result. However:

(1) the amount we will pay for damages is limited as described in **SECTION III – LIMITS OF INSURANCE**;

(2) our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverage A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS – COVERAGES A, B AND D.**

**b.** This insurance applies to **Personal and Advertising Injury** caused by an offense arising out of your **aviation operations,** but only if the offense was committed in the **coverage territory** during the policy period.

**2.** **Exclusions**

The insurance provided by **Coverage B** does not apply to:

**a.** **Personal and Advertising Injury** caused by or at the direction of the Insured with the knowledge that the act would violate the rights of another and would inflict **Personal and Advertising Injury**.

Includes copyrighted material of Insurance Services Office, Inc. with its permission.

b.  **Personal and Advertising Injury** arising out of oral or written publication of material, if done by or at the discretion of the Insured with knowledge of its falsity.

c.  **Personal and Advertising Injury** arising out of oral or written publication of material, whose first publication took place before the beginning of the policy period.

d.  **Personal and Advertising Injury** arising out of a criminal act committed by or at the direction of the Insured.

e.  **Personal and Advertising Injury** for which the Insured has assumed liability in a contract or written agreement. This exclusion does not apply to liability for damages that the Insured would have in the absence of the contract or agreement.

f.  **Personal and Advertising Injury** arising out of a breach of contract, except an implied contract to use another's advertising idea in your **advertisement**.

g.  **Personal and Advertising Injury** arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your **advertisement**.

h.  **Personal and Advertising Injury** arising out of the wrong description of the price of goods, products or services stated in your **advertisement**.

i.  **Personal and Advertising Injury** arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

    However this exclusion does not apply to infringement, in your **advertisement,** of copyright, title or slogan.

j.  **Personal and Advertising Injury** committed by an Insured whose business is:

    (1) advertising, broadcasting, publishing or telecasting,

    (2) designing or determining content of websites for others or

    (3) an internet search, access, content or service provider.

    However, this exclusion does not apply to paragraphs **a., b.** and **c.** of **Personal and Advertising Injury** under **SECTION I - DEFINITIONS**.

    For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k.  **Personal and Advertising Injury** arising out of an electronic chat room or bulletin board the Insured hosts, owns, or over which the Insured exercises control.

l.  **Personal and Advertising Injury** arising out of the unauthorized use of another's name or product in your e-mail address, domain name or meta tag, or any other similar tactics to mislead another.

m.  **Personal and Advertising Injury** to:

    (1) a person arising out of any of the following:

        (a) refusal to employ that person,

        (b) termination of that person's employment or

        (c) employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person.

    (2) the spouse, child, parent, brother or sister of that person as a consequence of **Personal and Advertising Injury** to that person at whom any of the employment-related practices described in paragraphs (a), (b) or (c) above is directed.

    This exclusion applies:

    (1) whether you may be held liable as an employer or in any other capacity and

    (2) to any obligation to share damages with or to repay someone else who must pay damages because of injury.

n.  **Personal injury** arising out of the taking of or exercising of the property rights of others by overflight or other operation of **aircraft**.

**COVERAGE C – MEDICAL PAYMENTS**

1.  **Insuring Agreement**

    a.  We will pay medical expenses as described below for **Bodily Injury** caused by an accident:

        (1) on premises you own, lease, or rent,

        (2) on ways next to premises you own, lease or rent or

        (3) arising out of your **aviation operations**,

        provided that:

        (1) the accident takes place in the **coverage territory** and during the policy period,

**AGCS - CGL 1400 (07-06)**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     **Page 10 of 21**

**125**

(2) the expenses are incurred and reported to us within one year of the date of the accident and

(3) the injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for any of the following:

(1) first aid administered at the time of an accident,

(2) necessary medical, surgical, x-ray and dental services, including prosthetic devices and

(3) necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for **Bodily Injury:**

**a.** to any Insured, except **volunteer workers**,

**b.** to a person hired to do work for or on behalf of any Insured or a tenant of any Insured,

**c.** to a person injured on that part of premises you own, lease or rent that the person normally occupies,

**d.** to a person, whether or not an **employee** of any Insured, if benefits for the **Bodily Injury** are payable or must be provided under a workers' compensation or disability benefits law or a similar law,

**e.** to a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests,

**f.** included within the **products-completed operations hazard** or

**g.** excluded under **Coverage A**.

**COVERAGE D – HANGARKEEPER'S LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the Insured becomes legally obligated to pay as damages because of **loss** to **aircraft** (subject to the deductible shown in the Declarations if applicable unless such **loss** results from fire or explosion or while the **aircraft** is dismantled and being transported) occurring while such **aircraft** is in the care, custody or control of the Insured for safekeeping, storage, service or repair. We will have the right and duty to defend any **suit** seeking those damages. We may at our discre-

tion investigate any **loss** and settle any claim or **suit** that may result. However:

(1) the amount we will pay for damages is limited as described in **SECTION III – LIMITS OF INSURANCE**.

(2) our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **Coverage D**.

(3) when you repair damages which you have caused we will not pay more than the following:

(a) your actual cost for necessary material and parts of like kind and quality and

(b) your actual wages for labor at current straight time rates with no premium for overtime, plus up to 150% of such wages as an allowance for overhead and supervision.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under **SUPPLEMENTARY PAYMENTS – COVERAGES A, B AND D**.

**b.** This insurance applies to damages because of loss to **aircraft** only if:

(1) the **loss** takes place in the **coverage territory** and

(2) the **loss** occurs during the policy period.

**2. Exclusions**

This insurance does not apply to any of the following:

**a.** the Insured's liability under any agreement to be responsible for **loss**;

**b.** **loss** to robes, wearing apparel, personal effects or merchandise;

**c.** loss or damage to **aircraft** or parts of any **aircraft** that is:

(1) owned by, leased to, rented to or loaned to the Insured or partner(s) of the Insured or

(2) owned by, leased to, rented to or loaned to an officer or employee of the Insured unless the property is an **aircraft** in your custody under an agreement for which a charge has been made.

**d.** **loss** due to theft or conversion caused in any way by you, your employees, your partners or by your shareholders.

**e.** **loss** to **your work** arising out of it or any part of it.

**AGCS - CGL 1400 (07-06)**      Includes copyrighted material of Insurance Services Office, Inc. with its permission.      **Page 11 of 21**

**126**

**f.** **loss** to **aircraft** while **in flight.**

## SUPPLEMENTARY PAYMENTS – COVERAGE A, B AND D

**1.** We will pay the following with respect to any claims we investigate or settle or any **suit** we defend:

  **a.** all expenses we incur.

  **b.** up to $5,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the **Bodily Injury** Liability Coverage applies. We do not have to furnish these bonds.

  **c.** the cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

  **d.** all reasonable expenses incurred by the Insured at our request to assist in the investigation or defense of the claim or **suit**, including actual loss of earnings up to $250 per day because of time off from work.

  **e.** all costs taxed against the Insured in the **suit**.

  **f.** pre-judgment interest awarded against the Insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any pre-judgment interest based on that period of time after the offer.

  **g.** all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an Insured against a **suit** and an indemnitee of the Insured is also named as a party to the **suit**, we will defend that indemnitee if all of the following conditions are met:

  **a.** the **suit** against the indemnitee seeks damages for which the Insured has assumed the liability of the indemnitee in a contract or agreement that is an **insured contract**,

  **b.** this insurance applies to such liability assumed by the Insured,

  **c.** the obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the Insured in the same **insured contract** and

  **d.** the indemnitee:

    (1) agrees in writing to:

      (a) cooperate with us in the investigation, settlement or defense of the **suit**,

      (b) immediately send us copies of any demands, notices, summonses or legal papers received in connection with the **suit**,

      (c) notify any other insurer whose coverage is available to the indemnitee and

      (d) cooperate with us with respect to coordinating other applicable insurance available to the indemnitee.

    (2) provides us with written authorization to:

      (a) obtain records and other information related to the **suit** and

      (b) conduct and control the defense of the indemnitee in such **suit**.

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provision of paragraph **2. b.** (2) of **SECTION II, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, such payments will not be deemed to be damages for **Bodily Injury** and **Property Damage** and will not reduce the limits of insurance.

Our obligation to defend an Insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

  **a.** we have used up the applicable limit of insurance in the payment of judgments or settlements or

  **b.** the conditions set forth above, or the terms of the agreement described in paragraph **2. d.** above, are no longer met.

## SECTION III - LIMITS OF INSURANCE

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

  **a.** Insureds,

  **b.** claims made or **suits** brought,

  **c.** persons or organizations making claims or bringing **suits** or

  **d.** **Aircraft** to which **Coverage D** applies.

**2.** The General Aggregate Limit is the most we will pay for the sum of the following:

  **a.** damages under **Coverage A,** except damages because of **Bodily Injury** or **Property Damage**

**AGCS - CGL 1400 (07-06)**    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    **Page 12 of 21**

**127**

included in the **products-completed operations hazard**;

**b.** damages under **Coverage B**;

**c.** medical expenses under **Coverage C**.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under **Coverage A** for damages because of **Bodily Injury** and **Property Damage** included in the **products-completed operations hazard**;

**4.** Subject to **2.** above, the **Personal and Advertising Injury** Aggregate Limit is the most we will pay under **Coverage B** for the sum of all damages because of all **Personal and Advertising Injury.**

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** damages under **Coverage A** and

**b.** medical expenses under **Coverage C**

because of all **Bodily Injury** and **Property Damage** arising out of any one **occurrence**.

**6.** Subject to paragraph **5.** above, the Damage to Premises Rented To You Limit is the most we will pay under **Coverage A** for damages because of **Property Damage** to any one premises, while rented or leased to you, or in the case of damage by fire, while rented or leased to you or temporarily occupied by you with the permission of the owner.

**7.** Subject to paragraph **5.** above, the Medical Expense Limit is the most we will pay under **Coverage C** for all medical expenses because of **Bodily Injury** sustained by any one person.

**8.** The Hangarkeeper's Each Loss Limit is the most we will pay for the sum of all damages under **Coverage D** because of any one **loss**.

**9.** Subject to **8.** above, the Hangarkeeper's Each Aircraft Limit is the most we will pay for the sum of damages under **Coverage D** because of **loss** to any one **aircraft** in any one **loss**.

## SECTION IV – COMMON POLICY EXCLUSIONS

This policy does not apply under any coverage:

**1.** to the conduct of any contest, exhibition, air meet, air race, air show, permitted, sponsored or participated in, by any Insured, or to any claims or **suits** resulting therefrom;

**2.** to the ownership, maintenance, use or operation by any Insured, or to any claims or **suits** resulting therefrom of:

**a.** grandstands, bleachers or observation platforms other than observation decks or promenades which are part of permanent structures on the premises,

**b.** swimming pools or playground equipment of any nature,

**c.** lodging accommodations for the general public or

**d.** schools other than pilot training schools.

**3.** to restaurants operated by you or by others trading under your name, to **Bodily Injury** or **Property Damage** arising out of:

**a.** **your products** or

**b.** reliance upon a representation or warranty made with respect thereto if the **Bodily Injury** or **Property Damage** occurs after physical possession of such products has been relinquished to others.

**4.** under **Coverages A, B** and **C:**

**a.** to any Insured or any other person or organization with respect to any **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** resulting or arising from any **occurrence** associated with or related to the acts of parachuting, skydiving, training for parachuting or skydiving, or the rental, use, maintenance or furnishing of any parachuting or skydiving equipment or

**b.** to any claims or **suit** for **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** sustained by any person or organization resulting or arising from any **occurrence** associated with or related to the act of parachuting, skydiving, training for parachuting or skydiving, or the rental, use, maintenance or furnishing of any parachuting or skydiving equipment.

As respects exclusions **4. a.** and **b.** above the Company will have no duty to defend the Insured against any claims or **suit** seeking damages for **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** caused by or arising from the acts of parachuting, skydiving, training for parachuting or skydiving, or the rental, use, maintenance or furnishing of any parachuting or skydiving equipment.  Furthermore, the section **SUPPLEMENTARY PAYMENTS – COVERAGE A, B AND D** shall not apply.

**5.** to any liability, including liability arising out of or assumed under contract, or any injury, loss or damage, including, but not limited to, fear of any injury, loss or damage, **Bodily Injury**, fear of **Bodily Injury**, personal injury, advertising injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, mental injury, **Property Damage** or any loss, cost or expense, loss of use including grounding, or any other claim, cost or expense, including

**AGCS - CGL 1400 (07-06)**          Includes copyrighted material of Insurance
Services Office, Inc. with its permission.          **Page 13 of 21**

**128**

any costs associated with medical monitoring in connection with injury, loss or damage or fear of injury, loss or damage whatsoever directly or indirectly arising out of, resulting from, caused or occasioned by, happening through, in consequence of, or in any way involving or related to asbestos or the use of or exposure to asbestos, including the failure of any product or material containing asbestos, or the existence or presence of asbestos in any place or thing or in the atmosphere, land, or any watercourse or body of water;

to any damages or any loss, cost or expense arising out of (i) any claim or suit by or on behalf of any governmental authority or any other allegedly responsible party because of, or (ii) any request, demand, order or statutory or regulatory requirement that any Insured or any other person or entity should be or is responsible for:

**a.** assessing the presence, absence, amount or effects of asbestos, or

**b.** identifying, sampling, testing for, detecting, monitoring, cleaning up, containing, treating, detoxifying, neutralizing, abating, disposing of, mitigating or removing asbestos or any product or material containing asbestos, or

**c.** responding to asbestos or the potential effects of asbestos in any way other than as described in subparagraph **5.** a. or **5.** b. above;

to any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with this exclusion **5.**

Insurers shall have no obligation to defend or indemnify, or to investigate claims or to share damages with or repay someone else due to or arising from, in whole or in part, any claim, action or suit against the Insured in connection with any of the matters described in this exclusion **5.**.  Insurers shall also not be responsible for any costs or expenses related to or associated with any such claims, action or suit.

Insurers shall have no obligation to defend or indemnify, or to investigate claims or to share damages with or repay someone else due to or arising from, in whole or in part, any claim, action or suit against the Insured in connection with any of the matters described in this exclusion **5**. Insurers shall also not be responsible for any costs or expenses related to or associated with any such claims, action or suit.

For purposes of this exclusion "asbestos" means asbestos, asbestos fibers, asbestos dust or any product or material containing "asbestos."

**6.** to any liability including liability arising out of or assumed under contract, or any injury, loss or damage, including **Bodily Injury**, fear of **Bodily Injury** damage or fear of damage, **Personal and Advertising**

**Injury**, sickness, disease, occupational disease, disability, shock, death, mental anguish, mental injury, **Property Damage** or any loss, cost or expense, loss of use including grounding, or any other claim, cost or expense whatsoever, directly or indirectly arising out of, resulting from, caused or occasioned by, happening through, in consequence of, or in any way involving any of the following:

**a.** noise (whether audible to the human ear or not), vibration, sonic boom, and any phenomena associated with the foregoing;

**b.** "pollution or contamination" of any kind whatsoever, or the exposure to "pollution or contamination", or the fear of exposure to or the effects of "pollution or contamination" or the existence of "pollution or contamination" in any place or thing or in the atmosphere, land, or any watercourse or body of water, as well as any claim or suit by or on behalf of or any direction, demand or request or any statutory or regulatory requirement, or any voluntary decision, by or on behalf of any governmental authority or other alleged responsible party, that any Insured or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants or contaminants";

**c.** electrical or electromagnetic emission or interference of any kind whatsoever;

**d.** interference with the use of property;

**e.** mold.

For purposes of this Exclusion the following definitions apply.

**f.** "Pollution or contamination" means any actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration, disposal or the mere presence of pollutants or contaminants in any form.

**g.** "Pollutants or contaminants" means any pollutant, contaminant or irritant, including, without limitation, any solid, liquid, gaseous or thermal pollutant, contaminant or irritant, or any air emission, smoke, vapor, soot, fume, acid, alkali, chemical, or nuclear material alleged to be a possible or probable carcinogenic, odor, oil or other petroleum product, fungus (including mold or mildew or any mycotoxin, spore, scent or byproduct produced or released by fungi, other than any fungi intended by the Insured for human consumption), or "waste" of any kind whatsoever, including solid waste, waste water, waste oil, infectious medical waste, and human, animal or vegetable waste.

**h.** "Waste" means any waste including material to be recycled, reconditioned or reclaimed, whether

**AGCS - CGL 1400 (07-06)**      Includes copyrighted material of Insurance Services Office, Inc. with its permission.      **Page 14 of 21**

**129**

or not the material has been disposed of by any person handling the waste.

With respect to any provision in the policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend:

**i.**   claims excluded by this exclusion or

**j.**   a claim or claims covered by the policy when combined with any claims excluded by this exclusion (referred to below as "Combined Claims").

In respect of any "Combined Claims", the Company shall (subject to proof of **loss** and the limits of the policy) reimburse the Insured for that portion of the following items which may be allocated to the claim or claims covered by this policy:

**k.**   damages awarded against the Insured; and

**l.**   defense fees and expenses incurred by the Insured.

Nothing herein shall override any radioactive contamination or other exclusion clause attached to or forming part of this policy.

This Exclusion shall not apply to any claim for **Bodily Injury** or physical injury to tangible property that results from a crash, fire, explosion or collision of **aircraft**, or results from a recorded in-flight emergency causing abnormal aircraft operation of **aircraft**.

**7.**   to claims for:

**a.**   loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss or

**b.**   any legal liability of whatsoever nature directly or indirectly caused by or contributed to, by or arising from:

(1)   the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

(2)   the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto or

(3)   ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of any other radioactive source whatsoever.

It is understood and agreed that such radioactive material or other radioactive source in exclusion **7. b.** (2) above shall not include:

**c.**   depleted Uranium and natural Uranium in any form or

**d.**   radioisotopes which have reached the final stage of fabrication so as to be useable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

This policy, however, does not cover **loss** of or destruction of or damage to any property or any consequential **loss** or any legal liability of whatsoever nature with respect to which:

**e.**   the Insured under this policy is also an Insured or an additional Insured under any other insurance policy, including any nuclear energy liability policy,

**f.**   any person or organization is required to maintain financial protection pursuant to legislation in any country or

**g.**   the Insured under this policy is, or had this policy not been issued would be entitled to indemnification from any government or agency thereof.

**Loss**, destruction, damage, expenses or legal liability in respect of the nuclear risks not excluded by reason of exclusion **7. b.** (2). shall (subject to all other terms, conditions, limitations, warranties and exclusions of this policy) be covered, provided that:

**h.**   in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereof, such carriage shall in all respects have complied with the full International Civil Aviation Organization "technical Instructions for the Safe Transport of Dangerous Goods by Air," unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

**i.**   this policy shall only apply to an incident happening during the policy period and where any claim by the Insured against the Company or by any claimant against the Insured arising out of such incident shall have been made within three (3) years after the date thereof;

**j.**   in the case of any claim for the **loss** of or destruction to or **loss** of use of an **aircraft** caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

**AGCS - CGL 1400 (07-06)**          Includes copyrighted material of Insurance          **Page 15 of 21**
Services Office, Inc. with its permission.

**130**

| Emitter<br><br>(IAEA Health and Safety Regulations) | Maximum permissible level of non-fixed radioactive surface contamination (Averaged over 300 $cm^2$) |
|---|---|
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Becquerels/$cm^2$ ($10^{-4}$ microcuries/$cm^2$) |
| All other alpha emitters | Not exceeding 0.4 Becquerels/$cm^2$ ($10^{-5}$ microcuries/$cm^2$) |

**k.** The coverage afforded hereby may be cancelled at any time by the Company by giving seven (7) days notice of cancellation.

**8.** to claims caused by:

**a.** war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power, or

**b.** any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter, or

**c.** strikes, riots, civil commotions or labor disturbances, or

**d.** any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the **loss** or damage resulting therefrom is accidental or intentional, or

**e.** any malicious act or act of sabotage, or

**f.** confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any government (whether civil, military or de facto), or public or local authority, or

**g.** hijacking or any unlawful seizure or wrongful exercise of control of an **aircraft** or **aircraft** crew **in flight** (including any attempt at such seizure or control) made by any person or persons on board the **aircraft** acting without the consent of the Insured.

Furthermore, this policy does not cover claims arising while the **aircraft** is outside the control of the Insured by reason of any of the above perils.

The **aircraft** shall be deemed to have been restored to the control of the Insured on the safe return of the **aircraft** to the Insured at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the **aircraft** (such safe return shall require that the **aircraft** be parked with the engines shut down and under no duress).

**9.** to any claim, **Property Damage**, **Bodily Injury**, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from, occasioned by, or in consequence of (whether directly or indirectly and whether wholly or partly):

**a.** any actual or alleged failure, malfunction or inadequacy of:

(1) any of the following, whether belonging to any Insured or to others, whether or not part of any computer system or whether in the possession of the Insured or of any third party:

(a) computer hardware, including microprocessors;

(b) computer application software;

(c) computer operating systems and related software;

(d) computer networks;

(e) microprocessors, computer chips, integrated circuits or other information technology equipment or systems;

(2) any other products or systems and any services, data, or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in paragraph **a.** (1) of this exclusion **9**;

(3) due to the inability to correctly recognize, process, distinguish, interpret or accept:

(a) the change of year from 1999 to 2000;

(b) the change of date from August 21, 1999 to August 22, 1999;

(c) any other change of year, date or time;

**b.** any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify, or test for any potential or actual problems described in this exclusion **9**.

## SECTION V – WHO IS AN INSURED

**1.** If you are designated in the Declarations as:

**a.** an individual, you and your spouse are Insureds, but only with respect to the conduct of a business of which you are the sole owner.

**b.** a partnership or joint venture, you are an Insured. Your members, your partners, and their

**AGCS - CGL 1400 (07-06)**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     **Page 16 of 21**

131

spouses are also Insureds, but only with respect to the conduct of your business.

**c.** a limited liability company, you are an Insured. Your members are also Insureds, but only with respect to the conduct of your business. Your managers are Insureds, but only with respect to their duties as your managers.

**d.** an organization other than a partnership, joint venture or limited liability company, you are an Insured. Your **executive officers** and directors are Insureds, but only with respect to their duties as your officers or directors. Your stockholders are also Insureds, but only with respect to their liability as stockholders.

**e.** a trust, you are an Insured. Your trustees are also Insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an Insured:

**a.** your **volunteer workers** only while performing duties related to the conduct of your business, or your **employees**, other than either your **executive officers** (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these **employees** or **volunteer workers** are insured for:

(1) **Bodily Injury** or **Personal and Advertising Injury:**

(a) to you, your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-**employee** while in the course of his or her employment or performing duties related to the conduct of your business, or to your other **volunteer workers** while performing duties related to the conduct of your business,

(b) to the spouse, child, parent, brother or sister of that co-**employee** or **volunteer worker** as a consequence of paragraph (1) (a) above,

(c) for which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1) (a) or (b) above or

(d) arising out of his or her providing or failing to provide professional health care services.

(2) **Property Damage** to property:

(a) owned, occupied or used by or

(b) rented to, leased to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your **employees**, **volunteer workers**, any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** any person (other than your **employee** or **volunteer worker**), or any organization while acting as your real estate manager.

**c.** any person or organization having proper temporary custody of your property if you die, but only:

(1) with respect to liability arising out of the maintenance or use of that property and

(2) until your legal representative has been appointed.

**d.** your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this policy.

**3.** With respect to **mobile equipment** registered in your name under any motor vehicle registration law, any person is an Insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an Insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an Insured with respect to:

**a.** **Bodily Injury** to a co-employee of the person driving the equipment or

**b.** **Property Damage** to property owned by, rented to, leased to, in the charge of, or occupied by you or in the employ of any person who is an Insured under this provision.

**4.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as an Insured if there is no other similar insurance available to that organization. However:

**a.** coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

**b.** **Coverage A** does not apply to **Bodily Injury** or **Property Damage** that occurred before you acquired or formed the organization.

**AGCS - CGL 1400 (07-06)**     Includes copyrighted material of Insurance Services Office, Inc. with its permission.     **Page 17 of 21**

132

**c. Coverage B** does not apply to **personal injury and advertising injury** arising out of an offense committed before you acquired or formed the organization.

**d. Coverage C** does not apply to medical expenses arising out of **Bodily Injury** that occurred before you acquired or formed the organization.

**e. Coverage D** does not apply to **loss** to **aircraft** before you acquired or formed the organization.

No person or organization is an Insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION VI – POLICY CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the **Insure**d or of the Insured's estate will not relieve us of our obligation under this policy.

**2. Cancellation**

**a.** The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**b.** We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

**c.** We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**d.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**e.** If this policy is cancelled, we will send to the first Named Insured any premium refund due. If we cancel, the refund will be pro-rata. If the first Named Insured cancels, the refund may be less than pro-rata. The cancellation will be effective even if we have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**3. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by the Company and made a part of this policy.

**4. Duties In The Event Of Occurrence, Loss, Claim Or Suit**

**a.** You must see to it that we are notified promptly of an **occurrence** or an offense which may result in a claim. To the extent possible, notice should include all of the following:

(1) How, when and where the **occurrence** took place;

(2) The names and addresses of any injured persons and witnesses;

(3) The nature and location of any injury or damage arising out of the **occurrence** or offense.

**b.** If a claim is made or **suit** is brought against any Insured, you must:

(1) immediately record the specifics of the claim or **suit** and the date received and

(2) notify the Company as soon as practicable.

**c.** You and any other involved Insured must:

(1) immediately send the Company copies of any demands, notices, summonses or legal papers received in connection with the claim or **suit,**

(2) authorize the Company to obtain records and other information,

(3) cooperate with the Company in the investigation, settlement or defense of the claim or **suit** and

(4) assist the Company, upon its request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

**d.** No Insured will, except at that Insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without the Company's consent.

**5. Examination of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**6. Inspection And Surveys**

**a.** We have the right to:

**AGCS - CGL 1400 (07-06)**        Includes copyrighted material of Insurance
Services Office, Inc. with its permission.        **Page 18 of 21**

**133**

(1) make inspections and surveys at any time,

(2) give you reports on the conditions we find and

(3) recommend changes.

**b.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums charged.

We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions

(1) are safe and healthful or

(2) comply with laws, regulations, codes or standards.

**c.** Paragraphs **a.** and **b.** of this condition **6.** apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**d.** Paragraph **b.** of this condition **6.** does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations of boilers, pressure vessels or elevators.

**7. Legal Action**

No person or organization has a right under this policy:

**a.** to join us as a party or otherwise bring us into a **suit** asking for damages from an Insured or

**b.** to sue on this policy unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an Insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this policy or in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the Insured and the claimant or the claimant's legal representative. Service of process may be made upon the Company. However, we do not waive our right to commence an action in any court of competent jurisdiction or to seek a transfer to another court as permitted by law.

**8. Other Insurance**

If other valid and collectible insurance is available to the Insured for a **loss** we cover under Coverages A,

B or D of this policy, our obligations are limited as follows:

**a. Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then we will share with all that other insurance by the method described in **c.** below.

**b. Excess Insurance**

This insurance is excess over:

(1) any other insurance, whether primary, excess, contingent or on any other basis

(a) that is Fire, Extended Coverage, Builders Risk, Installation Risk or similar coverage for **your work**,

(b) that is Fire Insurance for premises rented or leased to you or temporarily occupied by you with permission of the owner,

(c) that is insurance purchased by you to cover your liability as a tenant for **Property Damage** to premises rented to you or temporarily occupied by you with permission of the owner or

(d) if the **loss** arises out of the maintenance or use of **aircraft**, **autos** or watercraft to the extent not subject to exclusion **2. g.** of **SECTION II, COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional Insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under **Coverages A, B** or **D** to defend the Insured against any claim or **suit** if any other insurer has a duty to defend the Insured against that claim or **suit**. If no other insurer defends, we will undertake to do so, but we will be entitled to the Insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the **loss**, if any, that exceeds the sum of:

(1) the total amount that all such other insurance would pay for the **loss** in the absence of this insurance and

**AGCS - CGL 1400 (07-06)**         Includes copyrighted material of Insurance
Services Office, Inc. with its permission.         **Page 19 of 21**

**134**

(2) the total of all deductibles and self-insured amounts under all that other insurance.

We will share the remaining **loss**, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this policy.

**c.  Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the **loss** remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to total applicable limits of insurance of all insurers.

If the other insurance is written through the Company as primary insurance, the total limit of the Company's liability will not exceed the greatest limit on any one policy.

**9.  Premiums**

The first Named Insured shown in the Declarations:

**a.**  is responsible for the payment of all premiums and

**b.**  will be the payee for any return premiums we pay.

**10.  Premium Audit**

**a.**  We will compute all premiums for this policy in accordance with our rules and rates.

**b.**  Premium shown on this policy as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured.  The due date for audit and retrospective premiums is the date shown as the due date on the invoice.  If the sum of the advance and audit premiums paid for the policy term is greater than the earned premium, we will return the excess to the first Named Insured.

**c.**  The first Named Insured must keep records of the information we need for premium computation, and send us copies of those records at such times as we may request.

**11.  Representations**

By accepting this policy, you agree that:

**a.**  the statements in the Declarations are accurate and complete,

**b.**  those statements are based upon representations you made to us and

**c.**  the Company has issued this policy in reliance upon your representations.

**12.  Separation Of Insureds**

This insurance afforded under the liability coverage applies separately to each Insured against whom claim is made or suit is brought, but the inclusion herein of more than one Insured shall not operate to increase the applicable limits of the Company's liability.

**13.  State Statutes**

If the terms of this policy are in conflict with or inconsistent with the insurance statutes of any state where this policy is in effect, we will conform to those state insurance statutes.

**14.  Titles Of Paragraphs**

The titles of the various paragraphs of this policy and amendments, if any, attached to this policy are inserted solely for reference and are not to be deemed in any way to limit or affect the provisions to which they relate.

**15.  Transfer Of Rights Of Recovery Against Others To Us**

If the Insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The Insured must do nothing after **loss** to impair them. At the Company's request, the Insured will bring **suit** or transfer those rights to us and help us enforce them.

**16.  Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**17.  Violation Of Statute**

If coverage for a claim under this policy is in violation of any United States of America's economic or trade sanctions, including but not limited to, sanctions administered by the U.S. Treasury Department's Office

**AGCS - CGL 1400 (07-06)**            Includes copyrighted material of Insurance
Services Office, Inc. with its permission.            **Page 20 of 21**

**135**

of Foreign Assets Control ("OFAC"), then coverage for that claim shall be null and void.

## 18. When We Do Not Renew

If the Company decides not to renew this policy, then we will mail or deliver to the first Named Insured shown on the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

-END-

**AGCS - CGL 1400 (07-06)**            Includes copyrighted material of Insurance            **Page 21 of 21**
Services Office, Inc. with its permission.

**136**



**Named Insured:  GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2GA000581517AM**                           **Endorsement Number**
**Effective Date:   March 1, 2017**                                              **1**

# BROAD NAMED INSURED ENDORSEMENT

This endorsement modifies the policy to which it is attached as follows:

The **Named Insured** set forth on the Declarations is changed as follows:

GSSL, Inc. dba Near Space Corporation (NSC), K&T Properties, LLC and any subsidiary, affiliated, owned or controlled companies or entities now in existence or hereinafter formed or acquired jointly or severally, as their respective interests may appear.

"Subsidiary, affiliated, owned or controlled companies or entities" means any company or entity of which at least fifty percent (50%) of the stock or fifty percent (50%) of the members or, if a partnership, fifty percent (50%) interest in the partnership is owned by the **Named Insured**, or for which the **Named Insured** has assumed active management control. Subsidiary, affiliated, owned or controlled companies or entities acquired after the effective date of your policy shall be reported to the Company within thirty (30) days after they are acquired.

All other provisions of this policy remain the same.

**AGCS-AV 2105 (12-07)**                                                                              **Page 1 of 1**



**Named Insured: GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:  A2GA000581517AM**                                    Endorsement Number
**Effective Date:    March 1, 2017**                                                          **2**

# TRIA DISCLOSURE ENDORSEMENT

THIS ENDORSEMENT, DETAILING THE PROVISIONS OF THE "TERRORISM RISK INSURANCE ACT", AS AMENDED, IS MADE A PART OF THIS POLICY.  NOTHING IN THIS ENDORSEMENT CHANGES ANY OF THE TERMS OR CONDITIONS OF THIS POLICY OR PROVIDES ANY ADDITIONAL COVERAGE.

I.  <u>Terrorism Risk Insurance Act Notice</u>

Please take note that under the Terrorism Risk Insurance Act, as amended, (collectively referred to herein as "TRIA"), the **Named Insured** has a right to purchase insurance coverage from the Company for losses arising out of an "act of terrorism" as defined in Section 102(1) of "TRIA".

II.  <u>Definition</u>

You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, as amended, an "act of terrorism" shall mean:

The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act, as amended; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

III.  <u>Federal Share of Compensation</u>

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses by be partially reimbursed by the United States Government under formula established by Federal Law.  However, your policy may contain other exclusions which might affect your coverage, such as exclusion for nuclear events.  Under the formula, the United States Government generally reimburses eighty-five percent (85%) through 2015, 84% beginning on January 1, 2016, 83% beginning on January 1, 2017, 82% beginning on January 1, 2018, 81% on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the Company providing the coverage.  If you have purchased this coverage, the premium charged for this coverage (if any) does not include any charges for the portion of loss that may be covered by the Federal Government under the Act.

<u>$100 Billion Cap</u>

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as the insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion.  If the aggregated insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**AGCS-AV 3650 (01-15)**                                                                 **Page 1 of 2**



IV.  Conditional Termination of Endorsement

    A.  This endorsement terminates under the following conditions, whichever occurs first:

       i.  upon the expiration of the policy, or

      ii.  if the "Terrorism Risk Insurance Program" (the "Program") terminates (as provided by "TRIA" at the end of December 31, 2020) with respect to the coverage provided by this policy, and the "Program" is not renewed, extended or otherwise continued by the federal government or,

      iii.  if, on or after December 31, 2020, a renewal, extension or continuation of the "Program" becomes effective without a requirement to make terrorism coverage available to the **Named Insured** or with revisions that do any of the following:

        a.  increase the Company's statutory percentage deductible under the "Program" for terrorism losses,

        b.  decrease the federal government's statutory percentage share in potential terrorism losses above such deductible or,

        c.  redefines terrorism or makes insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

    B.  If none of the conditions set forth in paragraph IV. A. above occur, this endorsement will continue in effect unless the Company notifies the **Named Insured** of changes in response to federal law.

V.  <u>"TRIA" Terrorism Coverage may be purchased from the Company.  No coverage is provided by this notice. TRIA Terrorism Coverage must be purchased separately.</u>

    If "TRIA" coverage is purchased, the premium will be stated on the TRIA Write-Back Endorsement(s) attached to this policy, or on the Declarations Page.

    If "TRIA" coverage has not been purchased, coverages for liability and/or physical damage losses from "Acts of Terrorism" are offered for rates that are available upon request from the Company.

All other provisions of this policy remain the same.



**Named Insured:   GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2GA000581517AM**                                   **Endorsement Number**
**Effective Date:    March 1, 2017**                                             **3**

# TRIA EXCLUSION ENDORSEMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

This policy does not cover claims caused by any losses, damages, or injuries arising directly or indirectly as a result of a certified "Act of Terrorism" defined by the Terrorism Risk Insurance Act, as amended.

Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, as amended, an "Act of Terrorism" shall mean:

> The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act, as amended; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

> This endorsement shall apply solely to the Terrorism Risk Insurance Act, as amended, and shall in no way conflict with the War, Hijacking and Other Perils Exclusion contained within this policy or write-backs thereto.

All other provisions of this policy remain the same.

**AGCS-AV 3700 (01-15)**                                                              **Page 1 of 1**



**Named Insured:   GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2GA000581517AM**                                       **Endorsement Number**
**Effective Date:   March 1, 2017**                                              **4**

## AMENDMENT OF COVERAGE TERRITORY- WORLDWIDE COVERAGE

In consideration of an additional premium of $Included, the policy to which this endorsement is attached is amended as follows:

A.  Paragraph 6. of the **DEFINITIONS** section is replaced by the following:

    **6.  Coverage territory** means anywhere in the world with the exception of any country or jurisdiction which is subject to trade, OFAC or other economic sanction or embargo by the United States of America.

B.  The following is added to **SECTION VI – POLICY CONDITIONS:**

**Expanded Coverage Territory**

1.  If a **suit** is brought in a part of the **coverage territory** that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from defending the insured, the insured will initiate a defense of the **suit**. We will reimburse the insured, under Supplementary Payments, for any reasonable and necessary expenses incurred for the defense of a **suit** seeking damages to which this insurance applies, that we would have paid had we been able to exercise our right and duty to defend.

    If the insured becomes legally obligated to pay sums because of damages to which this insurance applies in a part of the **coverage territory** that is outside the United States of America (including its territories and possessions), Puerto Rico or Canada, and we are prevented by law, or otherwise, from paying such sums on the insured's behalf, we will reimburse the insured for such sums.

2.  All payments or reimbursements we make for damages because of judgments or settlements will be made in U.S. currency at the prevailing exchange rate at the time the insured became legally obligated to pay such sums. All payments or reimbursements we make for expenses under Supplementary Payments will be made in U.S. currency at the prevailing exchange rate at the time the expenses were incurred.

3.  Any disputes between you and us as to whether there is coverage under this policy must be filed in the courts of the United States of America (including its territories and possessions), Puerto Rico or Canada.

4.  The insured must fully maintain any coverage required by law, regulation or other governmental authority during the policy period, except for reduction of the aggregate limits due to payments of claims, judgments or settlements.

    Failure to maintain such coverage required by law, regulation or other governmental authority will not invalidate this insurance. However, this insurance will apply as if the required coverage by law, regulation or other governmental authority was in full effect.

C.  The following is added to Paragraph **8. b**. under the **POLICY CONDITIONS** section:

**8.  Other Insurance**

    **b.  Excess Insurance**

        This insurance is excess over:

        (3) Any of the other insurance, whether primary, excess, contingent or on any other basis:



(a) If the insured's liability to pay damages is determined in a **suit** brought outside the United States of America (including its territories and possessions), Puerto Rico or Canada; or

(b) That is coverage required by law, regulation or other governmental authority in a part of the **coverage territory** that is outside the United States of America (including Its territories and possessions), Puerto Rico or Canada.

All other provisions of this policy remain the same.



**Named Insured:   GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2GA000581517AM**                    **Endorsement Number**
**Effective Date:   March 1, 2017**                                              **5**

## WAR, HIJACKING AND OTHER PERILS
## LIMITED LIABILITY WRITE-BACK ENDORSEMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

1. Whereas the policy of which this Limited Write-Back Endorsement forms a part includes the War, Hijacking and Other Perils Exclusion **8.**, it is hereby understood and agreed that effective on the above date at **12:01 A.M., Standard Time**, and only as respects **Coverage A**, all sub-paragraphs other than sub-paragraph **8. b.** of the War, Hijacking and Other Perils Exclusion forming part of this policy are deleted, subject to all terms and conditions of this Limited Write-Back Endorsement.

2. Only with respect to the deletion of sub-paragraph **8. a.** from the War, Hijacking and Other Perils Exclusion by virtue of paragraph 1. above, this Limited Write-Back Endorsement shall not apply to liability for damage to any form of property on the ground situated outside Canada and the United States of America unless caused by or arising out of the use of aircraft.

3. LIMITATION OF LIABILITY

   The Company's liability in respect of this Limited Write-Back Endorsement shall be a sub-limit of $2,000,000 any one **occurrence** and in the annual aggregate. This sub-limit is part of and not in addition to the Limit of Liability for **Coverage A**.

   In no event shall the Company's liability under this Limited Write-Back Endorsement exceed the annual aggregate regardless of the number of (a) **Insureds**, (b) **occurrences** or events, (c) claims made or suits brought, or (d) persons or organizations making claims or bringing suits.

4. AUTOMATIC TERMINATION

   This Limited Write-Back Endorsement shall terminate automatically upon the happening of any of the following circumstances:

   a) Upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following:  France, the People's Republic of China, the Russian Federation, the United Kingdom, or the United States of America;  or

   b) Only with respect to the deletion of sub-paragraph **8. a.** from the War, Hijacking and Other Perils Exclusion by virtue of paragraph 1. above, upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wherever or whenever such detonation may occur and whether or not an insured aircraft may be involved;

   c) Upon the requisitioning of any insured aircraft for title or use.

   However, if an insured aircraft is **in flight** when a), b) or c) above occurs, then this Limited Write-Back Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such aircraft until completion of its first landing and any passengers have disembarked.

**AGCS-CGL 4140 (07-06)**



5.  REVIEW AND CANCELLATION

   a)  The Company may give notice to review premium and/or geographical limits; such notice shall be effective on the expiration of seven (7) days from 12:01 A.M., Standard Time on the day on which notice is given.

   b)  Following a hostile detonation as specified in paragraph 4. b) above, the Company may give notice of cancellation of one or more parts of this Limited Write-Back Endorsement provided in paragraph 1. above; such notice shall be effective on the expiration of forty-eight (48) hours from 12:01 A.M., Standard Time on the day on which notice is given.

   c)  This Limited Write-Back Endorsement may be cancelled by either the Company or the Insured giving notice to become effective on the expiration of seven (7) days from 12:01 A.M., Standard Time on the day on which such notice is given.

   d)  All notices referred to herein shall be in writing

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements, or representations of the undermentioned policy, other than as above stated.

All other provisions of this policy remain the same.



**Named Insured:   GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2GA000581517AM**                    **Endorsement Number**
**Effective Date:   March 1, 2017**                                          **6**

## DATE CHANGE RECOGNITION EXCLUSION
## LIMITED WRITE-BACK PROVISION ENDORSEMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

The <u>Date Change Recognition Exclusion</u> **9.** shall not apply to any sums which you shall become legally liable to pay as damages because of **Bodily Injury** or physical injury to or destruction of tangible property resulting from a covered **occurrence.**

Nothing herein contained shall be held to vary, waive, alter, or extend any of the terms, conditions, agreements, or representations of the undermentioned policy, other than as above stated.

All other provisions of this policy remain the same.



**Named Insured:   GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2GA000581517AM**                                    **Endorsement Number**
**Effective Date:   March 1, 2017**                                                       **7**

## EXCLUSION – PRODUCTS - COMPLETED OPERATIONS HAZARD

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

This insurance does not apply to **Bodily Injury** or **Property Damage** included within the **products-completed operations hazard**.

All other provisions of the policy are unchanged.



**Named Insured:  GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:  A2GA000581517AM**                        **Endorsement Number**
**Effective Date:  March 1, 2017**                                            **8**

## ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

1.  **WHO IS AN INSURED (SECTION V)** is amended to include as an additional Insured the person(s) or organization(s) shown below, but only with respect to liability for **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

    A.  In the performance of your ongoing operations; or

    B.  In connection with your premises owned by or rented to you.

2.  As respects the below additional Insured, this insurance does not apply to any claim or liability arising out of the use of any product manufactured, sold, handled, or distributed by the below additional Insured.


Name of Person(s) or Organization(s):

US Vendor Services
Tillamook Navel Museum
Columbia Pacific Economic Development District
Port of Tillamook Bay
Berg Air, LLC
U.S. Bank Equipment Finance

All other provisions of this policy remain the same.

**AGCS-CGL 6200 (07-06)**                                                     **Page 1 of 1**



**Named Insured:** **GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:** **A2GA000581517AM**                                            **Endorsement Number**
**Effective Date:** **March 1, 2017**                                                                **9**

## ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

1. **WHO IS AN INSURED (SECTION V)** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only to the extent required by the lease and only with respect to liability for **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

2. With respect to the insurance afforded to these additional insured's, this insurance does not apply to any **occurrence** which takes place after the equipment lease expires.

3. This insurance does not apply to any claim or liability arising out of the use of any product manufactured, sold, handled, or distributed by the person(s) or organization(s) shown in the Schedule.

**Schedule:**

CIT Finance, LLC

All other provisions of this policy remain the same.

**AGCS-CGL 6300 (05-07)**                                                              **Page 1 of 1**



**Named Insured:   GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:    A2GA000581517AM**                        **Endorsement Number**
**Effective Date:    March 1, 2017**                                                    **10**

## AMENDATORY ENDORSEMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

Notwithstanding Coverage A., Exclusion 2. g. this policy is extended to include the following:

**AIRCRAFT LIABILITY**

1.   INSURING AGREEMENT

(a)   We will pay those sums that the Insured becomes legally obligated to pay as damages because of **Bodily Injury** or **Property Damage** to which this insurance applies resulting from your ownership, maintenance or use of Experimental Aerostats and High Altitude Shuttle Systems (HASS). We will have the right and duty to defend any **suit** seeking those damages. We may at our discretion investigate any occurrence and settle any claim or **suit** that may result.

But:

(1)   The amount we will pay for damages is limited as described in ITEM 3 of this endorsement – LIMITS OF INSURANCE; and

(2)   Our right and duty to defend end when we have used up the applicable limit of insurance.

No other obligation or liability to pay sums or perform acts or services is covered.

(b)   This insurance applies to **Bodily Injury** and **Property Damage** only if:

(1)   The **Bodily Injury** or **Property Damage** is caused by an **occurrence** that takes place in the **coverage territory**; and

(2)   The **Bodily Injury** or **Property Damage** occurs during the policy period; and

(3)   The Experimental Aerostats and High Altitude Shuttle Systems are used by you or on your behalf in connection with your **Aviation Operations** insured under this policy.

(c)   Damages because of **Bodily Injury** include damages claimed by any person or organization for care, loss of services or death resulting at any time from the **Bodily Injury**.

2.   EXCLUSIONS

This insurance does not apply to:

(a)   **Bodily Injury** or **Property Damage** expected or intended from the standpoint of the Insured. This exclusion does not apply to **Bodily Injury** resulting from the use of reasonable force to protect persons or property.

(b)   **Bodily Injury** or **Property Damage** for which the Insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract of agreement.

(c)   Physical damage or **Property Damage** to, destruction of, or loss of use of the Experimental Aerostats and High Altitude Shuttle Systems.

(d)   Any obligation of the Insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**AGCS-AV 8200 (07-06)**                                                    **Page 1 of 2**



(e) **Bodily Injury** to:

   (1) An **employee** of the Insured arising out of and in the course of employment by the Insured; or

   (2) The spouse, child, parent, brother or sister of that **employee** as a consequence of (e) (1) above.

This exclusion applies:

   (i) Whether the Insured may be liable as an employer or in any other capacity; and

   (ii) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

(f) **Bodily Injury** or **Property Damage** included in the **products-completed operations hazard**.

3.  LIMITS OF INSURANCE

As respects this endorsement, the LIMITS OF INSURANCE of the policy are extended to include the following:

The each **occurrence** limit shown below is the most we will pay for all damages, including all **related claims** and all damages for care and loss of services, because of **Bodily Injury** or **Property Damage** sustained by one or more persons or organizations as the result of any one **occurrence**.

All **Bodily Injury**, including all **related claims** and **Property Damage** arising out of continuous or repeated exposure to substantially the same general harmful conditions shall be considered as arising out of one **occurrence**.

Single Limit excluding **Passengers** $1,000,000 each **occurrence**.

4.  DEFINITIONS AS RESPECTS THIS ENDORSEMENT

**Passenger** means any person in, on, or boarding an **aircraft** for the purpose of riding or flying in, or alighting from after a flight or attempted flight, including crew member(s).

**Related claims** means all claims for care and loss of services, loss of society and consortium, mental anguish, emotional distress, loss of support, medical or funeral expenses, and any and all other damages from or related to **Bodily Injury** to any person or **passenger**. Notwithstanding anything to the contrary in the definition of **Bodily Injury**, our liability and coverage for damages for both **Bodily Injury** and **related claims** are included and combined within the each person and each **occurrence** Limits of Insurance shown in this endorsement as applicable, and there are no separate or additional Limits of Insurance for **related claims**.

All other provisions of this policy remain the same.



Named Insured:   **GSSL, Inc. dba Near Space Corporation (NSC), et al**
Policy Number:   **A2GA000581517AM**                                    **Endorsement Number**
Effective Date:   **March 1, 2017**                                               **11**

## OREGON CANCELLATION / NONRENEWAL ENDORSEMENT

This endorsement modifies the policy to which it is attached as follows:

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, the cancellation provision of this policy is amended to read as follows:

1. Except as provided by subsection 4. below, this policy may not be cancelled by the Insurer before the expiration of the policy, except on one or more of the following grounds:

   a) Nonpayment of premium;

   b) Fraud or material misrepresentation made by or with the knowledge of the Insured or Other Insured(s) in obtaining the policy, continuing the policy or in presenting a claim under the policy;

   c) Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision;

   d) Failure to comply with reasonable loss control recommendations;

   e) Substantial breach of contractual duties, conditions or warranties;

   f) Determination by the director that the continuation of a line of insurance or class of business to which the policy belongs will jeopardize a company's solvency or will place the Insurer in violation of the insurance laws of Oregon or any other state;

   g) Loss or decrease in reinsurance covering the risk;

   h) Any other reason approved by the director by rule.

2. Cancellation of this policy will not be effective until ten (10) working days after the Insured receives written notice of cancellation. The notice shall state the effective date of and the reasons for cancellation and shall inform the Insured of the hearing rights established by ORS 742.704.

3. Notice of nonrenewal will be given to the Insured thirty (30) days prior to the expiration date or anniversary date of the policy. If, after the Insurer provides a notice of nonrenewal as described above, and the insurer then extends the policy ninety (90) days or less, an additional notice of nonrenewal will not be required with respect to the extension.

4. Subsections 1., 2., and 3. above do not apply to any insurance policy that has not been previously renewed if the policy has been in effect less than sixty (60) days at the time the notice of cancellation is mailed or delivered.

5. Subject to subsection 6 below, if the Insurer offers or purports to renew the policy, but on terms less favorable to the Insured or at higher rates, the new terms or rates may take effect on the renewal date, if the Insurer provides the Insured thirty (30) days written notice. If the Insurer does not so notify the Insured, the Insured may cancel the renewal policy within thirty (30) days after receipt of the notice or delivery of the renewal policy. Earned premium for the period of time the renewal policy was in force shall be calculated pro rata at the lower of the current or previous year's rate. If the Insured accepts the renewal, any premium increase or changes in terms shall be effective immediately following the prior policy's expiration date.



6.  Subsection 5. above does not apply if: (a) the change is a form, rate or plan filed with the Commissioner and applicable to the entire line of insurance or class of business to which the policy belongs; or (b) the form, rate and/or plan increase results from a classification change based on the altered nature or extent of the risk insured.

7.  A post office certificate of mailing to the Named Insured at the Named Insured's last known address shall constitute conclusive proof that the named Insured received the notice of cancellation or nonrenewal on the third calendar day after the date of the certificate of mailing.

All other provisions of this policy remain the same.



**Named Insured: GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:  A2GA000581517AM**                          **Endorsement Number**
**Effective Date:   September 8, 2017**                                          **12**

## AMENDATORY ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

With respect to the following location(s):

1.  **WHO IS AN INSURED (SECTION V)** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only to the extent required by the lease and only with respect to liability for **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** caused, in whole or in part, by your maintenance, operation or use of equipment leased to you by such person(s) or organization(s).

2.  With respect to the insurance afforded to these additional insured's, this insurance does not apply to any **occurrence** which takes place after the equipment lease expires.

3.  This insurance does not apply to any claim or liability arising out of the use of any product manufactured, sold, handled, or distributed by the person(s) or organization(s) shown in the Schedule.

4.  Coverage is primary and is not contributing with any insurance or self-insurance maintained by the Certificate Holder.

**Schedule:**

Peterson Machinery Co.

All other provisions of this policy remain the same.

**AGCS-AV 8100 (07-06)**                                                                                 **Page 1 of 1**



**Named Insured: GSSL, Inc., dba Near Space Corporation (NSC), et al**
**Policy Number:  A2GA000581517AM**
**Effective Date:   September 20, 2017**

**Endorsement Number**
**13**

### ADDITIONAL  INSURED – DESIGNATED PERSON OR ORGANIZATION

In consideration of an additional premium of $Included, this endorsement cancels and replaces Endorsement Number 8 as follows:

1. **WHO IS AN INSURED (SECTION V)** is amended to include as an additional Insured the person(s) or organization(s) shown below, but only with respect to liability for **Bodily Injury**, **Property Damage** or **Personal and Advertising Injury** caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

   A.  In the performance of your ongoing operations; or

   B.  In connection with your premises owned by or rented to you.

2. As respects the below additional Insured, this insurance does not apply to any claim or liability arising out of the use of any product manufactured, sold, handled, or distributed by the below additional Insured.

Name of Person(s) or Organization(s):

KSN Enterprises, LLC

All other provisions of this policy remain the same.

**AGCS-CGL 6200 (07-06)**

**Page 1 of 1**

# EXHIBIT C

Allianz Global Corporate & Specialty®

# Aircraft Products / Completed Operations and Grounding Liability Insurance Policy

## Prepared for:

GSSL, Inc. dba Near Space Corporation (NSC), et al
c/o Kris Lachenmeier
P.O. Box 909
Tillamook, OR 97141

## Arranged by:

Halton Hall & Associates, Inc.
P.O. Box 6275
Fort Worth, TX 76115





# Allianz Global Corporate & Specialty

The following are your options for reporting a claim to Allianz Global Corporate & Specialty.

We also recommend that you contact your agent or broker.

- Email:  **NewLoss@agcs.allianz.com**

- Call:  1-800-558-1606
  (outside of the U.S., +1-314-513-1353)

- Fax:  1-888-323-6450
  (outside of the U.S., +1-314-513-1345)

- Mailing Address:

  Allianz Global Corporate & Specialty
  Attn: FNOL Claims Unit
  One Progress Point Parkway
  O'Fallon, MO 63368



Policy Number A2PR000582017AM                    Previous Policy Number A2PR000582016AM

# AIRCRAFT PRODUCTS / COMPLETED OPERATIONS AND GROUNDING LIABILITY POLICY DECLARATIONS

| Issued by: | PRODUCER: |
|---|---|
| Allianz Global Risks US Insurance Company<br>225 W. Washington Street, Suite 1800<br>Chicago, IL  60606-3484<br>(hereinafter known as the Company) | Halton Hall & Associates, Inc.<br>P.O. Box 6275<br>Fort Worth, TX 76115 |

**ITEM 1**.  NAMED INSURED:    GSSL, Inc. dba Near Space Corporation (NSC), et al

MAILING ADDRESS:   c/o Kris Lachenmeier
P.O. Box 909
Tillamook, OR 97141

**ITEM 2**.  POLICY PERIOD:    FROM  March 1, 2017       TO    March 1, 2018

BOTH AT 12:01 A.M. LOCAL TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

**ITEM 3.  LIMITS OF INSURANCE**

| | | |
|---|---|---|
| **COVERAGE A:  BODILY INJURY** OR **PROPERTY DAMAGE** LIABILITY | $  1,000,000 | EACH **OCCURRENCE** AND ANNUAL AGGREGATE |
| **COVERAGE B:  GROUNDING LIABILITY** | $  1,000,000 | EACH **GROUNDING** AND ANNUAL AGGREGATE |
| **COVERAGES A AND B** COMBINED | $  1,000,000 | ANNUAL AGGREGATE |

| PREMIUM PAYABLE | |
|---|---|
| PREMIUM | $ █████ |
| STATE TAX OR OTHER | |
| TOTAL | $ █████ |
| PREMIUM SHOWN IS PAYABLE: | ☒ AT INCEPTION  ☐ SEMI-ANNUALLY  ☐ QUARTERLY  ☐ MONTHLY |



| FORMS AND ENDORSEMENTS ATTACHED TO THIS POLICY AS OF THE EFFECTIVE DATE |
|---|
| Endorsements 1 - 6 |

**THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.**

**In Witness Whereof**, we have caused this policy to be executed and attested and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Secretary                                        President



# TABLE OF CONTENTS

AIRCRAFT PRODUCTS / COMPLETED OPERATIONS AND GROUNDING LIABILITY INSURANCE POLICY .............2

## *DEFINITIONS* ....................................................................................................................................2

1. AIRCRAFT ....................................................................................................................................2
2. AIRCRAFT PRODUCTS ...............................................................................................................2
3. BODILY INJURY ...........................................................................................................................2
4. CURRENT MODIFICATION ..........................................................................................................2
5. COMPLETED OPERATIONS .........................................................................................................2
6. COMPLETED OPERATIONS HAZARD .........................................................................................2
7. GROUNDING ................................................................................................................................2
8. IN FLIGHT ....................................................................................................................................3
9. INSURED ......................................................................................................................................3
10. LAUNCH VEHICLE .......................................................................................................................3
11. MILITARY .....................................................................................................................................3
12. MINOR ALTERATIONS .................................................................................................................3
13. MISSILE .......................................................................................................................................3
14. NAMED INSURED ........................................................................................................................3
15. OCCURRENCE .............................................................................................................................3
16. OWNED BY ...................................................................................................................................4
17. PRODUCTS HAZARD ...................................................................................................................4
18. PROPERTY DAMAGE ...................................................................................................................4
19. ROUTINE MAINTENANCE ...........................................................................................................4
20. SPACECRAFT ..............................................................................................................................4

## *INSURING AGREEMENTS* ...............................................................................................................4

1. COVERAGE A - BODILY INJURY OR PROPERTY DAMAGE LIABILITY ......................................4
2. COVERAGE B - GROUNDING LIABILITY .....................................................................................4
3. DEFENSE AND SETTLEMENTS - COSTS AND SUPPLEMENTARY PAYMENTS ........................4
4. POLICY PERIOD ...........................................................................................................................5
5. POLICY TERRITORY .....................................................................................................................5

## *EXCLUSIONS* ..................................................................................................................................5

1. UNDER COVERAGES A AND B .....................................................................................................5
2. UNDER COVERAGE A ...................................................................................................................5
3. UNDER COVERAGE B ...................................................................................................................6
4. UNDER ANY COVERAGE ..............................................................................................................6

## *CONDITIONS* ...................................................................................................................................9

1. LIMITS OF LIABILITY ...................................................................................................................9
2. OTHER INSURANCE .....................................................................................................................10
3. NOTICE OF OCCURRENCE, LOSS, CLAIM, SUIT OR GROUNDING ...........................................10
4. ASSISTANCE AND COOPERATION OF THE INSURED ...............................................................10
5. ACTION AGAINST THE COMPANY ...............................................................................................10
6. BANKRUPTCY ..............................................................................................................................10
7. INSPECTION AND SURVEYS .......................................................................................................10
8. EXAMINATION OF INSURED'S RECORDS, BOOKS AND PREMISES ..........................................11
9. ACTION AGAINST THE NAMED INSURED ...................................................................................11
10. SEVERABILITY OF INTEREST .....................................................................................................11
11. SUBROGATION ............................................................................................................................11
12. CHANGING THE POLICY ..............................................................................................................11
13. TRANSFER OF THE NAMED INSURED'S RIGHTS AND DUTIES UNDER THIS POLICY ..............11
14. CANCELLATION ...........................................................................................................................11
15. STATE STATUTES ........................................................................................................................11
16. INADVERTENT ERRORS OR OMISSIONS ...................................................................................12
17. REPRESENTATIONS .....................................................................................................................12
18. FRAUD OR MISREPRESENTATION .............................................................................................12
19. PREMIUMS ..................................................................................................................................12
20. VIOLATION OF STATUTE .............................................................................................................12

# AIRCRAFT PRODUCTS / COMPLETED OPERATIONS AND GROUNDING LIABILITY INSURANCE POLICY

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Words and phrases that appear in **bold** type have special meaning. Refer to the section titled – **DEFINITIONS**.

In consideration of the payment of the premium, in reliance upon the statements of the Declarations made a part hereof, subject to all of the terms of this policy including the applicable limits of liability, the Company agrees with the **Named Insured** as follows:

## DEFINITIONS

**1. AIRCRAFT**

"**Aircraft**" means a vehicle designed to be used primarily in the air and to be supported by the dynamic reaction of the air upon the vehicle's wings or rotorblades, and/or by the vehicle's buoyancy in the air. The term **aircraft** excludes **missiles**, **spacecraft** and **launch vehicles**.

**2. AIRCRAFT PRODUCTS**

"**Aircraft Products**" means **aircraft**, **missiles**, **spacecraft** or **launch vehicles** and any ground support or control equipment used therewith or any article furnished by the **Insured** or its predecessors and installed therein or used in connection therewith, or for spare parts thereof, or tooling used for the manufacture thereof, including ground handling tools and equipment and also means training aids, instructions, manuals, blueprints, engineering or other data, and/or any article in respect of which engineering or other advice and/or services and/or labor have been given or supplied by the **Insured** relating to **aircraft**, **missiles**, **spacecraft, launch vehicles** or any article thereof.

**3. BODILY INJURY**

"**Bodily Injury**" means physical injury sustained by any person, caused by an **occurrence** during the policy period, including sickness, disease, mental anguish, and death at any time resulting therefrom. Mental anguish does not include personal injury.

**4. CURRENT MODIFICATION**

"**Current Modification**" means modification of or changes to an **aircraft** intended to improve performance of such **aircraft** but which are not necessary to the airworthiness of such **aircraft.**

**5. COMPLETED OPERATIONS**

"**Completed Operations**" means work, including services and labor performed by the **Insured** in connection with **aircraft**, **missiles** or **spacecraft**. Operations include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

A) when all operations to be performed by or on behalf of the **Insured** under the contract have been completed; or

B) when all operations to be performed by or on behalf of the **Insured** at the site of the operations have been completed; or

C) when the portion of the work out of which the **Bodily Injury** or **Property Damage** arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged for a principal as a part of the same project.

Operations which may require further service, maintenance, work, correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

**6. COMPLETED OPERATIONS HAZARD**

"**Completed Operations Hazard**" means **bodily injury** and **property damage** arising out of **completed operations** or reliance upon a representation or warranty at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises **owned by** or rented to the **Insured**. The **completed operations hazard** does not include **bodily injury** or **property damage** arising out of the existence of tools, uninstalled equipment or abandoned or unused materials.

**7. GROUNDING**

"**Grounding**" means the complete and continuous withdrawal from all flight operations at or about the same time of one or more **aircraft** due to a mandatory order of the Federal Aviation Administration of the United States of America (FAA), Civil Aviation Authority of the United Kingdom (CAA), or similar civil airworthiness authority, because of an existing, alleged or suspected like defect, fault or condition affecting the safe operation of two or more like model **aircraft** and which arises out of, results from or is in connection with an **occurrence** arising out of the **products hazard** or the **completed operations hazard.**

A **grounding** shall be deemed to commence from the effective date of the first mandatory order and continues until the last order relating to such exist-

ing, alleged or suspected like defect, fault or condition is withdrawn or becomes ineffective.

## 8. IN FLIGHT

An **aircraft** shall be deemed to be "**in flight**" from the start of its actual take-off run until it has completed its landing run or, in the case of a helicopter, from the time the rotors of the helicopter start to revolve preparatory to take-off until its rotors cease revolving after landing. A VTOL **aircraft** shall be deemed **in flight** from the time commencing when engine thrust is applied in attempting to lift the **aircraft** from a supporting surface and continuing thereafter until the **aircraft** is again returned to the condition of being supported by a surface. A **spacecraft** or a **launch vehicle** shall be deemed to be **in flight** from the moment of ignition of the propulsion motors for launch into space and continues until contact with the surface of the Earth, including up to completion of its landing operation.

## 9. INSURED

The unqualified word **Insured** includes the **Named Insured** and also includes any partner, executive officer, director, employee, stockholder or agent thereof, while acting within the scope of his duties as such.

Such insurance as is afforded any employee shall not apply to **bodily injury** sustained by another employee of the same **Insured** in the course of or arising out of his employment by such **Insured**.

## 10. LAUNCH VEHICLE

"**Launch Vehicle**" means a manned or unmanned rocket powered vehicle (including parts detached while **in flight**) used to propel **spacecraft** into space or orbit. **Launch vehicles** exclude **aircraft** and **missiles**. The NASA Space Shuttle is deemed to be a **launch vehicle**.

## 11. MILITARY

"**Military**" as applied to **aircraft** means such products while owned or used by or in the possession of the armed services of the United States or the armed services of any foreign government; provided that an **aircraft product** injured or destroyed while leased or chartered to the armed services of the United States or of any foreign government shall be deemed not to be a **military aircraft product**. It is agreed that this insurance does not apply to nor does the premium charge contemplate loss of or damage to property of the United States Government resulting from any defects or deficiencies in the **Named Insured's** products and occurring after final acceptance thereof by the United States Government if such **Named Insured's** products are delivered under any procurement contract with the United

States Government incorporating the clauses 52.245-23 (a) or 52.246-23 (b) prescribed by paragraph 46-805 of the Federal Acquisition Regulations or by paragraph 1 -330 of Defense Acquisition Regulations, its earlier provision the Armed Services Procurement Regulations, or similar provisions as included in the Armed Services Procurement Regulations.

## 12. MINOR ALTERATIONS

"**Minor Alterations**" means an alteration having no appreciable effect on the weight, balance, structural strength, powerplant operations, flight characteristics or other characteristics affecting the airworthiness of any **aircraft**.

## 13. MISSILE

"**Missile**" shall mean a vehicle, other than an **aircraft**, **spacecraft** or **launch vehicle**, which is designed to operate through the air and/or space and whose path and direction is guided during part or all of its flight by a partly or completely self-contained electronic, celestial, inertial or other remote or internal guidance system.

After arrival of a **missile** at a launching site, such **missile** shall be deemed not to be **owned by**, loaned to, in the possession or control of, or **in flight** by the **Insured**.

When the **Insured** removes a **missile** from the launching site, or recovers a **missile** after completion of its flight for the purpose of returning it to the **Insured's** premises other than a launching site, such **missile** shall be deemed in the possession or control of the **Insured** (except when such **missile** is being transported by others) until such **missile** again arrives at a launching site or the **Insured** surrenders possession of such **missile** to a person or organization who is not an **Insured** under this policy.

## 14. NAMED INSURED

"**Named Insured**" means the person or organization named in the Declarations.

## 15. OCCURRENCE

"**Occurrence**" means an accident, including continuous or repeated injurious exposure to conditions, other than **Grounding**, during the policy period, which results in **bodily injury** or **property damage** during the policy period neither expected nor intended from the standpoint of the **Insured**. In the event of continuing or progressive **bodily injury** or **property damage** otherwise covered by the policy happening over an extended period of time, such **bodily injury** or **property damage** shall be deemed to be one **occurrence**, and shall be deemed to occur only

when such **bodily injury** or **property damage** first commences.

### 16. OWNED BY

With respect to any **aircraft product** to which an **Insured** has retained title pursuant to:

A) a conditional sales contract, chattel mortgage or similar lien, or

B) a lease agreement, or

C) a consignment agreement or similar contract of bailment,

such product shall be deemed not to be **owned by** the **Insured.**

### 17. PRODUCTS HAZARD

"**Products Hazard**" means the handling or use of (other than by an **Insured**) or the existence of any condition in an **aircraft product** when such **aircraft product**:

A) is not in the possession of the **Insured** and

B) is away from premises owned, rented or controlled by the **Insured**.

With respect to Coverage A - **Bodily Injury** or **Property Damage** Liability - paragraph B) above does not apply to a completed **aircraft** or any **aircraft product** forming a part thereof. With respect to Coverage B - **Grounding** Liability - Conditions A) and B) of this paragraph do not apply to a completed **aircraft** or any **aircraft product** forming a part thereof.

### 18. PROPERTY DAMAGE

"**Property Damage**" means physical injury to or destruction of tangible property including the resultant loss of use of such injured or destroyed property.

### 19. ROUTINE MAINTENANCE

"**Routine Maintenance**" means simple or minor preservation operations including but not limited to the adjustment of rigging and clearances and/or the replacement of small standard parts not involving complex assembly operations.

### 20. SPACECRAFT

"**Spacecraft**" means a **spacecraft**, satellite, spaceship, space station (or a **launch vehicle** for such **spacecraft**) designed to travel to, in, or from space, or operate primarily in space (including parts thereof detached **in flight**). The term **spacecraft** excludes **aircraft** and **missiles**.

## INSURING AGREEMENTS

### 1. COVERAGE A - BODILY INJURY OR PROPERTY DAMAGE LIABILITY

To pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as damages because of **bodily injury** or **property damage** to which this insurance applies, caused by an **occurrence** arising out of the **products hazard** or the **completed operations hazard**.

### 2. COVERAGE B - GROUNDING LIABILITY

To pay on behalf of the **Insured** all sums which the **Insured** shall become legally obligated to pay as damages for the loss of use of completed **aircraft** occurring after delivery to and acceptance for flight operations by a purchaser or purchasers or operator or operators of such **aircraft**, and caused by a **grounding** following an **occurrence** arising out of the **products hazard** or the **completed operations hazard**.

### 3. DEFENSE AND SETTLEMENTS - COSTS AND SUPPLEMENTARY PAYMENTS

The Company shall have the right and duty to defend any suit against the **Insured** seeking damages on account of such **bodily injury**, **property damage** or loss of use, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigations and settlement of any claim or suit as it deems expedient.  However, the Company shall not be obligated to pay any claim or judgment, to defend any suit, or reimburse the **Insured** for any expenses after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.

During such time as the Company is obligated to defend a claim or claims under the provisions of the preceding paragraph, the Company will pay, with respect to such claim, in addition to the applicable Limit of Liability:

A) All expenses incurred by the Company, all costs taxed against the **Insured** in any suit defended by the Company and interest on that part of the judgment that does not exceed the limit of the Company's liability therein which accrues after entry of the judgment and before the Company has paid or tendered or deposited in court that part of the judgment;

B) Premiums on bonds to release attachment for an amount not in excess of the applicable Limit of Liability of this policy and all premiums on appeal bonds required in any such defended suit but without any obligation of the Company to apply for or furnish any such bonds;

C) Expenses incurred by the **Insured** for first aid costs to others at the time of an **occurrence** for **bodily injury** to which this policy applies;

D) Reasonable expenses incurred by the **Insured** at the Company's request, including actual loss of wages or salary (but not loss of other income) not to exceed $250.00 per day because of attendance at hearings or trials at such request.

**4. POLICY PERIOD**

Under **Coverage A – Bodily Injury** or **Property Damage** Liability - This policy applies only with respect to **occurrences** which take place during the policy period, provided that an **occurrence** involving a missing or unreported **aircraft** shall be deemed to occur at the time such **aircraft** commences flight or is last reported, whichever occurs last.

Under **Coverage B – Grounding** Liability - This policy applies only to **groundings** arising out of, resulting from or in connection with an **occurrence** during the Policy Period caused by the **products hazard** or the **completed operations hazard**. The only such **occurrence** which applies is the last such **occurrence** prior to the **grounding** order. **Grounding** coverage shall continue for as long as such **grounding** order shall apply, even if the policy has expired or is terminated.

**5. POLICY TERRITORY**

This policy applies to **occurrences** and **groundings** anywhere, but if claim is made or suit is brought elsewhere than within the United States of America, its territories or possessions, or Canada, the Company shall have the right but not the duty to investigate and settle such claims and to defend such suits. In any case in which the Company elects not to investigate, settle or defend, the **Insured**, under the supervision of the Company, will make or cause to be made such investigation and defense as are reasonable and necessary, and subject to prior authorization by the Company, will effect to the extent possible, such settlements as the Company deems prudent. The Company shall reimburse the **Insured** for the reasonable costs of such investigation and defense within the applicable Limits of Liability of this policy for the amount of such authorized settlements and defense expenses.

## EXCLUSIONS

**THIS POLICY DOES NOT APPLY:**

**1. UNDER COVERAGES A AND B:**

A) to liability assumed by the **Insured** under any contract or agreement except:

1) a warranty of fitness or quality of the **Named Insured's aircraft products** or a warranty that work performed by or on behalf of the **Named Insured** will be done in a workman-like manner or

2) liability assumed by the **Named Insured** under a written contract executed during the Policy Period provided such contract is:

a) reported to the Company within thirty (30) days after its execution and the **Insured** shall pay premium as determined by the Company and

b) not rejected by the Company by mailing to the **Named Insured** at the address shown in the Declarations a written notice stating when, not less than ten (10) days thereafter, such written contract is excluded from this policy.

B) to **bodily injury**, **property damage** or loss of use intentionally caused by the **Insured**;

C) to any obligation for which the **Insured** or any carrier as his insurer may be held liable under any workers' compensation, unemployment compensation or disability benefits law or under any similar law, or **bodily injury** to an employee of the **Insured** arising out of and in the course of employment by the **Insured**.

This exclusion does not apply with respect to liability of others assumed by the **Insured**;

D) to claims made or suits brought by one **Named Insured** against another **Named Insured** or

E) to damages claimed for infringement of any patent, copyright, trade name or trademark.

**2. UNDER COVERAGE A:**

A) to liability arising out of the handling or use of or the existence of any condition in any **aircraft product owned by**, loaned to, or, except with respect to **aircraft** covered under Coverage B, **grounding liability**, in possession or control of, or **in flight** by or on behalf of the **Insured**;

B) to **property damage** to any **military aircraft product** out of which the **occurrence** arises, or any **military aircraft** of which such **aircraft** is a part, nor to any claim brought by the Owner and/or Operator of a **military aircraft product** in respect of property and/or equipment and/or fittings carried in or on such **military aircraft** nor to any expenses incurred incidental to or resulting from the replacement, repair or loss of use of such **military aircraft** and/or property and/or equipment and/or fittings;

C) to **property damage** to the **Named Insured's products** arising out of such products or any part of such products;

D) to **property damage** to any **spacecraft** or any article or product furnished for, used in connection with, relating to, or installed in any **spacecraft**, whether partially or fully completed;

E) to **property damage** to any **missile** or **launch vehicle**;

F) to liability with respect to which insurance is or can be afforded under Coverage B or (except with respect to an **aircraft** which has made an emergency landing) to loss of use of any **aircraft** which has not been physically injured or destroyed;

G) to **property damage** to work performed by or on behalf of any **Insured** arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

H) to damages claimed for withdrawal, inspection, repair, replacement, modification, loss of use or restricted use of **aircraft** or work completed by or for any **Named Insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use or subject to restricted use because of any known or suspected defect or deficiency therein;

I) to **property damage** to property owned, rented, leased, occupied or used by or in the care, custody or control of any **Insured** at the time of the **occurrence** causing injury to or destruction of such property or to property while being maintained, repaired or serviced by the **Insured**;

J) to injury to or destruction of property or any **aircraft product,** including loss of use thereof, resulting from:

  1) a delay in or lack of performance by or on behalf of the **Named Insured** in any contract or agreement or

  2) the failure of any product furnished by the **Insured** or work performed by or for the **Insured** to meet the level of performance, quality, fitness or durability warranted or represented by the **Insured**.

  But this exclusion does not apply to physical injury to or destruction of tangible property, or to the loss of use consequent thereon or costs and expenses associated therewith resulting from 1) or 2) above;

K) to damages claimed for infringement of any patent, copyright, tradename or trademark;

L) to liability imposed upon the **Insured** solely by reason of its ownership of an **aircraft product**.

3. **UNDER COVERAGE B:**

A) to any **military aircraft product**, or to any **spacecraft** or **launch vehicle,** whether partially or wholly completed;

B) to the loss of use of any **aircraft** while withdrawn from service for the primary purpose of maintenance, **routine maintenance**, overhaul, alteration, or current or minor modification of the **aircraft** or parts thereof;

C) to the loss of use of any **aircraft** caused by the culpable failure of the **Insured** to perform any obligation with respect to making available or delivering **aircraft products** to the purchaser or operator of such **aircraft**;

D) to the loss of use of any **aircraft** occurring during the period that the **Insured** does not use reasonable diligence to correct or eliminate the cause of the loss of use;

E) to costs incurred for the correction or elimination of the cause of **grounding**;

F) to loss of use of any **aircraft** occurring during the period that facilities normally available to the **Insured** for the correction and elimination of the cause of the loss of use cannot be made available to the **Insured**;

G) to any **aircraft** which is required by its manufacturer, the FAA, CAA or similar civil airworthiness authority to be removed from part of or all flight operations due to a certificate of airworthiness being withdrawn or modified due to such **aircraft's** safe operational life having been reached or exceeded.

4. **UNDER ANY COVERAGE:**

A) to any liability, including liability arising out of or assumed under contract, or any injury, loss or damage, including **bodily Injury**, fear of **bodily injury** or fear of damage, personal injury, advertising injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, mental injury, **property damage** or any loss, cost or expense, loss of use including **grounding**, or any other claim, cost or expense whatsoever, directly or indirectly arising out of, resulting from, caused or occasioned by, happening through, in consequence of, or in any way involving:

  1) noise (whether audible to the human ear or not), vibration, sonic boom, and any phenomena associated with the foregoing,

2) "pollution or contamination" of any kind whatsoever, or the exposure to "pollution" or "contamination", or the fear of exposure to or the effects of "pollution" or "contamination" or the existence of "pollution" or "contamination" in any place or thing or in the atmosphere, land, or any watercourse or body of water, as well as any claim or suit by or on behalf of or any direction, demand or request or any statutory or regulatory requirement, or any voluntary decision, of any governmental authority or other alleged responsible party, that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to or assess the effects of "pollutants" or "contaminants",

3) electrical or electromagnetic emission or interference of any kind whatsoever,

4) interference with the use of property or

5) mold.

For purposes of this Exclusion:

"Pollution or contamination" means any actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration, disposal or the mere presence of pollutants or contaminants in any form.

"Pollutants or contaminants" means any pollutant, contaminant or irritant, including, without limitation, any solid, liquid, gaseous or thermal pollutant, contaminant or irritant, or any air emission, smoke, vapor, soot, fume, acid, alkali, chemical, or nuclear material alleged to be a possible or probable carcinogenic, odor, oil or other petroleum product, fungus (including mold or mildew or any mycotoxin, spore, scent or byproduct produced or released by fungi, other than any fungi intended by the **Insured** for human consumption), or "waste" of any kind whatsoever, including solid "waste", "waste" water, "waste" oil, infectious medical "waste", and human, animal or vegetable "waste."

"Waste" means any waste including material to be recycled, reconditioned or reclaimed, whether or not the material has been disposed of by you or any person handling the waste.

With respect to any provision in the policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend claims excluded by this exclusion **4**. A).

A claim or claims covered by the policy when combined with any claims excluded by this exclusion are "Combined Claims."

In respect of any "Combined Claims", the Company shall (subject to proof of loss and the limits of the policy) reimburse the **Insured** for that portion of damages awarded against the **Insured**, plus defense fees and expenses incurred by the **Insured**, which may be allocated to the claim or claims covered by the policy.

This exclusion **4**. A) shall not apply to any claim for **bodily injury** or **property damage** resulting from a crash, fire, explosion or collision of aircraft, or from a recorded **in-flight** emergency causing abnormal **aircraft** operation.

B) to claims for nuclear energy liability as follows:

1) this policy does not apply to loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss, or any legal liability of whatsoever nature directly or indirectly caused by or contributed to, by or arising from:

a) the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

b) the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto;

c) ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of any other radioactive source whatsoever.

2) it is understood and agreed that such radioactive material or other radioactive source in paragraph 1) b) and c) above shall not include:

a) depleted uranium and natural uranium in any form or

b) radioisotopes which have reached the final stage of fabrication so as to be useable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

3) this policy, however, does not cover loss of or destruction of or damage to any property or any consequential loss or any legal liability of whatsoever nature with respect to which:

a) the **Insured** under this policy is also an **Insured** or an additional **Insured** under any other insurance policy, including any nuclear energy liability policy; or

b) any person or organization is required to maintain financial protection pursuant to legislation in any country; or

c) the **Insured** under this policy is, or had this policy not been issued would be, entitled to indemnification from any government or agency thereof.

4) Loss, destruction, damage, expenses or legal liability in respect of the nuclear risks not excluded by reason of paragraph 1) b) above shall, subject to all other terms, conditions, limitations, warranties and exclusions of this policy, be covered, provided that:

a) in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereof, such carriage shall in all respects have complied with the full International Civil Aviation Organization "Technical Instructions for the Safe Transport of Dangerous Goods by Air," unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

b) this policy shall only apply to an incident happening during the policy period and where any claim by the **Insured** against the Company or by any claimant against the **Insured** arising out of such incident shall have been made within three (3) years after the date thereof;

c) in the case of any claim for the loss of or destruction to or loss of use of an aircraft caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

| Emitter (IAEA Health and Safety Regulations) | Maximum permissible level of non-fixed radioactive surface contamination (Averaged over 300 cm$^2$) |
| --- | --- |
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Becquerels/cm$^2$ ($10^{-4}$ microcuries/cm$^2$) |
| All other alpha emitters | Not exceeding 0.4 Becquerels/cm$^2$ ($10^{-5}$ microcuries/cm$^2$) |

d) the coverage afforded hereby may be cancelled at any time by the Company by giving seven (7) days notice of cancellation.

C) to any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1) war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power,

2) any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter,

3) strikes, riots, civil commotions or labor disturbances,

4) any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional,

5) any malicious act or act of sabotage,

6) confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any government (whether civil, military or de facto), or public or local authority or

7) hijacking or any unlawful seizure or wrongful exercise of control of an **aircraft** or **aircraft** crew **in flight** (including any attempt as such seizure or control) made by any person or persons acting without the consent of the **Insured**.

Furthermore, this policy does not cover claims arising while the **aircraft** is outside the control of the **Insured** by reason of any of the above perils. The **aircraft** shall be deemed to have been restored to the control of the **Insured** on the safe return of the **aircraft** to the **Insured** at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the **aircraft** (such safe return shall require that the **aircraft** be parked with the engines shut down and under no duress).

D) to asbestos as follows:

1) any liability, including liability arising out of or assumed under contract, or any injury, loss or damage, including, but not limited to, fear of any injury, loss or damage, bodily injury, fear of bodily injury, personal injury, advertising injury, sickness, disease, occupational disease, disability, shock, death, mental anguish, mental injury, property damage or any loss, cost or expense, loss of use including grounding, or any other claim, cost or expense, including any costs associated with medical monitoring in connection with injury, loss or damage or fear of injury, loss or damage whatsoever directly or indirectly arising out of, resulting from, caused or occasioned by, happening through, in consequence of, or in any way involving or related to asbestos or the use of or exposure to asbestos, including the failure of any product or material containing as-

bestos, or the existence or presence of asbestos in any place or thing or in the atmosphere, land, or any watercourse or body of water, or

2) any damages or any loss, cost or expense arising out of (i) any claim or suit by or on behalf of any governmental authority or any other allegedly responsible party because of, or (ii) any request, demand, order or statutory or regulatory requirement that any **Insured** or any other person or entity should be or is responsible for:

   a) assessing the presence, absence, amount or effects of asbestos,

   b) identifying, sampling, testing for, detecting, monitoring, cleaning up, containing, treating, detoxifying, neutralizing, abating, disposing of, mitigating or removing asbestos or any product or material containing asbestos,

   c) responding to asbestos or the potential effects of asbestos in any way other than as described in subparagraph 2) a) or b) above or

3) any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with paragraphs 1) and 2) of this Exclusion D).

The Company shall have no obligation to defend or indemnify, or to investigate claims or to share damages with or repay someone else due to or arising from, in whole or in part, any claim, action or suit against the Insured in connection with paragraphs 1), 2) and 3) of this Exclusion D). The Company shall also not be responsible for any costs or expenses related to or associated with any such claims, action or suit.

E) to any claim for **property damage**, **bodily injury**, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from, occasioned by, or in consequence of (whether directly or indirectly and whether wholly or partly):

1) any actual or alleged failure, malfunction or inadequacy of:

   a) any of the following, whether belonging to any **Insured** or to others, whether or not part of any computer system or whether in the possession of the **Insured** or of any third party:

      (1) computer hardware, including microprocessors,

      (2) computer application software,

      (3) computer operating systems and related software,

      (4) computer networks or

      (5) microprocessors, computer chips, integrated circuits or other information technology equipment or systems;

   b) any other products or systems and any services, data, or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in paragraph 1) a) of this Exclusion E).

   c) due to the inability to correctly recognize, process, distinguish, interpret or accept:

      (1) the change of year from 1999 to 2000,

      (2) the change of date from August 21, 1999 to August 22, 1999 or

      (3) any other change of year, date or time;

2) any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify, or test for any potential or actual problems described in this Exclusion E).

# CONDITIONS

1. **LIMITS OF LIABILITY**

   The insurance afforded by this policy for more than one **Insured** shall not operate to increase the limit of the Company's liability, but otherwise shall not operate to limit or void the coverage of any one **Insured** as respects claims against said **Insured** by any other **Insured** or the employees of any such other **Insured**.

   Regardless of the number of: (a) **Insureds** under this policy, (b) persons or organizations who sustain **bodily injury**, **property damage** or **groundings**; or, (c) claims made or suits brought on account of **bodily injury**, **property damage** or a **grounding**, the Company's liability is limited to the amounts specified on the Declarations page.

   **COVERAGE A** - **Bodily Injury** and **Property Damage** Liability

   The total liability of the Company for all damages because of all **bodily injury** and all **property damage** sustained by one or more persons or organizations as the result of any one **occurrence** shall not exceed the combined single limit of liability stated in the Declarations as applicable to each **occurrence**, and in the aggregate.

   For purpose of determining the limit of the Company's liability, all **bodily injury** and all **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one **occurrence**.

   **COVERAGE B - Grounding Liability**

The total liability of the Company for all damages sustained by one or more persons or organizations as the result of any one **grounding** shall not exceed the limit of liability stated in the Declarations as applicable to each **grounding** and in the aggregate.

### COVERAGES A AND B COMBINED

The total liability of the Company for all damages under **Coverages A** and **B** combined shall not exceed the annual aggregate limit of liability stated in the Declarations.

2. **OTHER INSURANCE**

If there is any other insurance against a loss covered by the policy, the insurance under this policy shall be excess insurance over any other valid and collectible insurance available to the **Insured**; provided, however, that as to any insurance specifically arranged to provide excess insurance over the Insurance afforded under this policy, this insurance shall be primary insurance.

3. **NOTICE OF OCCURRENCE, LOSS, CLAIM, SUIT OR GROUNDING**

A) The **Named Insured** must promptly notify the Company of an **occurrence** that may result in a claim.  Such notice shall be in writing to the Company.  Such notice shall include:

   (1) particulars sufficient enough to identify the **Insured**,

   (2) details regarding how, when and where the **occurrence** took place and

   (3) the names and addresses of any injured persons and witnesses.

B) If claim is made or suit is brought against the **Insured**, the **Named Insured** must see to it that the Company receive prompt written notice of the claim or suit. The **Named Insured** and any other **Insured** involved must:

   (1) immediately send the Company copies of any demands, notices, summonses or legal papers received in connection with the claim or suit,

   (2) authorize the Company to obtain records and other information,

   (3) cooperate with the Company in the investigation or defense of the claim or suit and

   (4) assist the Company, upon the Company's request, in the enforcement of any right against any person or organization which may be liable to the **Insured** because of injury or damage to which the insurance may also apply.

C) No **Insured** will, except at its own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without the Company's written consent.

4. **ASSISTANCE AND COOPERATION OF THE INSURED**

The **Insured** shall cooperate with the Company and upon the Company's request shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits.

5. **ACTION AGAINST THE COMPANY**

No person or organization has a right under this policy:

A) to join the Company as a party or otherwise bring the Company into a suit asking for damages from an **Insured** or

B) to sue on this policy unless all of its terms have been fully complied with.

A person or organization may sue the Company to recover on an agreed settlement or on a final judgment against an **Insured** obtained after an actual trial; but the Company will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by the Company, the **Insured** and the claimant or the claimant's legal representative. Service of process may be made upon the Company however, the Company does not waive its rights to commence an action in any court of competent jurisdiction or to seek a transfer to another court as permitted by law.

6. **BANKRUPTCY**

Bankruptcy or insolvency of the **Insured** or of the **Insured's** estate shall not relieve the Company of any of its obligations hereunder.

7. **INSPECTION AND SURVEYS**

The Company has the right but is not obligated to:

A) make inspections and surveys at any time,

B) give the **Named Insured** reports on the conditions found and

C) recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. The Company does not make safety inspections. The Company does not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the

public. Additionally the Company does not warrant that conditions are safe and healthful or comply with laws, regulations, codes or standards.

This condition applies not only to the Company but also to any rating, advisory, rate service or similar organization that make insurance inspections, surveys, reports or recommendations.

## 8. EXAMINATION OF INSURED'S RECORDS, BOOKS AND PREMISES

Subject to security regulations of the United States Government, the Company or its representative shall be permitted to inspect the **Insured's** premises and operations and to examine and audit the **Insured's** books and records at any time during the policy period and any extension thereof, and within three (3) years after final termination of this policy, as far as they relate to the premium basis or the subject matter of this insurance or, with respect to a claim, until settlement of such claim.

## 9. ACTION AGAINST THE NAMED INSURED

The Company shall have the power to institute and maintain suits in its own name against the **Named Insured** herein for non-payment of premiums or for breach of any other obligations arising from or by reason of this insurance, and any Judgment so obtained or release or receipt of judgment by the Company shall be binding on the Company.

## 10. SEVERABILITY OF INTEREST

The insurance afforded under the liability coverage applies separately to each **Insured** against whom claim is made or suit is brought, but the inclusion herein of more than one **Insured** shall not operate to increase the applicable limits of the Company's liability.

## 11. SUBROGATION

In the event of any payment under this policy, the Company shall be subrogated to all the **Insured's** rights of recovery therefor against any person or organizations and the **Insured** shall execute and deliver instruments and papers and do whatever else Is necessary to secure such rights. The **Insured** shall do nothing after a loss to prejudice such rights.

## 12. CHANGING THE POLICY

This policy contains all the agreements between the **Named Insured** and the Company concerning the insurance that is afforded. This policy's terms can be amended or waived only by endorsement signed and issued by the Company and made a part of this policy.

## 13. TRANSFER OF THE NAMED INSURED'S RIGHTS AND DUTIES UNDER THIS POLICY

The **Named Insured's** rights and duties under this policy may not be transferred without the Company's written consent except in the case of the death or bankruptcy of an individual **Named Insured**.

If such individual **Named Insured** dies or is adjudged bankrupt or insolvent, his or her rights and duties will be transferred to the **Named Insured's** legal representative but only while acting within the scope of duties as such. Until the **Named Insured's** legal representative is appointed, anyone having proper temporary custody of the **Named Insured's** property will have such **Named Insured's** rights and duties but only with respect to that property, but in no event for more than sixty (60) days following such death or adjudication.

## 14. CANCELLATION

A) The first **Named Insured** shown on the Declarations may cancel this policy by mailing or delivering to the Company advance written notice of cancellation.

B) The Company may cancel this policy by mailing or delivering to the first **Named Insured** written notice of cancellation at least:

1) ten (10) days before the effective date of cancellation if the Company cancels for non-payment of premium or

2) ninety (90) days before the effective date of cancellation if the Company cancels for any other reason.

C) The Company will mail or deliver notice to the first **Named Insured's** last mailing address known to the Company.

D) If this policy is cancelled, the Company will return any premium refund due. If the Company cancels, the refund will be pro rata. If the **Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if the Company has not made or offered a refund.

E) If notice is mailed, proof of mailing will be sufficient proof of notice.

## 15. STATE STATUTES

If the terms of this policy are in conflict with or inconsistent with the insurance statutes of any state where this policy is in effect, the Company will conform to those state statutes.

## 16. INADVERTENT ERRORS OR OMISSIONS

Except with respect to the report of contracts required under exclusion **1.**, A), 2) inadvertent errors, omissions or failure to give notice to the Company as herein required shall not relieve the Company of liability under this policy, provided that such error or omission shall be corrected as soon as discovered.

## 17. REPRESENTATIONS

By accepting this policy, the **Named Insured** agrees:

A)  the statements in the Declarations are accurate and complete,

B)  those statements are based upon representations of the **Named Insured** to the Company, and

C)  the Company has issued this policy in reliance upon the **Named Insured's** representations.

## 18. FRAUD OR MISREPRESENTATION

This policy shall be void if the **Named Insured** has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof or in case of any fraud, attempted fraud or false swearing by the **Named Insured** touching any matter relating to this insurance or the subject thereof, whether before or after a loss.

## 19. PREMIUMS

The **Named Insured** named in the Declarations shall be liable to the Company for the payment of the Policy Premium and shall alone be entitled to receive any return premium due from the Company.

## 20. VIOLATION OF STATUTE

If coverage for a claim under this policy is in violation of any United States of America's economic or trade sanctions, including but not limited to, sanctions administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), then coverage for that claim shall be null and void.

- END -

**Named Insured:** **GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:** **A2PR000582017AM**                                    **Endorsement Number**
**Effective Date:** **March 1, 2017**                                            **1**

## BROAD NAMED INSURED ENDORSEMENT

This endorsement modifies the policy to which it is attached as follows:

The **Named Insured** set forth on the Declarations is changed as follows:

GSSL, Inc. dba Near Space Corporation (NSC), K&T Properties, LLC and any subsidiary, affiliated, owned or controlled companies or entities now in existence or hereafter formed or acquired jointly or severally, as their respective interests may appear.

"Subsidiary, affiliated, owned or controlled companies or entities" means any company or entity of which at least fifty percent (50%) of the stock or fifty percent (50%) of the members or, if a partnership, fifty percent (50%) interest in the partnership is owned by the **Named Insured**, or for which the **Named Insured** has assumed active management control. Subsidiary, affiliated, owned or controlled companies or entities acquired after the effective date of your policy shall be reported to the Company within thirty (30) days after they are acquired.

All other provisions of this policy remain the same.

**AGCS-AV 2105 (12-07)**                                                    **Page 1 of 1**

**Named Insured:** **GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:   A2PR000582017AM**                                    **Endorsement Number**
**Effective Date:   March 1, 2017**                                                    **2**

## TRIA DISCLOSURE ENDORSEMENT

THIS ENDORSEMENT, DETAILING THE PROVISIONS OF THE "TERRORISM RISK INSURANCE ACT", AS AMENDED, IS MADE A PART OF THIS POLICY.  NOTHING IN THIS ENDORSEMENT CHANGES ANY OF THE TERMS OR CONDITIONS OF THIS POLICY OR PROVIDES ANY ADDITIONAL COVERAGE.

I.   Terrorism Risk Insurance Act Notice

Please take note that under the Terrorism Risk Insurance Act, as amended, (collectively referred to herein as "TRIA"), the **Named Insured** has a right to purchase insurance coverage from the Company for losses arising out of an "act of terrorism" as defined in Section 102(1) of "TRIA".

II.   Definition

You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, as amended, an "act of terrorism" shall mean:

The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act, as amended; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

III.   Federal Share of Compensation

You should know that where coverage is provided by this policy for losses resulting from certified acts of terrorism, such losses may be partially reimbursed by the United States Government under formula established by Federal Law.  However, your policy may contain other exclusions which might affect your coverage, such as exclusion for nuclear events.  Under the formula, the United States Government generally reimburses eighty-five percent (85%) through 2015, 84% beginning on January 1, 2016, 83% beginning on January 1, 2017, 82% beginning on January 1, 2018, 81% on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the Company providing the coverage.  If you have purchased this coverage, the premium charged for this coverage (if any) does not include any charges for the portion of loss that may be covered by the Federal Government under the Act.

$100 Billion Cap

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as the insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses in any one calendar year exceeds $100 billion.  If the aggregated insured losses for all insurers exceed $100 billion, your coverage may be reduced

All other provisions of this policy remain the same.

**AGCS-AV 3650 (01-15)**                                                                 **Page 1 of 2**

IV.  <u>Conditional Termination of Endorsement</u>

    A.  This endorsement terminates under the following conditions, whichever occurs first:

        i.  upon the expiration of the policy, or

        ii.  if the "Terrorism Risk Insurance Program" (the "Program") terminates (as provided by "TRIA" at the end of December 31, 2020) with respect to the coverage provided by this policy, and the "Program" is not renewed, extended or otherwise continued by the federal government or,

        iii.  if, on or after December 31, 2020, a renewal, extension or continuation of the "Program" becomes effective without a requirement to make terrorism coverage available to the **Named Insured** or with revisions that do any of the following:

            a.  increase the Company's statutory percentage deductible under the "Program" for terrorism losses,

            b.  decrease the federal government's statutory percentage share in potential terrorism losses above such deductible or,

            c.  redefines terrorism or makes insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

    B.  If none of the conditions set forth in paragraph IV. A. above occur, this endorsement will continue in effect unless the Company notifies the **Named Insured** of changes in response to federal law.

V.  <u>"TRIA" Terrorism Coverage may be purchased from the Company.  No coverage is provided by this notice. TRIA Terrorism Coverage must be purchased separately.</u>

    If "TRIA" coverage is purchased, the premium will be stated on the TRIA Write-Back Endorsement(s) attached to this policy, or on the Declarations Page.

    If "TRIA" coverage has not been purchased, coverages for liability and/or physical damage losses from "Acts of Terrorism" are offered for rates that are available upon request from the Company.

All other provisions of this policy remain the same.

**AGCS-AV 3650 (01-15)**



**Named Insured: GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number: A2PR000582017AM**                                   **Endorsement Number**
**Effective Date:   March 1, 2017**                                                                    **3**

# TRIA EXCLUSION ENDORSEMENT

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

This policy does not cover claims caused by any losses, damages, or injuries arising directly or indirectly as a result of a certified "Act of Terrorism" defined by the Terrorism Risk Insurance Act, as amended.

Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, as amended, an "Act of Terrorism" shall mean:

> The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act, as amended; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside of the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

---

This endorsement shall apply solely to the Terrorism Risk Insurance Act, as amended, and shall in no way conflict with the War, Hijacking and Other Perils Exclusion contained within this policy or write-backs thereto.

---

All other provisions of this policy remain the same.

**AGCS-AV 3700 (01-15)**                                                                   **Page 1 of 1**



**Named Insured: GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:  A2PR000582017AM**                                    **Endorsement Number**
**Effective Date:   March 1, 2017**                                                                **4**

## DATE CHANGE RECOGNITION EXCLUSION ENDORSEMENT
## LIMITED WRITE-BACK PROVISION

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

The Date Change Recognition Exclusion **4.** E) shall not apply to any sums which the **Insured** shall become legally liable to pay as damages because of **bodily injury** or physical injury to or destruction of tangible property resulting from a covered **occurrence**.

All other provisions of this policy remain the same.

**AGCS- MP 4980 (07-06)**                                                                        **Page 1 of 1**

**176**



**Named Insured: GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number:  A2PR000582017AM**
**Effective Date:   March 1, 2017**

<div align="right">

**Endorsement Number**
**5**

</div>

## ADDITIONAL  INSURED

In consideration of an additional premium of $Included, this endorsement modifies the policy to which it is attached as follows:

U.S. Bank Equipment Finance is added as an additional **Insured** with respect to an **occurrence** arising out of the **products hazard** or the **completed operations hazard** and only for claims arising out of operations of the **Named Insured**, and only to the extent and scope of insurance coverages afforded to the **Named Insured**.

All other provisions of this policy remain the same.

**AGCS- MP 6200 (07-06)**

<div align="right">

**Page 1 of 1**

</div>



**Named Insured: GSSL, Inc. dba Near Space Corporation (NSC), et al**
**Policy Number: A2PR000582017AM**
**Effective Date:   March 1, 2017**

**Endorsement Number**
**6**

## OREGON CANCELLATION / NONRENEWAL ENDORSEMENT

This endorsement modifies the policy to which it is attached as follows:

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, the cancellation provision of this policy is amended to read as follows:

1. Except as provided by subsection 4. below, this policy may not be cancelled by the Insurer before the expiration of the policy, except on one or more of the following grounds:

   a) Nonpayment of premium;

   b) Fraud or material misrepresentation made by or with the knowledge of the Insured or Other Insured(s) in obtaining the policy, continuing the policy or in presenting a claim under the policy;

   c) Substantial increase in the risk of loss after insurance coverage has been issued or renewed, including but not limited to an increase in exposure due to rules, legislation or court decision;

   d) Failure to comply with reasonable loss control recommendations;

   e) Substantial breach of contractual duties, conditions or warranties;

   f) Determination by the director that the continuation of a line of insurance or class of business to which the policy belongs will jeopardize a company's solvency or will place the Insurer in violation of the insurance laws of Oregon or any other state;

   g) Loss or decrease in reinsurance covering the risk;

   h) Any other reason approved by the director by rule.

2. Cancellation of this policy will not be effective until ten (10) working days after the Insured receives written notice of cancellation. The notice shall state the effective date of and the reasons for cancellation and shall inform the Insured of the hearing rights established by ORS 742.704.

3. Notice of nonrenewal will be given to the Insured thirty (30) days prior to the expiration date or anniversary date of the policy. If, after the Insurer provides a notice of nonrenewal as described above, and the insurer then extends the policy ninety (90) days or less, an additional notice of nonrenewal will not be required with respect to the extension.

4. Subsections 1., 2., and 3. above do not apply to any insurance policy that has not been previously renewed if the policy has been in effect less than sixty (60) days at the time the notice of cancellation is mailed or delivered.

5. Subject to subsection 6 below, if the Insurer offers or purports to renew the policy, but on terms less favorable to the Insured or at higher rates, the new terms or rates may take effect on the renewal date, if the Insurer provides the Insured thirty (30) days written notice. If the Insurer does not so notify the Insured, the Insured may cancel the renewal policy within thirty (30) days after receipt of the notice or delivery of the renewal policy. Earned premium for the period of time the renewal policy was in force shall be calculated pro rata at the lower of the current or previous year's rate. If the Insured accepts the renewal, any premium increase or changes in terms shall be effective immediately following the prior policy's expiration date.



6.  Subsection 5. above does not apply if: (a) the change is a form, rate or plan filed with the Commissioner and applicable to the entire line of insurance or class of business to which the policy belongs; or (b) the form, rate and/or plan increase results from a classification change based on the altered nature or extent of the risk insured.

7.  A post office certificate of mailing to the Named Insured at the Named Insured's last known address shall constitute conclusive proof that the named Insured received the notice of cancellation or nonrenewal on the third calendar day after the date of the certificate of mailing.

All other provisions of this policy remain the same.